## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Parthasarathy Krishnamoorthy, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Concorde International Group, Ltd., Swee Kheng Chua, Sze Yin Ong, Terence Wing Khai Yap, Mark Allen Brisson, Kreit And Chiu CPA, LLP, R.F. Lafferty & Co., Inc., Cogency Global Inc.,<br><br>Defendants. | Civil Action No. 1:26-cv-02283<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Parthasarathy Krishnamoorthy ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Concorde International Group, Ltd. ("Concorde" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Concorde; and (c) review of other publicly available information concerning Concorde.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Concorde securities between April 21, 2025, and July 14, 2025, inclusive (the "Class Period").  Plaintiff pursues claims against Concorde International Group, Ltd., Swee Kheng Chua, Sze Yin Ong, Terence Wing Khai Yap, Mark Allen Brisson, Kreit and Chiu CPA, LLP, R.F. Lafferty & Co., Inc., and Cogency Global, Inc. (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      The Company claims to be "an integrated security services providers that combines physical manpower and innovative technology to deliver effective security solutions."[1] Specifically, the Company claims to have three offerings consisting of "(1) i-Guarding Services; (2) Man-Guarding Services; and (3) Consultancy and Training Services."  97-99% of Company revenues are purported to derive from "i-Guarding Services" described as "electronic security systems" and mobile patrols which replace the role of a traditional human security guard.

---

[1]      Concorde International Group LTD, Prospectus (Form 424B4) (Apr. 21, 2025).

1

3.      The company was founded in 1997 and is incorporated as an offshore holding company in the British Virgin Islands ("BVI").  Its principal place of business is located at 3 Ang Mo Kio Street 62, #01-49 LINK@AMK, Singapore 569139.

4.      This case arises from the crash of Concorde's stock in July 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme.  In the weeks leading up to July 10, 2025, Concorde's share price surged from the initial public offering price ("IPO") of $4.00 to an all-time high of $31.06, despite no fundamental news from the Company justifying such a spike.  Investigations and public reports have since revealed that Concorde utilized social media to orchestrate an illicit "pump-and-dump" promotion scheme to defraud investors.  These reports detail how impersonators claiming to be legitimate financial advisors touted Concorde in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.

5.      This sharp rise proved short-lived.  On July 10, 2025, Concorde's share price abruptly crashed approximately 80%, to $5.66.  Since then, the Company's share price has continued to decline to approximately $2.00.

6.      The structure of Concorde's IPO mirrored that of several other recent Nasdaq-listed micro-cap companies implicated in pump-and-dump manipulation such as Ostin Technology Group Co., Ltd. ("OST"), Jayud Global Logistics Limited ("JYD"), and China Liberal Education Holdings Ltd ("CLEU") to name just a few.  These offerings were all characterized by unusually low floats (often under 10%), overwhelming insider control via supervoting shares or offshore affiliates, and minimal public disclosures.  In each instance, thinly traded shares were aggressively promoted via impersonator-run WhatsApp or WeChat groups and social media "stock tip" campaigns using the stolen identities of U.S. financial advisors.  In the wake of this epidemic, the

2

Nasdaq and SEC enacted tighter regulations and oversight on foreign microcap IPOs. Additionally, the Department of Justice ("DOJ") and Public Company Accounting Oversight Board ("PCAOB") have indicted executives and co-conspirators of these "companies" as well as sanctioning their auditors for participating in or enabling the scams. The Concorde IPO shared all of these structural hallmarks, yet neither the Registration Statement, Prospectus (collectively "the Offering Documents") nor press releases made any mention of the substantial market manipulation risk inherent to such offering architecture.

7. Despite these structural vulnerabilities, Concorde's Offering Documents included no disclosure that the Company's unusually small float and concentrated insider control created an elevated risk of artificial price inflation through coordinated social-media promotions. By April 2025, multiple low-float Nasdaq IPOs with similar ownership structures—including OST, JYD and CLEU—had already been targeted by WhatsApp and WeChat impersonator schemes, leading to extreme volatility, trading halts, and regulatory scrutiny. These risks were neither theoretical nor remote and were well known to Defendants. Yet Defendants did not warn investors that its securities were especially susceptible to the same type of promotion-based manipulation.

8. Defendants also failed to update investors as warning signs emerged during the Class Period. Before the July 10th collapse, unusual trading activity, outsized price swings, and the circulation of false claims in online investor groups were already public and readily observable. At no point did Concorde issue a cautionary statement alerting investors to these developments or warning that the stock's movement did not reflect Company fundamentals. Instead, Defendants continued to tout the Company's prospects while omitting that the trading environment surrounding CIGL had become highly irregular.

3

9.      Furthermore, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of its securities trading activity throughout the class period.  Specifically, Defendants failed to disclose to investors: (1) that Concorde was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) that insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) that Concorde's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the stock price; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's auditor, agent for service of process, and the underwriter Defendants are located in this District.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14. Plaintiff Parthasarathy Krishnamoorthy, as set forth in the accompanying certification, incorporated by reference herein, purchased Concorde securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15. Defendant Concorde is a BVI holding company with its principal executive offices located in Singapore. The Company's stock trades on NASDAQ under the symbol "CIGL."

16. Defendant Swee Kheng "Alan" Chua ("Chua") was the Company's Chief Executive Officer and Chairman of the Boad of Directors ("CEO") at all relevant times.

17. Defendant Sze Yin Ong ("Ong") was the Company's Chief Financial Officer ("CFO") at all relevant times.

18. Defendant Terence Wing Khai Yap ("Yap") was a Director of the Company at all relevant times.

19. Defendant Mark Allen Brisson ("Brisson") was a Director of the Company at all relevant times.

20. Defendant R.F. Lafferty & Co., Inc. ("R.F. Lafferty") was the Company's underwriter for the April 21, 2025, IPO.

21. Defendant Kreit and Chiu CPA, LLP ("Kreit and Chiu") was the company's auditor at all relevant times.

5

22.     Defendant Cogency Global, Inc. ("Cogency") was the company's agent at all relevant times.

23.     Defendants Chua, Ong, Yap, and Brisson (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (i.e., the market).   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

24.     Defendant Kreit and Chiu (the "Auditor Defendant") issued clean audit opinions on financial statements incorporated into the April 21, 2025, IPO.  Additionally, Kreit and Chiu was Concorde's auditor at the time of the IPO and had access to material non-public information during the class period.  Because of their position, Kreit and Chiu knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.  Furthermore, due to their position, the Auditor Defendant had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected.  Therefore, they are also liable for the false statements pleaded herein.

25.     Defendant R.F. Lafferty (the "Underwriter Defendant") was the "underwriter" as defined by 15 USC §80a-2(a)(40) of the Exchange Act for issuance of Concorde securities by way of the IPO consisting of the Registration Statement Concorde filed on January 7, 2025, ("Registration Statement") and Prospectus filed on April 21, 2025 ("Prospectus") containing the materially false and misleading statements detailed in this complaint.  Due to their position, the Underwriter Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected.  Therefore, they are also liable for the false statements pled herein.

26.     Defendant Cogency (the "agent Defendant") was the Company's agent for service of process as required by 17 CFR §249.250 of the Exchange Act for issuance of Concorde securities by way of the IPO consisting of the Registration Statement and Prospectus containing the materially false and misleading statements detailed in this complaint.  Due to their position, the agent Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected.  Therefore, they are also liable for the false statements pled herein.

<b>SUBSTANTIVE ALLEGATIONS</b>

**I.      MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

27.     The Class Period begins on April 21, 2025, when the Company filed an IPO prospectus permitting Concorde to issue 1,250,000 class A ordinary shares of their common stock at an initial offering price of $4.00/share for a total capital raise of $5.0M.[2]  The prospectus goes on to state that post-IPO, Defendant Chua "will retain controlling voting power in the Company

---

[2]     Concorde International Group LTD, *supra* note 1.

7

based on having approximately 97.57% of all voting rights." Therefore, the IPO represented less than 3% of total Concorde ownership.  In the IPO, to describe their business, the Company stated:

> Concorde International Group Limited is an integrated security services providers that combines physical manpower and innovative technology to deliver effective security solutions.  In 2014, we were awarded "The Business Model Innovation Award" by the Singapore Manufacturing Federation.  In 2015, we were awarded the "Best Innovative Use of Infocomm Technology Award" by the Singapore Infocomm Technology Federation ("SiTF").  In 2016, we were awarded the "Most Innovative Use of Infocomm Technology (Private Sector-SME) Award" by the Infocomm Media Development Authority of Singapore ("IMDA", formerly known as the Infocomm Development Authority) and the Singapore Infocomm Technology Federation ("SiTF").  In 2017, we were awarded the "IP Awards" by the World Intellectual Property Organization — Intellectual Property Office of Singapore (WIPO-IPOS).  In addition, in 2017 The Nanyang Technological University of Singapore recognized our innovative solution by publishing it as a case study entitled "The Transformation of Concorde Security Pte Ltd" via its Nanyang Technoprenuership Center.  In the same year, the Singapore Management University and Harvard Business Publishing Education also recognized our innovation by publishing a case study entitled "Main Case: The Resilience of a Disruptive Innovator: Concorde Security." From 2018 to 2019, in recognition of our solution in transforming the industry, the Infocomm Media Development Authority of Singapore ("IMDA") approved our solutions in the Singapore government's Industry Transformation Map Pilot Programme.  From 2020 to 2021, in recognition of our technology and solutions, we were included in the "Pre-approved IT solutions vendor" under the category of security, by the Infocomm Media Development Authority of Singapore ("IMDA").  From 2022 to 2023, in recognition of our technology solution, the Infocomm Development Authority of Singapore ("IMDA") approved our solutions in the Singapore government's Advanced Digital Solutions (ADS) under the Small Medium Enterprises Go Digital Programme.  With these awards and recognitions, we believe we are the leading solution provider in Singapore. Through the integration of our patented technology solution, we help our clients reduce costs and enhance security.  We have experienced significant revenue growth, primarily driven by the increasing labor costs and increasing demands in security and facilities management.
>
> Since our establishment in Singapore in 1997, we have built a track record in the professional security community by consistently providing high-quality security manpower.  Recognizing manpower sustainability with our ever-advancing society, in 2014, we decided to transit into a security solution services company using our innovative business model.  With our technological inventive solution, we deliver a higher level of security performance with headcount uplifted of higher skillset, better reward as well as much sought after work-life balances for the new era security workforce.  As a result, we have received numerous awards in Singapore, recognizing our innovative technology and our contribution to producing the next generation of reliable security solutions.  Anchored by our patented technology

8

*applications and pioneering solutions, we provide top-tier security and facilities management services to commercial, financial, industrial, and governmental customers in Singapore.*

*We offer a range of services to enhance security and safety: (1) i-Guarding Services; (2) Man-Guarding Services; and (3) Consultancy and Training Services. Our i-Guarding Services leverages technology to increase efficiency, with a mobile platform and cluster® aggregation model of higher skillset workforce. For the six months ended June 30, 2024 and 2023, our i-Guarding Services accounted for 96.75% and 98.66% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, our i-Guarding Services accounted for 98.09% and 99.09% of our consolidated revenues, respectively. Man-Guarding Services employs trained security officers to maintain safety and deter unlawful activities. For the six months ended June 30, 2024 and 2023, our Man-Guarding Services accounted for 0.82% and 1.22% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, it accounted for 1.41% and 0.24% of our consolidated revenues, respectively. For the six months ended June 30, 2024, our revenue from others accounted for 1.84% of our consolidated revenue and this related to a one-off sales of security consumable. There was no such sales in other periods. Consultancy and Training Services provide expert guidance tailored to clients' needs. For the six months ended June 30, 2024 and 2023, our Consultancy and Training Services accounted for 0.59% and 0.12% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, it accounted for 0.50% and 0.67% of our consolidated revenues, respectively.*

*We have gained recognition for our disruptive innovation in the integrated monitoring of properties, assets, and building service systems. This ensures round-the-clock surveillance for complete security and operational efficiency. This achievement is made possible through our suite of intelligent security solutions, known as "I-Guarding Services." One of our flagship services, the groundbreaking I-Man Facility Sprinter, is a mobile vehicular platform that revolutionizes security and facility maintenance services. These pioneering solutions not only improve workers' compensation, skill sets, and working conditions but also redefine the overall business landscape of the industry.*

*Our company's second flagship product is the Intelligent Facility Authenticator. The IFA is an innovative solution that leverages advanced kiosk technology to enhance security and streamline visitor management. In response to the challenges of limited manpower and rising costs, the IFA system automates the issuance of secure passes and access cards, eliminating the need for physical human interaction. It works by sending secure pass-icons to visitors, verifying their identity upon entry, and dispensing access cards with varying levels of security clearance. This technology not only enhances security within buildings but also offers efficient visitor management services, making it a game-changer in industries where kiosk adoption is increasing. Ultimately, IFA represents a significant advancement in security access control without relying on human*

*intervention. For the six months ended June 30, 2024 and 2023, more than 83% and 98.73% of our revenues were generated by annual recurring contracts, respectively. For the fiscal years ended December 31, 2023 and 2022, more than 96% and 85% of our revenues were generated by annual recurring contract, respectively. 99% of our clients were based in Singapore. For the six months ended June 30, 2024, our top two customers, People's Association at One Tampines Hub and People's Association at OnePunggol accounted for approximately 6% and 6% of our total revenue, respectively. For the six months ended June 30, 2023, our top two customers, Singapore University of Technology and Design and People's Association at OnePunggol accounted for approximately 10% and 8% of our total revenue, respectively. For the fiscal year ended December 31, 2023, our revenue generated by annual recurring contract increased by 11% from 85% in fiscal year 2022 to 96% in fiscal year 2023 as we continued to focus on securing recurring contracts to ensure long-term financial stability and growth. For the fiscal year ended December 31, 2023, our top two customers, Singapore University of Technology and Design and People's Association at OnePunggol accounted for approximately 8% and 7% of our total revenue, respectively. For the fiscal year ended December 31, 2022, our top two customers, Ceva Logistics Singapore Pte Ltd and JTC Corporation, accounted for approximately 10% and 10% of our total revenue, respectively.*

28. The IPO also contained the following 2022, 2023, and 2024 financial results:

*Our revenue decreased by $241,443, or 4% in the six months ended June 30, 2024 as compared to the six months ended June 30, 2023, primarily due to a major customer one-off commencement sales in the six months ended June 30, 2023. The core sales have remained stable, indicating resilience and consistent demand.*

*Our profit decreased by $84,188,345, or 8,676% for the six months ended June 30, 2024, as compared to the six months ended June 30, 2023. This decline is primarily due to (i) the share-based compensation to members of our Board, executive officers, their affiliates, and existing shareholders totaling $83,155,336, for the six months ended June 30, 2024 based on the calculation of the fair value of Class B Ordinary Shares issued to them, with no shares issued during the six months ended June 30, 2023, (ii) offering-related costs of $388,788, (iii) increased subcontracting of security guards to external vendors to reduce internal staffing, (iv) the absence of a voluntary pay cut by Swee Kheng Chua and his spouse, Ping Ping Lim, in the six months ended June 30, 2024 (compared to their voluntary pay cut in the same period in 2023), and (v) an increase in employee benefits expenses. Our headcount grew by 50% during the first half of 2024 compared to the same period in 2023 due to increased hiring of skilled personnel, particularly in key management roles dedicated to long-term growth initiatives and anticipated business expansion. The increased subcontracting of security guards to external vendors is a strategic decision to allow the Company to focus resources on enhancing the technology aspect of our business. Cost of subcontracting has risen due to labour supply shortage in the local market. This is precisely where our technology-integrated service aims to address the issue. The share-based compensation reflects the*

10

*Company's strategic commitment to attract and retain key management talents during the critical growth phase of the Company. It also aligns key management's incentives with the creation of long-term shareholder value, driving sustainable business growth and performance. We believe that this profit decrease is a temporary setback, as many customers will need time to transition to less human-reliant technology. This increase in hiring represents an initial investment focused on future planning and strategic development not reflective of current basal operational or administrative needs. This additional spending is scalable and aligns with our long-term objectives.*

*The Company reported a net non-GAAP profit before tax (refer to page 42) despite ongoing transitions and local market challenges, highlighting the resilience of our proven business model and the strong demand for our services. The temporary setback in financial performance aligns with our strategic decision to foster sustainable market growth and underscores our strong commitment to and readiness for anticipated market expansion.*

*Our revenue increased by $5,649,648, or 113 %, from $5,006,345 for the year ended December 31, 2022 to $10,655,993 for the year ended December 31, 2023. Our profit increased by $1,798,174, or 224%, from a net loss of $803,980 for the year ended December 31, 2022 to a net profit of $994,194 for the year ended December 31, 2023, which was mainly due to by (i) an increase in sales by 5,649,648 or 113% driven by market demand, and; by (ii) a decrease of other expenses of $672,157, or 68% from $986,796 for the year ended December 31, 2022 to $314,639 for the year ended December 31, 2023 due to step up collection effort of the new established finance team, there was improvement in bad debt allowances and recovery of previously written off bad debt.*

*There were more new clients acquired during the year because our services were favored by customers compared to those of competitors in the Singapore markets, this shows that our market demand is on an increasing trend.*

29.    Lastly, the IPO detailed the company's strategies and strengths that would support the future growth of Concorde:

***Our Growth Strategies***

*We believe that implementing the following growth strategies will continue to position our company as the leader in the markets we serve:*

- ***Continue to grow our recurring revenue business.*** *For the six months ended June 30, 2024 and 2023, our recurring revenue was approximately 83% and 98.73% of our total revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, our recurring revenue was approximately 96% and 85% of our total revenues, respectively. Monthly recurring revenue allows us to achieve a more consistent and predictable*

11

*income stream. In addition, it should improve our profitability as we continue to roll out more i-Guarding services. Each building or location deployed under the I-Guarding represents incremental revenues with almost the same cost levels as one IFS can service at least 15 or more buildings or locations. Serving our recurring customers should require lower acquisition and marketing costs as compared to new customers. Hence, signing on more buildings or locations will lead to increased revenues and profitability. We see significant market opportunities for our services because customers in our target markets prefer outsourced security and facilities management services that offer real-time security monitoring for continuous protection and rapid responses to security breaches and fire alarms. We intend to continue pursuing opportunities for recurring revenue by developing new and innovative products and by continuing our aggressive sales and marketing efforts. In order to build scale, we will have to continue to spend on marketing and development. As a result, this may impact our overall profitability.*

- ***Maintain our commitment to best-in-class customer service.*** *We are focused on fostering a culture dedicated to providing industry-leading customer service to our extensive customer base. We operate through a fleet of 5 cluster command centers in Singapore. From these mobile locations, our teams offer monitored security, interactive residential and commercial automation solutions, including installation, field service, repair, ongoing monitoring, and customer support.*

*Our installation and service technicians, along with our customer service representatives, are dedicated to delivering a high-quality customer service experience. This commitment enhances our brand, improves customer satisfaction, increases customer retention, and accelerates the adoption of additional interactive automation solutions. As a result, it drives returns on new customer acquisition expenditures and enhances cash flow generation. We pride ourselves on providing on-site responses within a cluster® radius of 15 minutes of security alerts for the majority of our customers.*

- ***Maintain our high-quality customer base.*** *We believe customer retention is also strongly correlated with the credit quality of our customers. We plan to maintain our focus on strict underwriting standards and will establish processes to evaluate potential new customers' creditworthiness to improve our customer selection or require upfront payments for higher-risk customers. We expect that our focus on generating high-quality customers will continue to result in a portfolio of customers with attractive credit scores, thereby improving retention, decreasing credit risk exposure, and generating a strong, long-term customer portfolio that generates robust returns on new customer acquisition expenditures and drives strong cash flow generation.*

12

- ***Disciplined expansion of our patented protected solution beyond Singapore.*** *We strongly believe that there will be significant demand for our solutions due to the continuous increase in labor costs and the growing demand for high-quality security and facilities management services. Our plan is to expand our geographical coverage and export our successful business model beyond Singapore within the next 24 months. We aim to expand to Malaysia, Australia, and North America markets via partnerships with local security service provider who already have an existing customer base that needs our solution to improve service delivery and to mitigate the increasing labor costs. We have not signed up with any partners yet, but we aim to have them in place based upon the following plan. Our business plan is subject to change based on the change of global economy and other factors that may affect our business operations.*

### *Our Competitive Strengths*

*We believe that the following competitive strengths contribute to our success and differentiate us from our competitors:*

- ***Proven Solution that is protected by Patents.*** *Our patent-protected solution that has been proven to reduce the need for manpower while maintaining, and even increasing, the quality of service levels for security and facilities management.*

- ***Superior-Class Customer Service****. Rather than competing purely on price, we emphasize the quality of our services, which we believe is distinguished by superior customer service.*

- ***Deep industrial knowledge and experience.*** *We believe that our focus on safety and security, coupled with our sales consultants, our solid reputation for and expertise in providing reliable security and monitoring services through our patent-protected business model vide our cluster® mobile command centers, our dependable product solutions, and our highly skilled installation and service capabilities, position us well to compete with both traditional and new competitors.*

30.     As stated previously, the structure of Concorde's IPO was intentionally designed to facilitate an eventual pump-and-dump scheme. Concorde conducted a low-float IPO, offering just 1,250,000 shares to the public, less than 3% of total outstanding equity, while maintaining overwhelming insider control through Class B supervoting shares and offshore holding entities. Such a small float meant that insiders effectively controlled the overwhelming majority of shares. In offerings of this size, even limited trading activity can materially affect price levels. A float

13

this thin is atypical for a company that reached a market capitalization exceeding $700 million within weeks. All these red flags were well known to be commonly associated with manipulated micro-cap offerings such as OST, JYD and CLEU just to name a few.

31. On May 16, 2025, the Company issued a press release announcing financial results for the full-year ended December 31, 2025. It included the following financial highlights and overview among others:

### *2024 Financial Highlights*

- *Maintained stable revenues at approximately $10.5 million for the year ended December 31, 2024, compared to $10.7 million in 2023.*

- *Gross profit increased by approximately 20.8% to $3.6 million in 2024 compared to approximately $3.0 million in 2023, driven in part by an improvement in gross profit margin, which increased to approximately 34.5% in 2024, compared to approximately 28.1% in 2023.*

- *Completed an IPO on April 22, 2025, raising gross proceeds of $5.75 million (including over-allotment option), and commenced trading on the Nasdaq Capital Market on April 22, 2025.*

### *Financial Overview*

*Revenue remained relatively flat year over year, with a slight decrease of approximately 1.5% to $10.5 million for 2024, compared to $10.7 million for 2023. Gross profit increased to approximately $3.6 million for 2024, compared to approximately $3.0 million for 2023.*

*Operating loss was approximately $83.6 million in 2024, compared to operating profit of approximately $1.0 million in 2023. Operating loss in 2024 was impacted by a one-time, non-cash share-based compensation expense of $83.2 million. As of December 31, 2024, and 2023, the Company had cash and cash equivalents of approximately $1.0 million and $957 thousand, respectively. Subsequently, in April 2025, the Company completed its IPO, raising gross proceeds of $5.75 million, including the full exercise of the over-allotment option.*

32. Additionally, Defendant Chua was quoted in the May 16th Press Release stating:

*2024 was a transformative year for Concorde, culminating in our successful IPO on April 22, 2025. We raised a total of $5.75 million in gross proceeds, including the full exercise of the over-allotment option, and proudly commenced trading on*

14

*the Nasdaq Capital Market.  This milestone not only validates our business model but also provides the capital foundation to accelerate our next phase of growth.*

*Our position as a leading integrated security services provider in Singapore is built on our ability to blend skilled manpower with patented technologies that deliver scalable, cost-effective, and high-performance solutions.  At the core of our offering is our suite of smart security technologies, known as I-Guarding Services.  Supported by 4 granted global patents and our proprietary innovations—such as the I-Man Facility Sprinter ("IFS"), a mobile platform transforming security and facility maintenance, and the Intelligent Facility Authenticator, a kiosk-based system that enhances access control and visitor management—are redefining industry standards.  These technologies help reduce operational costs, improve security performance, and optimize overall efficiency for our clients.*

*While our 2024 revenue remained stable at approximately $10.5 million, we anticipate strong year over year growth going forward.  Specifically, our 2025 growth strategy is focused on scaling our high-margin recurring revenue, largely driven by the continued deployment of our i-Guarding services.  These solutions generate incremental revenue with minimal additional cost, as each IFS unit can service 15 or more locations.  We also plan to expand internationally over the next 24 months, targeting Malaysia, Australia, and North America through partnerships with established local security providers to address rising labor costs and growing demand for smart, tech-enabled solutions.  Moreover, our net results in 2024 were impacted by a one-time, non-cash share-based compensation expense of $83.2 million.  Excluding this, we maintained positive operating profit, reflecting the strength and earnings potential of our core business.  Since our founding in 1997, and especially following our strategic shift in 2014 toward a tech-integrated model—we've built a reputation for excellence, agility, and innovation.  With increasing demand for intelligent security and facility solutions, we are well-positioned to scale sustainably and deliver long-term value to our clients, employees, and shareholders.*

33.     Lastly, the May 16th Press Release reiterated that Concorde is a "an integrated security services provider that combines physical manpower and innovative technology to deliver effective security solutions," its product offerings, and competitive advantage in the marketplace first published in the IPO.

34.     On May 15, 2025, the Company filed its 2024 Form 20-F with the SEC reporting financial results for the full year ended December 31, 2024, summarized in the May 16th Press Release.

35.    On June 17, 2025, the Company issued a Press Release announcing "it has secured a total of SG$11,621,370 (approximately US$9,040,472) in new contracts from January through May 2025.  The contracts include engagements with new clients as well as expanded agreements with existing customers across newly secured sites."  Furthermore, that "[m]ajority of the contracts represent multi-year recurring revenue, to be recognized over the 2025–2029 period." As well as that "[t]he Company's continued growth reinforces its position as a leading provider of integrated security services in Singapore—one of Asia's most advanced and competitive security markets."

36.    Defendant Chua was quoted in the June 17th Press Release stating:

*"We're only halfway through the year, and we've already surpassed the total value of new contracts signed in all of 2024.  These new contracts validate the market's confidence in our solutions and position us for continued growth as we expand our footprint in both the public and private sectors.  Singapore remains one of the most sophisticated and competitive security markets in Asia, and our continued momentum reinforces Concorde's leadership in delivering reliable, technology-driven security and facilities management solutions to a diverse client base."*

37.    Lastly, the June 17th Press Release reiterated that Concorde is a "an integrated security services provider that combines physical manpower and innovative technology to deliver effective security solutions," its product offerings, and competitive advantage in the marketplace first published in the IPO.

38.    On June 27, 2025, the Company filed a form 6-K containing an investor presentation the Company stated "it intends to use in conferences and meetings with investors, shareholders and analysts."[3]  The 6-K also directs investors to the Company website—https://www.concordesecurity.com—to view a copy of the presentation.  There, investors would

---

[3]    Concorde International Group LTD, Report of Foreign Private Issuer (Form 6-K) (Jun. 27, 2025).

16

see that the Company directs the public to Facebook, Instagram, LinkedIn, X (formerly Twitter), YouTube, and TikTok to learn more about Concorde:[4]



39.     Together, all these statements over the class period evidence Defendants continued promotion of the company despite being in the midst of a well-known social media-based stock promotion scheme epidemic.   Therefore, Defendants were active participants in the scam themselves, conspired with others to perpetrate it on their behalf, and/or recklessly disregarded a substantial risk that the Company's shares would be used for this purpose.

## II.     AUDITOR DEFENDANT ALLEGATIONS

40.     The unqualified audit opinion of Kreit and Chiu covering the two-year period ended December 31, 2023, was incorporated into the IPO, registration statements, prospectuses, and other "offerings" of securities the Company filed during the Class Period.  In their opinion, Kreit and Chiu certified that, "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022" and that the audits were conducted "in conformity with International Financial Reporting Standards (IFRS)" and "in accordance with the standards of the PCAOB" which "require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud."[5]  They go on to affirm the procedures they performed stating:

> *Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or*

---

[4]      *Vision & Mission*, Concorde Security Pte Ltd, https://www.concordesecurity.com/mission-and-vision/ [https://perma.cc/RMX7-2V9G] (last visited Mar. 16, 2026).

[5]      Concorde International Group LTD, *supra* note 1.

17

*fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.*

41.     This unqualified audit report incorporated into the IPO and other SEC filings was false and misleading because Concorde's consolidated financial statements were not prepared in accordance with IFRS or PCAOB requirements.

42.     In issuing unqualified audit opinions on Concorde's financial statements—despite these IFRS and PCAOB violations— Kreit and Chiu failed to comply with the professional standards dictated by the PCAOB. These standards required Marcum to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[6]

43.     In conducting its audits, Kreit and Chiu had access to the files and key employees of the Company at all relevant times. As Concorde's auditor, Kreit and Chiu had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review Concorde's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as Concorde's internal controls and structures. Accordingly, Kreit and Chiu was aware of significant deficiencies and material weaknesses at the Company. Thus, had Kreit and Chiu complied with PCAOB standards, they would have determined that there

---

[6]     GENERAL RESPONSIBILITIES OF THE AUDITOR IN CONDUCTING AN AUDIT AND AMENDMENT TO PCAOB STANDARDS, PCAOB RELEASE NO. 2024-004 (MAY 13, 2024), https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit    [https://perma.cc/S4PV-DDED].

was no reasonable basis for their unqualified audit report because, among other things, Kreit and Chiu was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports, its conformity with IFRS and the Company's reported financial metrics.

## III.    THE TRUTH BEGINS TO EMERGE

44.    On July 9, 2025, Concorde's stock reached a closing price of $28.18, with an intraday high of $31.06.  At that time, the Company had approximately 26.99M shares outstanding, giving it a market capitalization of around $761 million.

45.    On July 10, 2025, Concorde's stock price abruptly crashed by approximately 80%. Investigations and public reports have since detailed how Concorde's stock was used as a primary vehicle for an illicit "pump-and-dump" promotion scheme.  Impersonators, using stolen identities of legitimate financial advisors, touted Concorde in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.  The structure of Concorde's public listing and low float made the scam possible.

46.    Here, Plaintiff was a victim of one such impersonator.  After listening to legitimate podcasts of motivational speaker and life coach Tony Robbins, Meta delivered a targeted advertisement like the one below to Plaintiff promoting investment advice endorsed by Mr. Robbins:

19



47.     After clicking on the Meta ad, Plaintiff was funneled into a WhatsApp Group claiming to be the investment firm "Capital Trust Wealth Management," a legitimate FINRA and SEC registered wealth management firm.[7]  There, someone claiming to be Mr. Thomas Joseph Brough, the legitimate firm's actual President, asserted they'd provide exclusive guidance on when to purchase undervalued stocks for guaranteed returns.  Below was Plaintiff's introduction to the WhatsApp group:

---

[7]     *BrokerCheck   Report   Thomas   Joseph   Brough,*  BROKERCHECK   BY   FINRA, https://brokercheck.finra.org/individual/summary/2403390 [https://perma.cc/DTC9-8J4Z] (last visited Mar. 16, 2026).     *See also  IAPD  Report  Thomas  Joseph  Brough*, INVESTMENT ADVISER PUBLIC DISCLOSURE, https://adviserinfo.sec.gov/individual/summary/2403390 [https://perma.cc/9NBL-6WB6] (last visited Mar. 16, 2026).



48.     To provide reassurance, Plaintiff was explained the firm's investor-friendly commission model where "[d]uring the trial period, investors can fully enjoy the professional services we provide without paying any fees" and given loss protection covering "80% of the loss." Additionally, the group bolstered their legitimacy by providing copies of Mr. Borough's CFA credential and SEC registration:



49.     Next, Plaintiff was funneled into another of "Mr. Borough's" WhatsApp investment groups and was encouraged to "sell existing holdings" and "concentrate your funds" in CIGL and other stock recommendations to maximize returns:



50.     Acting on "Mr. Borough's" advice, Plaintiff invested his life savings in CIGL and lost it all in the July 10, 2025, crash.  Contrary to being genuine investment advice this was merely as theft orchestrated by Defendants.

## IV.     PUBLIC WARNINGS DURING CLASS PERIOD

51.     On June 16, 2025, the *Wall Street Journal* (the "WSJ")—a national newspaper of record and one of the largest sources of financial news in the United States[8]— published the article "Obscure Chinese Stock Scams Dupe American Investors by the Thousands."[9]  In the article, the WSJ tells the story of Braden Lindstrom, a Utah based college professor who lost tens of thousands of dollars in the JYD social media pump-and-dump scam identical to CIGL.

52.     On July 10, 2025, *TradeInformer* published the article "Exclusive: Pump and dump scammers target Concorde International Group at market open Thursday" detailing the parallels between the Ostin Technology ("OST") fraud and what was happening with CIGL.[10]  The article goes on to detail how brokers such as DEGIRO had restricted access to CIGL recognizing it as a fraud and prevented their clients from purchasing it.  Specifically, it stated, "social media ads" were being used "to mass target retail investors in different countries, pushing them to join Telegram and WhatsApp groups" and "[f]rom there, they pushed them to buy stock." Lastly, the article explains how perpetrators instructed investors "to hold for five days" for guaranteed returns.

---

[8]     *National Newpapers of Record*, PRESSBOOKS, https://pressbooks.pub/webliteracy/chapter/national-newspapers-of-record/ [https://perma.cc/9XFE-GVBD] (last visited Mar. 16, 2026).

[9]     Dave Michaels, *Obscure Chinese Stock Scams Dupe American Investors by the Thousands*, WALL ST. J. (Jun. 16, 2025), https://www.wsj.com/finance/regulation/obscure-chinese-stock-scams-dupe-american-investors-by-the-thousands-8416f795 [https://perma.cc/TG9V-GVJK].

[10]     David Kimberley, *Exclusive: Pump and dump scammers target Concorde International Group at market open Thursday*, TRADEINFORMER (Jul. 10, 2025), https://tradeinformer.com/broker-news/exclusive-pump-and-dump-scammers-target-concorde-international-group-at-market-open-thursday [https://perma.cc/MS8U-EUAQ].

23

53.     On September 12, 2025, DOJ indicted OST's Co-CEO and a financial advisor for orchestrating the social media based pump and dump of OST's stock during the class period.[11] Here, the parallels and timeline of the CIGL pump and dump identified by *TradeInformer* raise a presumption that Defendants acted in the same manner; purposefully/recklessly engaging in or conspiring to engage in a coordinated social media promotion campaign aimed at defrauding investors.

54.     On July 17, 2025, *The Bear Cave*, a leading forensic financial research authority, published the article "Problems in Chinatown" calling out the Concorde IPO and subsequent pump and dump as a fraud along with OST, CLEU, WAI, PHH, and others.[12]   This reinforces the presumption of Defendants' purposeful/reckless participation in the fraudulent social media promotion of CLEU's stock.

## V.     REGULATORY ACTIONS

55.     Recognizing this recurring "pump-and-dump" pattern in offshore micro-cap IPOs regulators took action to stop them.

56.     On September 3, 2025, Nasdaq issued a press release detailing proposed changes to its listing standards in response to "emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments."[13]   Specifically, "[t]he revised standards include:

- A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.

---

[11]     Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme (Sep. 12, 2025) (on file with author).

[12]     Edwin Dorsey, *Problems in Chinatown: A Deep Dive Into Criminal Stock Scams*, THE BEAR CAVE (Jul. 17, 2025), https://thebearcave.substack.com/p/problems-in-chinatown [https://perma.cc/W79G-HLDM].

[13]     Press Release, Nasdaq, NASDAQ Proposes Changes to its Listing Standards (Sep. 3, 2025) (on file with author).

- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.

- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China."

The article goes on to explain that "Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (['] SEC[']) and the Financial Industry Regulatory Authority (['] FINRA[']) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets."  As a whole, the proposed rule changes by Nasdaq demonstrate how well known and pervasive foreign micro-cap IPOs like Concorde were over the class period. Therefore, Defendants purposefully engaged in, conspired to engage in a pump-and-dump of CIGL's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

57.    On September 5, 2025, the SEC issued a press release announcing "Formation of Cross-Border Task Force to Combat Fraud."[14]  The release specifically identifies "auditors and underwriters" as "gatekeepers" who enable "'pump-and-dump' and 'ramp-and-dump' schemes" perpetrated by "foreign based companies" including "China" as targets of the new task force.  Paul S. Atkins, Chairman of the SEC was quoted in the September 5th release stating:

> we will not tolerate bad actors – whether **companies, intermediaries, gatekeepers,** or exploitative traders – **that attempt to use international borders to frustrate and avoid U.S. investor protections**.  This new task force will consolidate SEC investigative efforts and allow the SEC to **use every available tool to combat transnational fraud**. (emphasis added).

Overall, the SEC press release reinforces just how omnipresent foreign based microcap IPO frauds like Concorde were throughout the class period.  Again, this demonstrates that defendants

---

[14]    Press Release, Security and Exchange Commission, SEC Announces Formation of Cross-Border Task Force to Combat Fraud (Sep. 5, 2025) (on file with author).

purposefully engaged in, conspired to engage in a pump-and-dump of CIGL's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

58.    On December 18, 2025, the SEC officially approved Nasdaq's proposed rule changes.[15]

59.    As previously stated, on September 10, 2025, the Department of Justice ("DOJ") unsealed an indictment in the Eastern District of Virginia charging executives of OST with securities and wire fraud as well as conspiracy to commit securities fraud and wire fraud, for orchestrating the Ostin pump-and-dump scheme identical to Concorde.[16]

60.    The indictment alleges that the Defendants, along with their co-conspirators, engaged in a fraudulent scheme to artificially inflate the price and trading volume of Ostin stock through social media and messaging service applications, including promotions that impersonated advisors and financial professionals.  The government details how the Defendants inflated the market capitalization of Ostin from $22 million to more than $1 billion.  As the stock price rose, the Defendants opened brokerage accounts that were used to sell millions of shares that were obtained through non-bona fide securities offerings and resulted in members of the conspiracy fraudulently obtaining more than $110 million in proceeds from the sale of the stock.  These offerings were structured to give the appearance of legitimate financing but were, in fact, used to funnel shares into nominee accounts later used for dumping.

61.    On December 4, 2025, OST's auditor, TPS Thayer, LLC, was sanctioned by the PCAOB after finding for a fact that Thayer's 2020, 2021, and 2022 audits of OST knowingly

---

[15]    Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 1, to Modify Certain Initial Listing Requirements, SEC Release No. 34-104450 (Dec. 18, 2025).

[16]    Off. of Pub. Affs., U.S. Dep't of Just., *supra* note 11.

violated both PCAOB Auditing Standards, and the Sarbanes-Oxley Act of 2002 (the "Act").[17] Concorde's auditor, Kreit and Chiu, made these same knowing and/or purposeful violations and were key enablers of the pump and dump scam. As the SEC explained, "gatekeepers, particularly auditors and underwriters, […] help these companies access the U.S. capital markets."[18] Therefore, without these fraudulent audit opinions, companies like Concorde could not have registered their securities for sale and Defendants executed their fraudulent scheme.

62.     In summary, the updates to Nasdaq's rules, SEC task force, DOJ indictment of OST executives, and PCAOB sanctioning of OST's auditor demonstrate just how pervasive foreign microcap IPO fraud was throughout the class period. Despite these obvious risks, Defendants proceeded with the Concorde IPO and continued to promote investment in the Company. Therefore, Defendants purposefully engaged in, conspired to engage in a pump-and-dump of CIGL's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

63.     Together, the facts alleged by Plaintiff and other class members, along with news releases like those of *The Bear Cave*, *WSJ*, and *TradeInsider*, as well as regulatory actions taken by the Nasdaq, SEC, DOJ, and PCAOB prove that throughout the Class Period, Concorde's stock price was artificially inflated through coordinated social media campaigns which disseminated materially false and misleading information about the Company. Through these campaigns, impersonators using stolen identities of legitimate financial advisors lured victims through Facebook/Instagram/Meta ads into private investor chat groups on platforms like

---

[17]     ORDER INSTITUTING DISCIPLINARY PROCEEDINGS, MAKING FINDINGS, AND IMPOSING SANCTIONS, PCAOB RELEASE NO. 105-2025-037 (DEC. 4, 2025), https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/decisions/documents/105-2025-037-tps.pdf?sfvrsn=41d4ed02_2 [https://perma.cc/Q78L-LNB2].

[18]     SEC, *supra* note 14.

WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise buying pressure of Concorde stock.

64.    The statements made by impersonators had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing Concorde shares at inflated prices. By peddling fabricated prospects of imminent corporate success, the scheme misled investors about Concorde's value and created artificial demand for CIGL stock. Again, Concorde's IPO and low float were purposefully designed by Defendants to enable this fraudulent scheme to be effectuated.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Concorde securities between April 21, 2025, and July 14, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

66.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Concorde's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Concorde shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Concorde or its transfer agent and may be notified of the

28

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

69.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Concorde; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

70.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

71.     The market for Concorde's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Concorde's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Concorde's securities relying upon the integrity of the market price of the Company's securities and market information relating to Concorde and have been damaged thereby.

72.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Concorde's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false, or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Concorde's business, operations, and prospects as alleged herein.

73.     At all relevant times, the material misrepresentations, and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Concorde's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the

30

Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

1. Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

2. During the Class Period, Plaintiff and the Class purchased Concorde's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

74. As alleged herein, Defendants acted with scienter since Defendants: (1) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Concorde, their control over, and/or receipt and/or modification of Concorde's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Concorde, participated in the fraudulent scheme alleged herein.

31

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

75.    The market for Concorde's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Concorde's securities traded at artificially inflated prices during the Class Period.  On July 9, 2025, the Company's share price reached a Class Period high of $31.06 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Concorde's securities and market information relating to the Company, and have been damaged thereby.

76.    During the Class Period, the artificial inflation of Concorde's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Concorde's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Concorde and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

77.    At all relevant times, the market for Concorde's securities was an efficient market for the following reasons, among others:

a.    Concorde shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

32

b.      as a regulated issuer, Concorde filed periodic public reports with the SEC and/or the NASDAQ;

c.      Concorde regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.      Concorde was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for Concorde's securities promptly digested current information regarding Concorde from all publicly available sources and reflected such information in Concorde's share price.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Concorde's securities at artificially inflated prices and a presumption of reliance applies.

79.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

80.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Concorde who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Concorde's securities at artificially inflated prices.  In

34

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

83.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Concorde's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Concorde's financial well-being and prospects, as specified herein.

85.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Concorde's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Concorde and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

86.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

87.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Concorde's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

88.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Concorde's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Concorde's securities during the Class Period at artificially high prices and were damaged thereby.

89.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Concorde was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Concorde securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

90.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     Individual Defendants acted as controlling persons of Concorde within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

95.     As set forth above, Concorde and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

38

other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 19, 2026          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/* Sean T. Masson
Sean T. Masson
The Helmsley Building
230 Park Ave, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
smasson@scott-scott.com

John T. Jasnoch (*pro hac vice* forthcoming)
Mollie E. Chadwick (*pro hac vice* forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565

Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Tom Grady (*pro hac vice* forthcoming)
GRADYLAW
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Parthasarathy Krishnamoorthy, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorized Scott+Scott Attorneys at Law to file a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, shares of Concorde International Group, Ltd. ("CIGL").

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___March 8___ 2026 at ___San diego, CA___(city, state).


_____
Parthasarathy Krishnamoorthy

## SCHEDULE A

| Transaction | Date | Shares | Buy Price |
|---|---|---|---|
| BUY | 7/10/2025 | 79.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 97.00 | $27.65 |
| BUY | 7/10/2025 | 200.00 | $27.65 |
| BUY | 7/10/2025 | 100.00 | $27.65 |
| BUY | 7/10/2025 | 200.00 | $28.26 |
| BUY | 7/10/2025 | 200.00 | $28.21 |
| BUY | 7/10/2025 | 200.00 | $28.21 |
| BUY | 7/10/2025 | 100.00 | $28.22 |
| BUY | 7/10/2025 | 124.00 | $28.22 |
| BUY | 7/10/2025 | 200.00 | $28.29 |
| BUY | 7/10/2025 | 76.00 | $28.22 |
| BUY | 7/10/2025 | 200.00 | $28.26 |
| BUY | 7/10/2025 | 100.00 | $28.19 |
| BUY | 7/10/2025 | 200.00 | $28.26 |
| BUY | 7/10/2025 | 200.00 | $28.20 |
| BUY | 7/10/2025 | 200.00 | $28.19 |
| BUY | 7/10/2025 | 1900.00 | $28.30 |
| BUY | 7/10/2025 | 300.00 | $28.30 |
| BUY | 7/10/2025 | 200.00 | $28.30 |
| BUY | 7/10/2025 | 300.00 | $28.30 |
| BUY | 7/10/2025 | 200.00 | $28.30 |
| BUY | 7/10/2025 | 300.00 | $28.30 |
| BUY | 7/10/2025 | 4500.00 | $28.30 |
| BUY | 7/10/2025 | 4200.00 | $28.30 |
| BUY | 7/10/2025 | 300.00 | $28.30 |
| BUY | 7/10/2025 | 300.00 | $28.30 |
| BUY | 7/10/2025 | 124.00 | $28.30 |

| | | | |
|---|---|---|---|
| BUY | 7/10/2025 | 5101.00 | $28.30 |
| BUY | 7/10/2025 | 4.00 | $28.37 |
| BUY | 7/10/2025 | 35.00 | $28.37 |
| BUY | 7/10/2025 | 0.10 | $28.25 |
| BUY | 7/10/2025 | 1747.64 | $28.61 |
| BUY | 7/10/2025 | 873.00 | $28.61 |
| BUY | 7/10/2025 | 0.82 | $28.61 |
| BUY | 7/10/2025 | 67.00 | $29.40 |
| BUY | 7/10/2025 | 1.00 | $29.50 |
| BUY | 7/10/2025 | 0.02 | $29.40 |
| BUY | 7/10/2025 | 84.86 | $29.46 |
| BUY | 7/10/2025 | 100.00 | $29.48 |
| BUY | 7/10/2025 | 69.00 | $29.45 |
| BUY | 7/10/2025 | 0.68 | $29.47 |
| BUY | 7/10/2025 | 169.00 | $29.49 |
| BUY | 7/10/2025 | 0.55 | $29.49 |
| SALE | 7/10/2025 | 24353.00 | $2.17 |
| SALE | 7/10/2025 | 0.67 | $2.17 |