**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CONCORDE INTERNATIONAL GROUP SECURITIES LITIGATION | Civil Action No. 1:26-cv-02283-DLC<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Parthasarathy Krishnamoorthy ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Concorde International Group, Ltd. ("Concorde" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Concorde; and (c) review of other publicly available information concerning Concorde.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Concorde securities between April 21, 2025, and July 14, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against Concorde International Group, Ltd., Swee Kheng Chua, Sze Yin Ong, Terence Wing Khai Yap, Mark Allen Brisson, Henry Hackel, Colleen A. De Vries, Kreit and Chiu CPA, LLP, R.F. Lafferty & Co., Inc., and Cogency Global, Inc. (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

2. The Company claims to be "an integrated security services providers that combines physical manpower and innovative technology to deliver effective security solutions."[1] Specifically, the Company claims to have three offerings consisting of "(1) i-Guarding Services; (2) Man-Guarding Services; and (3) Consultancy and Training Services." 97-99% of Company

[1] Concorde International Group Ltd., Prospectus (Form 424B4) (Apr. 21, 2025) (https://www.sec.gov/Archives/edgar/data/2001794/000121390025033795/ea0238904-424b4_concorde.htm)

revenues are purported to derive from "i-Guarding Services" described as "electronic security systems" and mobile patrols which replace the role of a traditional human security guard.

3. The Company was founded in 1997 and is incorporated as an offshore holding company in the British Virgin Islands ("BVI"). Its principal place of business is located at 3 Ang Mo Kio Street 62, #01-49 LINK@AMK, Singapore 569139.

4. This case arises from the crash of Concorde's stock in July 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme. In the weeks leading up to July 10, 2025, Concorde's share price surged from the initial public offering ("IPO") price of $4.00 to an all-time high of $31.06, despite no fundamental news from the Company justifying such a spike. Investigations and public reports have since revealed that Concorde utilized social media to orchestrate an illicit "pump-and-dump" promotion scheme to defraud investors. These reports detail how impersonators claiming to be legitimate financial advisors touted Concorde in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.

5. This sharp rise proved short-lived. On July 10, 2025, Concorde's share price abruptly crashed approximately 80%, to $5.66. The Company's share price continued to decline to approximately $1.61 in late August 2025. On July 1, 2026, Nasdaq notified the Company that it was not in compliance with the minimum bid price requirement per Rule 5550(a)(2) for continued listing as the price for the Company's Class A ordinary shares was below $1.00 per share for the previous 30 consecutive business days. To date, Concorde's price continues to trade at less than $1.00 per share. *See* Table 1.1 illustrating the erratic history of the Company's share prices below:




6. The structure of Concorde's IPO mirrored that of several other recent Nasdaq-listed companies implicated in pump-and-dump manipulation such as Ostin Technology Group Co., Ltd. ("Ostin"), Pheton Holdings, Ltd. ("Pheton"), Jayud Global Logistics Limited ("Jayud"), and China Liberal Education Holdings Ltd ("China Liberal") to name just a few. These offerings were all characterized by unusually low floats (often under 10%), overwhelming insider control via supervoting shares or offshore affiliates, and minimal public disclosures. In each instance, shares were aggressively promoted via impersonator-run WhatsApp or WeChat groups and social media "stock tip" campaigns using the stolen identities of U.S. financial advisors.

7. In the wake of this epidemic, the Nasdaq and SEC enacted tighter regulations and oversight on foreign IPOs. Additionally, the Department of Justice ("DOJ") has indicted executives and co-conspirators of these "companies" as well as sanctioning their auditors for participating in or enabling the scams. The Public Company Accounting Oversight Board ("PCAOB") has sanctioned auditors for violations related to these their audits of these companies. Due to the significant uptick in investor complaints stemming from recommendations made by purported "investment groups" promoted through social media channels, the SEC announced the formation of a task force on September 5, 2025, to focus in part on investigating potential U.S.

securities law violations related to foreign-based companies including "pump-and-dump" and "ramp-and-dump" schemes. Similarly, FINRA issued an investor alert warning the public of these broker imposter scams on December 9, 2025. The Concorde IPO shared all of these structural hallmarks, yet neither the Registration Statement, Prospectus (collectively, "the Offering Documents") nor press releases made any mention of the substantial market manipulation risk inherent to such offering architecture.

8. Despite these structural vulnerabilities, Concorde's Offering Documents included no disclosure that the Company's unusually small float and concentrated insider control created an elevated risk of artificial price inflation through coordinated social-media promotions. By April 2025, multiple low-float Nasdaq IPOs with similar ownership structures, including Ostin, Jayud, and China Liberal, had already been targeted by WhatsApp and WeChat impersonator schemes, leading to extreme volatility, trading halts, and regulatory scrutiny. These risks were neither theoretical nor remote and were well known to Defendants. Yet Defendants did not warn investors that Concorde's securities were especially susceptible to the same type of promotion-based manipulation.

9. Defendants also failed to update investors as warning signs emerged during the Class Period. Before the July 10th collapse, unusual trading activity, outsized price swings, and the circulation of false claims in online investor groups were underway. At no point did Concorde issue a cautionary statement alerting investors to these developments or warning that the stock's movement did not reflect Company fundamentals. Instead, Defendants continued to tout the Company's prospects while omitting that the trading environment surrounding Concorde had become highly irregular.

10. Furthermore, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of its securities trading activity throughout the class period. Specifically, Defendants failed to disclose to investors: (1) that Concorde was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) that, on information and belief, insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) that Concorde's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the stock price; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's auditor, agent for service of process, and the underwriter defendant are located in this District.

14. This Court also has subject-matter jurisdiction over, and venue is proper in this Judicial District for, the claims asserted under the Securities Act, pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a). Concorde's securities were offered and sold to the investing public in this Judicial District, and Concorde's auditor, agent for service of process, and underwriter are located in this District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

16. Plaintiff Parthasarathy Krishnamoorthy, as set forth in the previously filed certification, incorporated by reference herein, purchased Concorde securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein. Plaintiff lost approximately $636,651 in the collapse of Concorde.

17. Defendant Concorde is a BVI holding company with its principal executive offices located in Singapore. The Company's stock trades on NASDAQ under the symbol "CIGL." Concorde temporarily went by the ticker symbol "YOOV" effective April 13, 2026, in connection with its March 18, 2026 merger with YOOV Group Holding Limited, but changed its symbol back to "CIGL" on July 21, 2026.

18. Defendant Swee Kheng "Alan" Chua ("Chua") was the Company's Chief Executive Officer and Chairman of the Board of Directors ("CEO") at all relevant times.

19. Defendant Sze Yin Ong ("Ong") was the Company's Chief Financial Officer ("CFO") at all relevant times.

20. Defendant Terence Wing Khai Yap ("Yap") was a Director of the Company at all relevant times.

21. Defendant Mark Allen Brisson ("Brisson") was a Director of the Company at all relevant times.

22. Defendants Chua, Ong, Yap, and Brisson (collectively, the "Concorde Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (i.e., the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

23. Defendant R.F. Lafferty & Co., Inc. ("R.F. Lafferty") was the Company's underwriter for the April 21, 2025, IPO. Due to its position, R.F. Lafferty had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, it is also liable for the false statements pled herein.

24. Defendant Henry Hackel ("Hackel") was, at all times relevant to the conduct alleged herein, the President and majority owner of R.F. Lafferty. According to R.F. Lafferty's Uniform Application for Broker-Dealer Registration (Form BD), its FINRA BrokerCheck report, and R.F. Lafferty's investment-adviser disclosures in effect through at least December 2025,

Hackel served as President of R.F. Lafferty since October 1980, owned 75% or more of the firm, and directed the management and policies of the firm during that period. R.F. Lafferty's public announcements and its FINRA BrokerCheck report reflect that Robert Hackel, who served as R.F. Lafferty's Chief Operating Officer during the relevant period and who signed the Concorde underwriting agreement on the firm's behalf, succeeded Henry Hackel as Chief Executive Officer and majority owner of R.F. Lafferty in 2026. R.F. Lafferty has been family owned and operated since 1970. By virtue of his controlling ownership interest and his position as President, Hackel possessed the power and authority to control, and did control, the conduct of R.F. Lafferty, including its participation as underwriter and sole book-running manager for the Concorde IPO and the acts and omissions of R.F. Lafferty alleged herein. Hackel is named as a defendant solely in his capacity as a controlling person of R.F. Lafferty under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

25. Defendant Kreit and Chiu CPA, LLP ("Kreit and Chiu") was the Company's auditor at all relevant times. Kreit and Chiu issued clean audit opinions on financial statements incorporated into the April 21, 2025, IPO. Additionally, Kreit and Chiu was Concorde's auditor at the time of the IPO and had access to material non-public information during the class period. Because of its position, Kreit and Chiu knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading. Furthermore, due to its position, Kreit and Chiu had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, it is also liable for the false statements pleaded herein.

26. Defendant Cogency Global, Inc. ("Cogency") was the company's agent at all relevant times. Defendant Cogency was the Company's agent for service of process for issuance

of Concorde securities by way of the IPO consisting of the Registration Statement and Prospectus containing the materially false and misleading statements detailed in this complaint. Cogency, through Defendant Colleen A. De Vries also signed Concorde's Form F-1 registration statement and amendments. Due to its position, Cogency had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, it is also liable for the false statements pled herein.

27. Defendant Colleen A. De Vries ("De Vries") was the Company's authorized representative in the United States and a Senior Vice President of Defendant Cogency. De Vries signed Concorde's Form F-1 registration statement and amendments, approving them for issuance.

## SUBSTANTIVE ALLEGATIONS

### I. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

28. The Class Period begins on April 21, 2025, when the Company filed an IPO prospectus permitting Concorde to issue 1,250,000 Class A ordinary shares of their common stock at an initial offering price of $4.00/share for a total capital raise of $5.0M.[2] The prospectus goes on to state that post-IPO, Defendant Chua "will retain controlling voting power in the Company based on having approximately 97.57% of all voting rights." Therefore, the IPO represented approximately 0.06% of the Company's voting rights. In the IPO, to describe its business, the Company stated:

> Concorde International Group Limited is an integrated security services providers that combines physical manpower and innovative technology to deliver effective security solutions. In 2014, we were awarded "The Business Model Innovation Award" by the Singapore Manufacturing Federation. In 2015, we were awarded the "Best Innovative Use of Infocomm Technology Award" by the Singapore Infocomm Technology Federation ("SiTF"). In 2016, we were awarded the "Most Innovative Use of Infocomm Technology (Private Sector-SME) Award" by the

[2] Concorde International Group Ltd., *supra* note 1.

Infocomm Media Development Authority of Singapore ("IMDA", formerly known as the Infocomm Development Authority) and the Singapore Infocomm Technology Federation ("SiTF"). In 2017, we were awarded the "IP Awards" by the World Intellectual Property Organization — Intellectual Property Office of Singapore (WIPO-IPOS). In addition, in 2017 The Nanyang Technological University of Singapore recognized our innovative solution by publishing it as a case study entitled "The Transformation of Concorde Security Pte Ltd" via its Nanyang Technoprenuership Center. In the same year, the Singapore Management University and Harvard Business Publishing Education also recognized our innovation by publishing a case study entitled "Main Case: The Resilience of a Disruptive Innovator: Concorde Security." From 2018 to 2019, in recognition of our solution in transforming the industry, the Infocomm Media Development Authority of Singapore ("IMDA") approved our solutions in the Singapore government's Industry Transformation Map Pilot Programme. From 2020 to 2021, in recognition of our technology and solutions, we were included in the "Pre-approved IT solutions vendor" under the category of security, by the Infocomm Media Development Authority of Singapore ("IMDA"). From 2022 to 2023, in recognition of our technology solution, the Infocomm Development Authority of Singapore ("IMDA") approved our solutions in the Singapore government's Advanced Digital Solutions (ADS) under the Small Medium Enterprises Go Digital Programme. With these awards and recognitions, *we believe we are the leading solution provider in Singapore*. Through the integration of our patented technology solution, we help our clients reduce costs and enhance security. We *have experienced significant revenue growth*, primarily driven by the increasing labor costs and increasing demands in security and facilities management.

Since our establishment in Singapore in 1997, we have built a track record in the professional security community by consistently providing high-quality security manpower. Recognizing manpower sustainability with our ever-advancing society, in 2014, we decided to transit into a security solution services company using our innovative business model. With our technological inventive solution, we deliver a higher level of security performance with headcount uplifted of higher skillset, better reward as well as much sought after work-life balances for the new era security workforce. As a result, we have received numerous awards in Singapore, recognizing our innovative technology and our contribution to producing the next generation of reliable security solutions. Anchored by our patented technology applications and pioneering solutions, we provide top-tier security and facilities management services to commercial, financial, industrial, and governmental customers in Singapore.

We offer a range of services to enhance security and safety: (1) i-Guarding Services; (2) Man-Guarding Services; and (3) Consultancy and Training Services. Our i-Guarding Services leverages technology to increase efficiency, with a mobile platform and cluster® aggregation model of higher skillset workforce. For the six months ended June 30, 2024 and 2023, our i-Guarding Services accounted for 96.75% and 98.66% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, our i-Guarding Services accounted for 98.09%

and 99.09% of our consolidated revenues, respectively. Man-Guarding Services employs trained security officers to maintain safety and deter unlawful activities. For the six months ended June 30, 2024 and 2023, our Man-Guarding Services accounted for 0.82% and 1.22% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, it accounted for 1.41% and 0.24% of our consolidated revenues, respectively. For the six months ended June 30, 2024, our revenue from others accounted for 1.84% of our consolidated revenue and this related to a one-off sales of security consumable. There was no such sales in other periods. Consultancy and Training Services provide expert guidance tailored to clients' needs. For the six months ended June 30, 2024 and 2023, our Consultancy and Training Services accounted for 0.59% and 0.12% of our consolidated revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, it accounted for 0.50% and 0.67% of our consolidated revenues, respectively.

We have gained recognition for our disruptive innovation in the integrated monitoring of properties, assets, and building service systems. This ensures round-the-clock surveillance for complete security and operational efficiency. This achievement is made possible through our suite of intelligent security solutions, known as "I-Guarding Services." One of our flagship services, the groundbreaking I-Man Facility Sprinter, is a mobile vehicular platform that revolutionizes security and facility maintenance services. These pioneering solutions not only improve workers' compensation, skill sets, and working conditions but also redefine the overall business landscape of the industry.

Our company's second flagship product is the Intelligent Facility Authenticator. The IFA is an innovative solution that leverages advanced kiosk technology to enhance security and streamline visitor management. In response to the challenges of limited manpower and rising costs, the IFA system automates the issuance of secure passes and access cards, eliminating the need for physical human interaction. It works by sending secure pass-icons to visitors, verifying their identity upon entry, and dispensing access cards with varying levels of security clearance. This technology not only enhances security within buildings but also offers efficient visitor management services, making it a game-changer in industries where kiosk adoption is increasing. Ultimately, IFA represents a significant advancement in security access control without relying on human intervention. For the six months ended June 30, 2024 and 2023, more than 83% and 98.73% of our revenues were generated by annual recurring contracts, respectively. For the fiscal years ended December 31, 2023 and 2022, more than 96% and 85% of our revenues were generated by annual recurring contract, respectively. 99% of our clients were based in Singapore. For the six months ended June 30, 2024, our top two customers, People's Association at One Tampines Hub and People's Association at OnePunggol accounted for approximately 6% and 6% of our total revenue, respectively. For the six months ended June 30, 2023, our top two customers, Singapore University of Technology and Design and People's Association at OnePunggol accounted for approximately 10% and 8% of our total revenue, respectively. For the fiscal year ended December 31, 2023, our revenue generated

> by annual recurring contract increased by 11% from 85% in fiscal year 2022 to 96% in fiscal year 2023 as we continued to focus on securing recurring contracts to ensure long-term financial stability and growth. For the fiscal year ended December 31, 2023, our top two customers, Singapore University of Technology and Design and People's Association at OnePunggol accounted for approximately 8% and 7% of our total revenue, respectively. For the fiscal year ended December 31, 2022, our top two customers, Ceva Logistics Singapore Pte Ltd and JTC Corporation, accounted for approximately 10% and 10% of our total revenue, respectively.

[Emphasis added.]

29. The foregoing statements were materially false and misleading when made, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In those statements Concorde catalogued the awards and recognitions it had received, asserted that it was "the leading solution provider in Singapore", described its "patented" i-Guarding technology and its I-Man Facility Sprinter and Intelligent Facility Authenticator as "disruptive" and "game-changer" innovations, and represented that it had "experienced significant revenue growth" anchored by a base of recurring-contract customers, 99% of them in Singapore. Those statements were materially false and misleading because they sold investors an award-winning, technology-differentiated operating company while omitting the contrary facts that gave Concorde's shares their price: that the offering had been deliberately structured so that the price of Concorde's shares was set not by the business, technology, and customer base described but by the coordinated promotional manipulation alleged below; that comparable issuers sharing Concorde's structure, including Ostin, Jayud, and China Liberal, had already been the targets of that same manipulation; and that Concorde's own financial condition was so weak that its most recent reported profit had been restated into a loss of approximately $83 million. A reasonable investor would have viewed Concorde's representations that it was "the leading solution provider in Singapore" and had "experienced significant revenue growth" differently if told that the market price of the shares being offered was the product of a coordinated

pump-and-dump manipulation that the offering's structure was designed to enable. As a result of the foregoing, Defendants' positive statements about Concorde's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

30. The IPO also contained the following 2022, 2023, and 2024 financial results:

> Our revenue decreased by $241,443, or 4% in the six months ended June 30, 2024 as compared to the six months ended June 30, 2023, primarily due to a major customer one-off commencement sales in the six months ended June 30, 2023. *The core sales have remained stable, indicating resilience and consistent demand.*
>
> Our profit decreased by $84,188,345, or 8,676% for the six months ended June 30, 2024, as compared to the six months ended June 30, 2023. This decline is primarily due to (i) the share-based compensation to members of our Board, executive officers, their affiliates, and existing shareholders totaling $83,155,336, for the six months ended June 30, 2024 based on the calculation of the fair value of Class B Ordinary Shares issued to them, with no shares issued during the six months ended June 30, 2023, (ii) offering-related costs of $388,788, (iii) increased subcontracting of security guards to external vendors to reduce internal staffing, (iv) the absence of a voluntary pay cut by Swee Kheng Chua and his spouse, Ping Ping Lim, in the six months ended June 30, 2024 (compared to their voluntary pay cut in the same period in 2023), and (v) an increase in employee benefits expenses. Our headcount grew by 50% during the first half of 2024 compared to the same period in 2023 due to increased hiring of skilled personnel, particularly in key management roles dedicated to long-term growth initiatives and anticipated business expansion. The increased subcontracting of security guards to external vendors is a strategic decision to allow the Company to focus resources on enhancing the technology aspect of our business. Cost of subcontracting has risen due to labour supply shortage in the local market. This is precisely where our technology-integrated service aims to address the issue. The share-based compensation reflects the Company's strategic commitment to attract and retain key management talents during the critical growth phase of the Company. It also aligns key management's incentives with the creation of long-term shareholder value, driving sustainable business growth and performance. *We believe that this profit decrease is a temporary setback*, as many customers will need time to transition to less human-reliant technology. This increase in hiring represents an initial investment focused on future planning and strategic development not reflective of current basal operational or administrative needs. This additional spending is scalable and aligns with our long-term objectives.
>
> The Company *reported a net non-GAAP profit before tax* (refer to page 42) despite ongoing transitions and local market challenges, *highlighting the resilience of our proven business model and the strong demand for our services.* The temporary setback in financial performance aligns with our strategic decision to foster

> sustainable market growth and underscores our strong commitment to and readiness for anticipated market expansion.
>
> Our revenue increased by $5,649,648, or 113%, from $5,006,345 for the year ended December 31, 2022 to $10,655,993 for the year ended December 31, 2023. Our profit increased by $1,798,174, or 224%, from a net loss of $803,980 for the year ended December 31, 2022 to a net profit of $994,194 for the year ended December 31, 2023, which was mainly due to by (i) an increase in sales by 5,649,648 or 113% driven by market demand, and; by (ii) a decrease of other expenses of $672,157, or 68% from $986,796 for the year ended December 31, 2022 to $314,639 for the year ended December 31, 2023 due to step up collection effort of the new established finance team, there was improvement in bad debt allowances and recovery of previously written off bad debt.
>
> There were more new clients acquired during the year because our services were favored by customers compared to those of competitors in the Singapore markets, this shows that our market demand is on an increasing trend.

[Emphasis added.]

31. The foregoing financial results were also materially false and misleading when made. Concorde reported that its profit had decreased by $84,188,345, or 8,676%, for the six months ended June 30, 2024, but characterized that collapse as a mere "temporary setback", directed investors to a "net non-GAAP profit before tax", and described its results as reflecting the "resilience" of its "proven business model" and the "strong demand" for its services. Those characterizations were materially false and misleading because they obscured what the reported figure actually represented and omitted the contrary facts necessary to make them not misleading. As Concorde's own disclosure reflected, the loss was driven by $83,155,336 in share-based compensation paid in Class B ordinary shares to Concorde's Board, executive officers, their affiliates, and existing shareholders; far from a "temporary setback", that charge memorialized a transfer of more than $83 million in equity value to the very insiders who controlled Concorde through their supervoting shares and who were thereby positioned to profit from an artificial inflation of its share price, a concentration of ownership integral to the scheme alleged herein. The characterizations were further misleading because Concorde's assurances that its "core sales have

remained stable" and that its "market demand is on an increasing trend" presented the Company as financially sound while omitting that its independent registered public accounting firm had expressed substantial doubt about its ability to continue as a going concern, and that the same financial statements were not prepared in conformity with International Financial Reporting Standards, as alleged in the Auditor Defendant Allegations below. A reasonable investor would have viewed Concorde's characterization of the loss as a "temporary setback" and its representations of "resilience" and "strong demand" differently if told that the loss reflected a multimillion-dollar equity transfer to controlling insiders and that the Company's own auditor had cast substantial doubt on its ability to survive. As a result of the foregoing, Defendants' positive statements about Concorde's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

32. Lastly, the IPO detailed the Company's strategies and strengths that would support the future growth of Concorde:

> **Our Growth Strategies**
>
> We believe that implementing the following growth strategies will continue to position our company as the leader in the markets we serve:
>
> - **Continue to grow our recurring revenue business.** For the six months ended June 30, 2024 and 2023, our recurring revenue was approximately 83% and 98.73% of our total revenues, respectively. For the fiscal years ended December 31, 2023 and 2022, our recurring revenue was approximately 96% and 85% of our total revenues, respectively. Monthly recurring revenue allows us to achieve a more consistent and predictable income stream. In addition, it should improve our profitability as we continue to roll out more i-Guarding services. Each building or location deployed under the I-Guarding represents incremental revenues with almost the same cost levels as one IFS can service at least 15 or more buildings or locations. Serving our recurring customers should require lower acquisition and marketing costs as compared to new customers. Hence, signing on more buildings or locations will lead to increased revenues and profitability. We see significant market opportunities for our services because customers in our target markets prefer outsourced security and facilities management services that offer real-time security monitoring for continuous protection

and rapid responses to security breaches and fire alarms. We intend to continue pursuing opportunities for recurring revenue by developing new and innovative products and by continuing our aggressive sales and marketing efforts. In order to build scale, we will have to continue to spend on marketing and development. As a result, this may impact our overall profitability.

- **Maintain our commitment to best-in-class customer service.** We are focused on fostering a culture dedicated to providing industry-leading customer service to our extensive customer base. We operate through a fleet of 5 cluster command centers in Singapore. From these mobile locations, our teams offer monitored security, interactive residential and commercial automation solutions, including installation, field service, repair, ongoing monitoring, and customer support.

Our installation and service technicians, along with our customer service representatives, are dedicated to delivering a high-quality customer service experience. This commitment enhances our brand, improves customer satisfaction, increases customer retention, and accelerates the adoption of additional interactive automation solutions. As a result, it drives returns on new customer acquisition expenditures and enhances cash flow generation. We pride ourselves on providing on-site responses within a cluster® radius of 15 minutes of security alerts for the majority of our customers.

- **Maintain our high-quality customer base.** We believe customer retention is also strongly correlated with the credit quality of our customers. We plan to maintain our focus on strict underwriting standards and will establish processes to evaluate potential new customers' creditworthiness to improve our customer selection or require upfront payments for higher-risk customers. We expect that our focus on generating high-quality customers will continue to result in a portfolio of customers with attractive credit scores, thereby improving retention, decreasing credit risk exposure, and generating a strong, long-term customer portfolio that generates *robust returns on new customer acquisition expenditures and drives strong cash flow generation.*

- **Disciplined expansion of our patented protected solution beyond Singapore.** We strongly believe that there will be significant demand for our solutions due to the continuous increase in labor costs and the growing demand for high-quality security and facilities management services. Our plan is to expand our geographical coverage and *export our successful business model beyond Singapore within the next 24 months*. We aim to expand to Malaysia, Australia, and North America markets via partnerships with local security service provider who already have an existing customer base that needs our solution to improve service delivery and to mitigate the increasing labor costs. We have not signed up with any partners yet, but we aim to have them in place based upon the following plan. Our business plan

is subject to change based on the change of global economy and other factors that may affect our business operations.

**Our Competitive Strengths**

We believe that the following competitive strengths contribute to our success and differentiate us from our competitors:

- **Proven Solution that is protected by Patents.** Our patent-protected solution that has been proven to reduce the need for manpower while maintaining, and even increasing, the quality of service levels for security and facilities management.

- **Superior-Class Customer Service**. Rather than competing purely on price, we emphasize the quality of our services, which we believe is distinguished by superior customer service.

- **Deep industrial knowledge and experience.** We believe that our focus on safety and security, coupled with our sales consultants, our solid reputation for and expertise in providing reliable security and monitoring services through our patent-protected business model vide our cluster® mobile command centers, our dependable product solutions, and our highly skilled installation and service capabilities, position us well to compete with both traditional and new competitors.

[Emphasis added.]

33. The foregoing statements of Concorde's growth strategies and competitive strengths were likewise materially false and misleading when made, and omitted material facts necessary to make them not misleading. Those statements projected that Concorde would "continue to grow our recurring revenue business" and generate "robust returns" and "strong cash flow generation", and represented that Concorde would undertake a "disciplined expansion" of its "patent-protected" solution "beyond Singapore within the next 24 months", targeting Malaysia, Australia, and North America through partnerships with local security providers. Those statements were materially false and misleading because they projected growth, expansion, and returns while omitting the contrary facts: that the centerpiece of the growth narrative lacked a reasonable basis, because Concorde presented the 24-month international expansion as a concrete plan while

acknowledging in the same document that "we have not signed up with any partners yet", so that the expansion on which the projected growth depended rested on partnerships that did not exist; that Concorde's own auditor had expressed substantial doubt about the Company's ability to continue as a going concern, a fact squarely at odds with the projected "robust returns" and "strong cash flow generation"; and that, as with Concorde's other Class Period statements, the growth strategies were presented to investors as the source of the shares' value when that value was in fact the product of the coordinated manipulation alleged herein. A reasonable investor would have viewed Concorde's projections of "robust returns", "strong cash flow generation", and "disciplined expansion" beyond Singapore differently if told that Concorde had no expansion partners, that its auditor doubted its ability to survive as a going concern, and that its share price was the product of manipulation rather than of the growth described. These statements also were not shielded by any safe harbor for forward-looking statements, for the reasons set forth below. *See infra* "No Safe Harbor". As a result of the foregoing, Defendants' positive statements about Concorde's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

34. As stated previously, the structure of Concorde's IPO was intentionally designed to facilitate an eventual pump-and-dump scheme. Concorde conducted a low-float IPO, offering just 1,250,000 shares to the public, approximately 5% of total outstanding equity, while maintaining overwhelming insider control through Class B supervoting shares and offshore holding entities. Such a small float meant that insiders effectively controlled the overwhelming majority of shares. In offerings of this size, even limited trading activity can materially affect price levels. A float this thin is atypical for a company that reached a market capitalization approaching $700 million within weeks. All these red flags were well known to be commonly associated with manipulated offerings such as Ostin, Jayud, Pheton, and China Liberal just to name a few.

35. The disparity between the number of Concorde shares actually available for public trading and the number of shares on which Concorde's reported market capitalization was based was extreme, and made Concorde's shares an ideal vehicle for manipulation. In the IPO, Concorde sold only 1,250,000 Class A ordinary shares to the public, a number that increased to 1,437,500 Class A ordinary shares after R.F. Lafferty exercised the over-allotment option in full on May 2, 2025. Those shares were the only Concorde shares sold into the public market and freely available for trading. As reflected in Concorde's SEC filings, including its registration statement, prospectus, and its annual report on Form 20-F, Concorde had a total of 22,326,386 ordinary shares outstanding, consisting of 2,000,460 Class A ordinary shares and 20,325,926 Class B ordinary shares, each Class B ordinary share carrying one hundred votes and convertible into one Class A ordinary share and held by Concorde's founders and insiders.[3] The public float of approximately 1,437,500 Class A ordinary shares therefore represented only approximately 6.4% of Concorde's total ordinary shares outstanding, and approximately 71.9% of its Class A ordinary shares.

36. Although only approximately 1,437,500 Concorde shares were actually available for public trading, Concorde's reported market capitalization was calculated on its entire outstanding share count of approximately 22,326,386 shares. At the July 9, 2025 closing price of $28.18 per share, that share count produced a headline market capitalization of approximately $629.2 million, even though the overwhelming majority of the shares underlying that figure were insider-held Class B supervoting shares and restricted Class A shares that were not part of the tradeable public float. As a result, a small number of trades in the thin public float could, and did,

[3] Concorde International Group Ltd., Registration Statement (Form F-1), File No. 333-281799 (Jan 7, 2025); Concorde International Group Ltd., Prospectus (Apr. 21, 2025); and Concorde International Group Ltd., Annual Report (Form 20-F) (May 12, 2026) for the fiscal year ended Dec. 31, 2025.

move Concorde's share price and apparent market capitalization dramatically, while the market was presented with a share-count and valuation picture that bore little relationship to the shares actually available for trading. As in the related pump-and-dump schemes involving China Liberal and other Chinese issuers, the disparity between the share count that framed Concorde's public valuation and the small number of shares actually available for trading was a structural feature that facilitated the manipulation of Concorde's stock.

37. Concorde's inability to account for the shares underlying its reported valuation was confirmed by the Company's own subsequent SEC filings, which gave irreconcilable accounts of how many Class A and Class B ordinary shares were outstanding, reported conflicting insider-conversion dates and amounts, and in one instance understated Concorde's total shares outstanding by 392,589 shares. As alleged in detail below, those inconsistencies, which could not reliably account for the very insider-affiliated shares whose lockup and conversion status were material to the market, confirm that the share-count and valuation picture presented to investors bore little relationship to the shares actually available for trading, and made Concorde's securities an ideal vehicle for the manipulative scheme alleged herein.

38. The Offering Documents through which Concorde conducted its initial public offering included the Company's prospectus filed with the SEC on April 21, 2025, pursuant to Rule 424(b)(4), Registration No. 333-281799 (the "Prospectus"), pursuant to which Concorde's Class A ordinary shares commenced trading on the Nasdaq Capital Market on April 22, 2025. The Prospectus contained an extensive "Risk Factors" section. Although that section addressed, in general terms, the possibility that the trading price of Concorde's Class A ordinary shares could be volatile, it nowhere disclosed the specific and material risk that the structure of Concorde's

offering rendered its shares a vehicle for the coordinated market manipulation that had already befallen comparable issuers and that ultimately befell Concorde.

39. For example, in a risk factor captioned "The market price of our Class A Ordinary Shares may be volatile and may trade at prices below the initial public offering price," the Prospectus represented:

> The stock market in general, and the market for equities of new public companies in particular, have been highly volatile. As a result, the market price of our Class A Ordinary Shares is likely to be similarly volatile, and investors in our Class A Ordinary Shares may experience a decrease, which could be substantial, in the value of their Class A Ordinary Shares, including decreases unrelated to our operating performance or prospects, or a complete loss of their investment.

40. The Prospectus included a further, discrete risk factor captioned "Certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company." That risk factor represented:

> [O]ur Class A Ordinary Shares may be subject to extreme volatility that is seemingly unrelated to the underlying performance of our business. Recently, companies with comparable public floats and initial public offering sizes have experienced instances of extreme stock price run-ups followed by rapid price declines, and such stock price volatility was seemingly unrelated to the respective company's underlying performance. Should our Class A Ordinary Shares experience run-ups and declines that are seemingly unrelated to our actual or expected operating performance and financial condition or prospects, prospective investors may have difficulty assessing the rapidly changing value of our Class A Ordinary Shares.

41. The foregoing statements were materially false and misleading when made, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Although the Prospectus acknowledged that companies with public floats "comparable" to Concorde's had recently experienced "extreme stock price run-ups followed by rapid price declines," it characterized that phenomenon as generic market "volatility" that was merely "seemingly unrelated" to the issuers' performance. In truth,

and as Defendants knew or recklessly disregarded, the run-ups and ensuing collapses in those comparable offerings were not unexplained volatility; they were the product of coordinated pump-and-dump manipulation carried out through social-media channels and impersonated financial professionals, and targeting Nasdaq-listed foreign issuers that shared Concorde's defining structural features: an unusually small public float, overwhelming insider voting control, and an offshore holding-company form. Those comparable offerings included, among others, Ostin, Jayud, Pheton, and China Liberal.

42. By presenting the risk as ordinary and undirected market volatility while omitting (i) the actual mechanism of the manipulation, (ii) that issuers sharing Concorde's structure had been the specific targets of that manipulation, and (iii) that Concorde's own public float of approximately 1,437,500 Class A ordinary shares, representing only approximately 6.4% of its shares outstanding, coupled with approximately 97.57% insider voting control, replicated that structure, the Prospectus created the materially misleading impression that any volatility in Concorde's shares would result from ordinary market forces rather than from the known and foreseeable risk of targeted manipulation. These omissions were material because the manipulation of comparable foreign offerings was, by the time of the offering, the subject of public reporting and regulatory attention, as alleged above. The statements also were not shielded by any safe harbor for forward-looking statements, for the reasons set forth below. *See infra* "No Safe Harbor."

43. The Prospectus separately disclosed the extreme concentration of voting control and the thinness of the tradeable float, but once again without disclosing the manipulation risk that those features created. Addressing its dual-class structure, the Prospectus represented that, following the offering, and "even if 100% of such shares are sold," Defendant Chua would "retain

controlling voting power in the Company based on having approximately 97.57% of the combined voting power of our outstanding ordinary shares." In a risk factor captioned "A significant portion of our total outstanding shares are restricted from immediate resale but may be sold into the market in the near future," the Prospectus represented that such sales "could reduce the market price of our Class A Ordinary Shares," and that, after the offering, only the "1,250,000 Class A Ordinary Shares" sold in the offering would be "freely tradable, without restriction, in the public market." These disclosures confirmed the very features that made Concorde's shares susceptible to manipulation, yet the Prospectus presented them only as ordinary governance and dilution risks and omitted that the combination of a negligible public float and near-total insider control created a heightened and known risk that Concorde's share price could be artificially inflated and then collapsed through coordinated promotion.

44. The Prospectus's "Underwriting" section disclosed that Defendant R.F. Lafferty & Co., Inc. served as the sole underwriter and representative for the offering, pursuant to an underwriting agreement dated April 21, 2025, and that R.F. Lafferty agreed to purchase all 1,250,000 Class A ordinary shares offered. The Prospectus further disclosed that Concorde granted R.F. Lafferty an over-allotment option to purchase up to an additional 187,500 Class A ordinary shares, equal to 15% of the shares sold in the offering, that R.F. Lafferty would receive Representative's Warrants, and that, in connection with the offering, the underwriters "may engage in stabilizing transactions, over-allotment transactions, syndicate-covering transactions, penalty bids and purchases to cover positions created by short sales." As the sole underwriter and representative, R.F. Lafferty controlled the size and distribution of the offering, and therefore the creation of the thin public float described above. Notwithstanding that central role, and its

disclosed ability to transact in Concorde's shares in the aftermarket, R.F. Lafferty did not disclose the manipulation risk inherent in the offering's structure. *See infra* "Underwriter Allegations."

45. Concorde's initial public offering was conducted pursuant to a registration statement on Form F-1 (File No. 333-281799) that Concorde initially filed with the SEC on or about August 27, 2024, and thereafter amended five times, with Amendment No. 5 filed on January 7, 2025 (as so amended, the "Registration Statement"). The Registration Statement was declared effective on or about March 31, 2025, and the offering was priced on or about April 21, 2025, and the Prospectus formed a part of the Registration Statement. The Registration Statement was signed by Defendant Chua, as Chief Executive Officer and Chairman, by Defendant Ong, as Chief Financial Officer, and by Defendant Yap, as a director, and named Defendant Brisson as a director nominee who had consented to being named in the Registration Statement and to becoming a director upon the effectiveness of the offering. Defendants Cogency Global Inc. and De Vries signed the Registration Statement as Concorde's authorized representatives in the United States.

46. The Registration Statement and the Prospectus disclosed that Concorde suffered from multiple material weaknesses in its internal control over financial reporting. The Offering Documents stated that, as of June 30, 2024, Concorde had identified material weaknesses consisting of a "lack of proper segregation of duties over the execution and approval of journal entries and financial processes," a "lack of proper training of the accounting staff to ensure consistent application of IFRS," and an "ineffective design of review controls" over both routine and complex accounting transactions. The Offering Documents further disclosed that "all of the above noted material weaknesses contributed to the restatement of the Company's interim financial statements included in this prospectus."

47. That restatement was material. During the registration process, Concorde restated its unaudited interim financial statements for the six months ended June 30, 2024, to correct an error in its accounting for share-based compensation. As restated, Concorde recognized share-based compensation expense of $83,155,336 attributable to ordinary shares that had been issued to "members of our Board, executive officers or their affiliates and existing shareholders." The correction transformed the interim results Concorde had previously reported, which reflected a modest pre-tax profit, into a loss before tax of approximately $83.1 million and a net loss of approximately $83.2 million for the period. Concorde had originally recognized only the nominal value of those shares, in the amount of $208, rather than their fair value.

48. These facts were material and further rendered Defendants' statements concerning Concorde's financial condition and business misleading. The restatement confirmed that, on the eve of an offering in which the public would receive approximately 5% of Concorde's equity, Concorde's controlling insiders and their affiliates had been issued ordinary shares carrying a fair value in excess of $83 million, further concentrating the economic ownership of the Company in the hands of the very persons positioned to profit from an artificial inflation of Concorde's share price. The restatement also confirmed that Concorde's financial reporting was subject to material weaknesses so significant that they had produced an $83 million error in the Company's reported results, a circumstance known to Defendants and to Concorde's auditor, Defendant Kreit and Chiu CPA, LLP. *See infra* "Auditor Defendant Allegations" and "Scienter Allegations."

49. On April 30, 2025, Concorde filed with the SEC a Notification of Late Filing on Form 12b-25 (the "NT 20-F") with respect to its annual report on Form 20-F for the fiscal year ended December 31, 2024, which Defendant Chua signed on the Company's behalf. In that filing, in response to the question whether any significant change in the results of operations from the

corresponding period for the last fiscal year would be reflected in the report to be filed, Concorde indicated "No," representing that it did not anticipate a significant year-over-year change in its results of operations. That answer was irreconcilable with information already known to Concorde and Chua and publicly disclosed in the April 21, 2025 Prospectus. As Concorde disclosed approximately two weeks later in its Form 20-F for fiscal year 2024, and as alleged above, the Company had recognized a share-based compensation charge of $83,155,336 in connection with the Class B ordinary shares issued to its insiders and affiliates, which transformed the Company's results from the net profit of approximately $994,194 it had reported for fiscal year 2023 into a substantial net loss for fiscal year 2024. Because that charge arose from the March 18, 2024 insider share issuance and had already been the subject of a restatement during the registration process, Defendants, including Defendant Chua, who signed the NT 20-F, knew or recklessly disregarded when the NT 20-F was filed that the Company's results of operations for fiscal year 2024 would in fact reflect a significant year-over-year change. Thus, when Chua signed the NT 20-F, Concorde's already-restated financial results showed precisely the type of significant year-over-year change addressed by the form. Concorde's objectively incorrect "No" response further demonstrates Chua's and the Company's reckless disregard for the accuracy and consistency of Concorde's SEC filings and the inadequacy of its disclosure controls.

50. On May 16, 2025, the Company issued a press release announcing financial results for the full-year ended December 31, 2024. It included the following financial highlights and overview among others:

**<u>2024 Financial Highlights</u>**

- Maintained stable revenues at approximately $10.5 million for the year ended December 31, 2024, compared to $10.7 million in 2023.
- Gross profit increased by approximately 20.8% to $3.6 million in 2024 compared to approximately $3.0 million in 2023, driven in part by an

improvement in gross profit margin, which increased to approximately 34.5% in 2024, compared to approximately 28.1% in 2023.

- Completed an IPO on April 22, 2025, raising gross proceeds of $5.75 million (including over-allotment option), and commenced trading on the Nasdaq Capital Market on April 22, 2025.

**Financial Overview**

Revenue remained relatively flat year over year, with a slight decrease of approximately 1.5% to $10.5 million for 2024, compared to $10.7 million for 2023. Gross profit increased to approximately $3.6 million for 2024, compared to approximately $3.0 million for 2023.

Operating loss was approximately $83.6 million in 2024, compared to operating profit of approximately $1.0 million in 2023. Operating loss in 2024 was impacted by a one-time, non-cash share-based compensation expense of $83.2 million. As of December 31, 2024, and 2023, the Company had cash and cash equivalents of approximately $1.0 million and $957 thousand, respectively. Subsequently, in April 2025, the Company completed its IPO, raising gross proceeds of $5.75 million, including the full exercise of the over-allotment option.

51. Additionally, Defendant Chua was quoted in the May 16th Press Release stating:

2024 was a transformative year for Concorde, culminating in our successful IPO on April 22, 2025. We raised a total of $5.75 million in gross proceeds, including the full exercise of the over-allotment option, and proudly commenced trading on the Nasdaq Capital Market. *This milestone not only validates our business model but also provides the capital foundation to accelerate our next phase of growth.*

Our position as a leading integrated security services provider in Singapore is built on our ability to blend skilled manpower with patented technologies that deliver scalable, cost-effective, and high-performance solutions. At the core of our offering is our suite of smart security technologies, known as I-Guarding Services. Supported by 4 granted global patents and our proprietary innovations—such as the I-Man Facility Sprinter ("IFS"), a mobile platform transforming security and facility maintenance, and the Intelligent Facility Authenticator, a kiosk-based system that enhances access control and visitor management—are redefining industry standards. These technologies help reduce operational costs, improve security performance, and optimize overall efficiency for our clients.

While our 2024 revenue remained stable at approximately $10.5 million, *we anticipate strong year over year growth going forward.* Specifically, our 2025 growth strategy is focused on scaling our high-margin recurring revenue, largely driven by the continued deployment of our i-Guarding services. These solutions generate incremental revenue with minimal additional cost, as each IFS unit can service 15 or more locations. We also plan to expand internationally over the next

> 24 months, targeting Malaysia, Australia, and North America through partnerships with established local security providers to address rising labor costs and growing demand for smart, tech-enabled solutions. Moreover, our net results in 2024 were impacted by a one-time, non-cash share-based compensation expense of $83.2 million. Excluding this, *we maintained positive operating profit, reflecting the strength and earnings potential of our core business*. Since our founding in 1997, and especially following our strategic shift in 2014 toward a tech-integrated model—we've built a reputation for excellence, agility, and innovation. With increasing demand for intelligent security and facility solutions, we are well-positioned to scale sustainably and deliver long-term value to our clients, employees, and shareholders.

52. Lastly, the May 16th press release reiterated that Concorde is "an integrated security services provider that combines physical manpower and innovative technology to deliver effective security solutions," its product offerings, and competitive advantage in the marketplace first published in the IPO.

53. On May 15, 2025, the Company filed its 2024 Form 20-F with the SEC reporting financial results for the full year ended December 31, 2024, summarized in the May 16th press release.

54. The 2024 Form 20-F was itself materially false and misleading, and was issued during the Class Period. In it, Concorde repeated the representations, quoted above, that it was "the leading solution provider in Singapore" and "a leading provider in Singapore's security training industry"; that it had "experienced significant revenue growth"; and that its business was anchored by high-margin recurring revenue, with the substantial majority of its revenues generated by annual recurring contracts. The 2024 Form 20-F reproduced the same risk-factor disclosures addressed above, including the generic "volatility" risk factors and the "comparable public floats" risk factor, and, like the Offering Documents, nowhere disclosed that Concorde's offering structure had rendered, and was being used to render, its shares a vehicle for coordinated market manipulation.

55. The 2024 Form 20-F further disclosed that Concorde's financial condition was materially weaker than the Company's contemporaneous public messaging conveyed. The 2024 Form 20-F stated that Concorde's "independent registered public accounting firm expressed substantial doubt regarding [its] ability to continue as a going concern for the fiscal year ended December 31, 2022," that Concorde's operating losses "raise substantial doubt about the Company's ability to continue as a going concern," and that this "indicates the existence of a material uncertainty which may cast significant doubt over [its] ability to continue as a going concern." The 2024 Form 20-F separately disclosed that, "[a]s of December 31, 2024 and 2023," Concorde's audited financial statements were prepared on the assumption that it would continue as a going concern, but that Concorde's ability to continue as a going concern remained "dependent upon [its] profit generating operations in the future and/or obtaining the necessary financing," and warned that, if Concorde could not continue as a going concern, its "shareholders [would] lose all or a part of their investment."

56. These going-concern disclosures were irreconcilable with the picture Concorde presented to investors one day later. In the May 16, 2025 press release quoted above, issued the day after the 2024 Form 20-F was filed, Defendant Chua represented that the IPO "validates our business model" and "provides the capital foundation to accelerate our next phase of growth," and that Concorde "anticipate[d] strong year over year growth going forward," without disclosing that Concorde's own auditor had expressed substantial doubt about the Company's ability to continue as a going concern. Having elected to tout the Company's prospects and the purported validation of its business model, Defendants were obligated to disclose these material qualifying facts, and their failure to do so rendered their statements materially misleading.

57. The 2024 Form 20-F also disclosed that Concorde continued to suffer from material weaknesses in its internal control over financial reporting for the fiscal years 2022, 2023, and 2024, and that a material weakness had "contributed to" the restatement described above. The 2024 Form 20-F thus confirmed, in a Class Period filing, that the same internal-control deficiencies that had produced the approximately $83 million restatement of Concorde's interim financial statements persisted through the end of the fiscal year on which the 2024 Form 20-F reported, further undermining the reliability of the financial results and disclosures on which Concorde's Class Period statements depended.

58. On June 17, 2025, the Company issued a press release announcing "it has secured a total of SG$11,621,370 (approximately US$9,040,472) in new contracts from January through May 2025. The contracts include engagements with new clients as well as expanded agreements with existing customers across newly secured sites." Furthermore, that "[m]ajority of the contracts represent multi-year recurring revenue, to be recognized over the 2025–2029 period." As well as that "[t]he Company's continued growth *reinforces its position as a leading provider of integrated security services in Singapore*—one of Asia's most advanced and competitive security markets."

59. Defendant Chua was quoted in the June 17th press release stating:

> We're only halfway through the year, and we've already surpassed the total value of new contracts signed in all of 2024. These new contracts *validate the market's confidence in our solutions and position us for continued growth* as we expand our footprint in both the public and private sectors. Singapore remains one of the most sophisticated and competitive security markets in Asia, and our *continued momentum reinforces Concorde's leadership* in delivering reliable, technology-driven security and facilities management solutions to a diverse client base.

60. Lastly, the June 17th press release reiterated that Concorde is a "an integrated security services provider that combines physical manpower and innovative technology to deliver effective security solutions," its product offerings, and competitive advantage in the marketplace first published in the IPO.

61. The foregoing statements in the June 17, 2025 press release were materially false and misleading when made. Concorde announced that it had "secured a total of SG$11,621,370 (approximately US$9,040,472) in new contracts", the "majority" of them "multi-year recurring revenue" to be recognized over 2025 through 2029, and Defendant Chua declared that Concorde had "already surpassed the total value of new contracts signed in all of 2024" and that these contracts "validate the market's confidence in our solutions" and "position us for continued growth". Those statements were materially false and misleading because they touted accelerating contract wins and market validation while omitting the contrary facts necessary to make them not misleading. Chua's representation that the contracts "validate the market's confidence in our solutions" pointed investors to Concorde's share price as independent confirmation of the Company's solutions, when Defendants knew or recklessly disregarded that the "market" price they invoked was not an independent market judgment at all, but the artificially inflated product of the coordinated manipulation alleged herein. The announcement of accelerating contract wins and "continued growth", issued at the height of that promotional campaign and only weeks before Concorde's share price collapsed on July 10, 2025, further omitted that Concorde's own auditor had expressed substantial doubt about the Company's ability to continue as a going concern, which Concorde had disclosed one month earlier and which was irreconcilable with the picture of momentum and market validation the press release conveyed. A reasonable investor would have viewed Chua's statement that the contracts "validate the market's confidence" and "position us for continued growth" differently if told that the "market" it referenced was a manipulated one and that the Company's own auditor had cast substantial doubt on its ability to continue as a going concern. As a result of the foregoing, Defendants' positive statements about Concorde's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

62. On June 27, 2025, the Company filed a form 6-K containing an investor presentation the Company stated "it intends to use in conferences and meetings with investors, shareholders and analysts."[4] The 6-K also directs investors to the Company website—https://www.concordesecurity.com— to view a copy of the presentation. There, investors would see that the Company directs the public to Facebook, Instagram, LinkedIn, X (formerly Twitter), YouTube, and TikTok to learn more about Concorde:[5]




63. Together, all these statements over the Class Period evidence Defendants' continued promotion of the company despite being in the midst of a well-known social media-based stock promotion scheme epidemic. Therefore, Defendants were active participants in the scam themselves, conspired with others to perpetrate it on their behalf, and/or recklessly disregarded a substantial risk that the Company's shares would be used for this purpose.

## II. THE TRUTH BEGINS TO EMERGE

64. On July 9, 2025, Concorde's stock reached a closing price of $28.18, with an intraday high of $31.06. At that time, the Company had approximately 22.33 million shares outstanding, giving it a market capitalization of around $629.2 million.

65. On July 10, 2025, Concorde's stock price abruptly crashed by approximately 80%. As of July 2026, the Company's share price has traded below $1.00 for over 30 days.

---

[4] Concorde International Group Ltd., Report of Foreign Private Issuer (Form 6-K) (June 27, 2025).

[5] *Vision & Mission*, CONCORDE SECURITY PTE LTD, https://www.concordesecurity.com/mission-and-vision/ [https://perma.cc/RMX7-2V9G] (last visited Aug. 14, 2026).

Investigations and public reports have since detailed how Concorde's stock was used as a primary vehicle for an illicit "pump-and-dump" promotion scheme. Impersonators, using stolen identities of legitimate financial advisors, touted Concorde in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors. The structure of Concorde's public listing and low float made the scam possible.

66. Here, Plaintiff was a victim of one such impersonator. After listening to legitimate podcasts of motivational speaker and life coach, Tony Robbins, Meta delivered a targeted advertisement like the one below to Plaintiff promoting investment advice endorsed by Mr. Robbins:




67. After clicking on the Meta ad, Plaintiff was funneled into a WhatsApp Group claiming to be the investment firm "Capital Trust Wealth Management," a legitimate FINRA and

SEC registered wealth management firm.[6] There, someone claiming to be Mr. Thomas Joseph Brough, the legitimate firm's actual President, asserted they'd provide exclusive guidance on when to purchase undervalued stocks for guaranteed returns. Below was Plaintiff's introduction to the WhatsApp group:




68. To provide reassurance, Plaintiff was told about the firm's investor-friendly commission model where "[d]uring the trial period, investors can fully enjoy the professional services we provide without paying any fees" and given loss protection covering "80% of the loss." Additionally, the group bolstered their legitimacy by providing copies of Mr. Brough's CFA credential and SEC registration:

---

6 *BrokerCheck Report Thomas Joseph Brough*, BROKERCHECK BY FINRA, https://brokercheck.finra.org/individual/summary/2403390 [https://perma.cc/DTC9-8J4Z] (last visited Aug. 14, 2026). *See also IAPD Report Thomas Joseph Brough*, INVESTMENT ADVISER PUBLIC DISCLOSURE, https://adviserinfo.sec.gov/individual/summary/2403390 [https://perma.cc/9NBL-6WB6] (last visited Aug. 14, 2026).




69. Next, Plaintiff was funneled into another of "Mr. Brough's" WhatsApp investment groups and was encouraged to "sell existing holdings" and "concentrate your funds" in Concorde and other stock recommendations to maximize returns:



70. The impersonators also disseminated mass "trading strategy" messages that promoted Concorde stock by name and promised specific, guaranteed-sounding returns over short holding periods. One such message, captioned "7.10 Value Investment Strong Trading Strategy" and identifying "Stock Code: CIGL," directed recipients to "Buy at Market Price," represented an "Expected Return" of "180%" over a "Holding Time" of "5 Trading Days," and recited the same operational talking points that appeared in Concorde's own promotional materials, describing Concorde as Singapore's leading smart security solution provider with self-developed "I-Guarding Solutions," asserting that the Company had introduced "strategic investors" and that its stock had "hit a new record high," and claiming that the price was "expected to rise explosively in the near future." The five-trading-day holding period corresponds to the instruction, described above, that investors hold for five days for guaranteed returns.



71. Investors were also given specific, individualized buy instructions for Concorde stock through private messages. In the exchange below, an account bearing the name "Joseph" and a New York (646) telephone number sent a "Today's high-quality stock strategy" message identifying "Stock code: CIGL.us," a "Purchase price" of "$27.7," "Purchase funds" of "100K," and a "Target return" of "more than 20%," accompanied by a live price quotation showing "Concorde International Group Ltd (CIGL)" trading at $28.63 on Nasdaq. The recipient was prompted to, and confirmed that he would, "Buy at $27.7." This solicitation occurred while Concorde's share price was near its Class Period high.




72. The manipulation was actively coordinated within the messaging-application groups themselves. In the group pictured below, styled "Stock market Forum-8003" and configured so that only administrators could post, accounts posing as ordinary members announced

in rapid succession that they had “added another 3000 shares,” that “some funds have just arrived, I will buy more,” and that they anticipated “more than 100% profit in 2 days.” A group administrator instructed members who had purchased to “keep it confidential,” to “not [] publish any specific information of the stock in the group,” and to “send the screenshot of the completed order” to an assistant for “registration.” Another administrator message assured members that a “risk control team” had “launched an emergency plan and is ready to use $1 billion of institutional reserve funds to push the stock price to rebound above $30.00.” These coordinated purchases, false assurances of institutional support, and demands for secrecy are hallmarks of the pump-and-dump scheme alleged herein.



73. Acting on "Mr. Brough's" advice, Plaintiff invested a substantial portion of his life savings in Concorde and lost approximately $636,651, more than 90% of that investment in the July 10, 2025 crash.

74. The same coordinated promotion that ensnared Plaintiff was independently reported by other members of the investing public. In a public online discussion of Concorde's July 10, 2025 collapse, one participant reported having been contacted by the same or similar operators and reproduced a message, timestamped July 10, 2025, and attributed to a WhatsApp contact using the name Kristi, that was captioned 7.10 Value Investment Strong Trading Strategy, identified Concorde, directed the recipient to buy at market, promised an expected return of 180% over a five-trading-day holding period, and recited the same distinctive assertions concerning Concorde's I-Guarding technology, strategic investors, institutional interest, record-high price, and imminent explosive rise that appear in the messages disseminated to Plaintiff's group. The same participant reported that, while Concorde traded near $30 that day, the contact predicted that Concorde would reach $36 to $42 after the close, urged an immediate purchase, and asked whether the trade had been completed. Other participants then reported, in real time, that the stock was dumping and had been halted, and that the operators continued asking, and ultimately pleading, for screenshots of completed transactions.[7] These public reports corroborate the existence, wording, and timing of the widespread promotion scheme alleged herein.

75. The same public discussion reflects that substantially identical Concorde solicitations circulated through multiple ostensible identities and through more than one messaging-application group. One participant reported receiving the same messages under

---

7 Delicious-Outcome964, *CIGL possible Pump and Dump*, REDDIT: R/QUEENSTREETBETS, https://www.reddit.com/r/queenstreetbets/comments/1lwd05d/cigl_possible_pump_and_dump/ [https://perma.cc/4FDZ-96J6] (last visited Aug. 14, 2026).

different names; another identified a WhatsApp contact using the name Mila and the telephone number +1 (609) 381-9402; and other participants identified supposed assistants or administrators using the names Diana, Lilley Martinez, Esther, Claudia, and Emily. A participant separately identified a Concorde-related WhatsApp group called Value Nuggets Group-9560, distinct from the Stock market Forum-8003 group pictured above.[8]

76. Members of the public also reported that the operators who promoted Concorde were the same operators who had previously promoted the securities of Ostin Technology Group Co., Ltd., another foreign issuer. Participants reported that Concorde was offered to investors who had lost money on Ostin as purported compensation for those losses, again with a five-trading-day horizon and a promised return of 150% or more; that the same messaging-application group that had promoted Ostin moved to promoting Concorde; that Concorde collapsed within hours of a purported five-day recommendation; and that at least one recipient received a contemporaneous telephone call from a number in India concerning Concorde. These reports appear in separate public discussions concerning Ostin and Concorde.[9]

77. The promotion of Concorde's securities was reported beyond Plaintiff's group and beyond the United States. On June 28, 2026, the Israeli technology publication Calcalist reported that shares of Concorde had appeared in comparable WhatsApp pump-and-dump campaigns targeting Israeli investors. A separate public account posted to LinkedIn, naming Ostin, China

---

8 Delicious-Outcome964, *supra* note 7.

9 Delicious-Outcome964, *supra* note 7; Flimsy_Control_9733, *OST Pump and Dump scam Victims - Information and Help*, REDDIT: R/QUEENSTREETBETS, https://www.reddit.com/r/queenstreetbets/comments/1lq4gxn/ost_pump_and_dump_scam_victims_information_and/ [https://perma.cc/4X7H-7NHC] (last visited Aug. 14, 2026); ComprehensiveBee8146, *Possible OST (Ostin Technology Group) Pump-and-Dump Scam - Be Careful*, REDDIT: R/QUEENSTREETBETS, https://www.reddit.com/r/queenstreetbets/comments/1l8qzy5/possible_ost_ostin_technology_group_pumpanddump/ [https://perma.cc/C7UT-QEF8] (last visited Aug. 14, 2026).

Liberal, and Concorde, described a recurring funnel that began with sponsored Instagram or Facebook advertisements impersonating financial professionals and ended in a private WhatsApp group that delivered initial winning recommendations, pressure to buy or hold, a sudden collapse, and a follow-on recovery trade.[10]

78. Lead Counsel's investigation included the review of messaging-application communications from the coordinated promotional groups through which Concorde's securities were promoted to Plaintiff and other retail investors.

79. The operators followed the same playbook that has been charged and documented in connection with the other Nasdaq foreign pump-and-dump schemes described above. They recruited retail investors through sponsored social-media advertisements, including advertisements invoking the name and likeness of a well-known financial personality; funneled those recruits into private WhatsApp groups; impersonated legitimate investment advisers and financial professionals; and posted a steady stream of coordinated messages urging members to buy and to hold, to place limit orders at operator-directed prices, and to liquidate their other holdings and concentrate their funds in the security the operators were then promoting. The operators used a rotating set of apparently fabricated "member" accounts to post screenshots of purported profits and to manufacture a fear of missing out and directed members to send screenshots of their completed purchases so that the operators could compile, and later coordinate, the group's aggregate holdings.

---

[10] *See* Almog Azar, *"I lost almost $300,000 in four minutes": How an alleged WhatsApp pump-and-dump scheme played out*, CALCALIST (June 28, 2026), https://www.calcalistech.com/ctechnews/article/byi5s11hgfe; Albert Cervello Griso, *Pump and Dump: The slow scam that feels like a smart decision… until it crushes*, LINKEDIN: ALBERT CERVELLÓ GRISO'S POST, https://www.linkedin.com/posts/albertcervello_ost-pumpanddump-scam-activity-7350550904066011137-4Ehh [https://perma.cc/5KLU-R9BE] (last visited Aug. 14, 2026).

80. The messaging-application communications reflect that this apparatus operated as a serial pump-and-dump conveyor that moved the same investors from one Nasdaq-listed foreign issuer to the next. When Concorde's price collapsed, the operators directed investors to sell their Concorde shares and to preserve their remaining funds for yet another undisclosed "value investment," continuing the same conveyor.

81. The communications further reflect that the operators did not merely recommend Concorde, but represented that they were themselves controlling its price. On the day of Concorde's collapse, the operators represented to investors that a coordinated effort to raise Concorde's share price using pooled investor funds had already begun, that the effort had been overwhelmed by stop-loss selling and short-selling, and that the plan to raise the price would therefore be postponed. The operators predicted that Concorde's price would fall below $2, instructed investors to sell, and directed them to conserve their remaining funds for the next coordinated trade. Concorde's share price in fact collapsed that day, and the operators immediately pivoted the group to a new target.

82. After the collapse, and consistent with the same playbook, the operators offered Plaintiff a purported "compensation plan," representing that a portion of his losses would be reimbursed, a device used to keep victims engaged with the operators and to solicit further funds rather than to make investors whole.

83. The apparatus that promoted Concorde was not new, and Concorde was not its first target. The same coordinated WhatsApp promotional model, operated through impersonated investment advisers and financial professionals and the serial rotation of retail investors from one Chinese-linked Nasdaq foreign ticker to the next, is the model that the United States Department of Justice charged in the criminal Indictment in *United States v. Yan Zhao and Lai Kui Sen*, No.

1:25-CR-259 (E.D. Va.), which alleged that a financial adviser, an issuer's co-chief executive officer, and at least 15 co-conspirators used coordinated WhatsApp groups and impersonated financial professionals to manipulate the shares of Ostin, which collapsed more than 90% in a single trading session on June 26, 2025, approximately two weeks before Concorde's own collapse on July 10, 2025. The same model was alleged in the pump-and-dump schemes involving China Liberal, Pheton, and Jayud. Public reporting and social-media accounts of these campaigns, including accounts that identify Ostin, Pheton, China Liberal, and Concorde together, that describe the identical recruitment-and-rotation funnel, and that describe the same messaging-application group that had promoted Ostin moving to promote Concorde, further reflect that Concorde was promoted through the same, or an affiliated, network of promoters as part of the same coordinated wave of Nasdaq foreign issuer manipulations, of which Concorde was a later instance.

84. Taken together, the identity of the promotional apparatus, personas, and modus operandi; the rotation of the same investors out of a prior Nasdaq foreign issuer and into Concorde; the operators' representation that they were themselves raising Concorde's price with pooled funds; and the near-simultaneity of Concorde's collapse with the collapses of the other issuers manipulated through the same apparatus support the inference that Concorde was targeted and promoted by the same, or an affiliated, network of promoters responsible for the earlier pump-and-dump schemes, and that Concorde's low-float offering was selected and exploited as the next vehicle for the same coordinated manipulation.

## III. PUBLIC WARNINGS DURING CLASS PERIOD

85. On June 16, 2025, the *Wall Street Journal* (the "WSJ"), a national newspaper of record and one of the largest sources of financial news in the United States,[11] published the article "Obscure Chinese Stock Scams Dupe American Investors by the Thousands."[12] In the article, the WSJ tells the story of Braden Lindstrom, a Utah-based college professor who lost tens of thousands of dollars in the Jayud social media pump-and-dump scam identical to Concorde.

86. On July 10, 2025, *TradeInformer* published the article "Exclusive: Pump and dump scammers target Concorde International Group at market open Thursday" detailing the parallels between the Ostin Technology fraud and what was happening with Concorde.[13] The article goes on to detail how brokers such as DEGIRO had restricted access to Concorde recognizing it as a fraud and prevented their clients from purchasing it. Specifically, it stated, "social media ads" were being used "to mass target retail investors in different countries, pushing them to join Telegram and WhatsApp groups" and "[f]rom there, they pushed them to buy stock." Lastly, the article explains how perpetrators instructed investors "to hold for five days" for guaranteed returns.

87. On July 17, 2025, *The Bear Cave*, a leading forensic financial research authority, published the article "Problems in Chinatown" identifying Concorde among recent U.S.-listed foreign issuers whose shares were the subject of such stock promotions, along with Ostin, China

---

[11] *National Newpapers of Record*, PRESSBOOKS, https://pressbooks.pub/webliteracy/chapter/national-newspapers-of-record/ [https://perma.cc/9XFE-GVBD] (last visited Aug. 14, 2026).

[12] Dave Michaels, *Obscure Chinese Stock Scams Dupe American Investors by the Thousands*, WALL ST. J. (June 16, 2025), https://www.wsj.com/finance/regulation/obscure-chinese-stock-scams-dupe-american-investors-by-the-thousands-8416f795 [https://perma.cc/TG9V-GVJK].

[13] David Kimberley, *Exclusive: Pump and dump scammers target Concorde International Group at market open Thursday*, TRADEINFORMER (July 10, 2025), https://tradeinformer.com/broker-news/exclusive-pump-and-dump-scammers-target-concorde-international-group-at-market-open-thursday [https://perma.cc/MS8U-EUAQ].

Liberal, WAI, PHH, and others.[14] This reinforces the strong inference of Defendants' purposeful/reckless participation in the fraudulent social media promotion of Concorde's stock.

88. On August 7, 2025, The Bear Cave published a follow-up investigation, "Problems in Chinatown (Part 2)," further detailing the machinery of the coordinated pump-and-dump schemes targeting U.S.-listed foreign issuers. The report described the schemes' reliance on hundreds or thousands of WhatsApp groups, fabricated rumors that a large and legitimate company would soon acquire or partner with the promoted issuer, polished educational content, loyalty gifts, and photo or video verification used to gatekeep "VIP" trading groups, and estimated that, with dozens of such schemes each year, the total stock-manipulation revenue was likely approaching tens of billions of dollars annually.

89. In connection with that investigation, *The Bear Cave* launched a public, searchable database at StopNasdaqChinaFraud.com, to which investors can upload screenshots from the WhatsApp stock-manipulation groups used to promote these issuers, in order to document the schemes and warn other investors. The coordinated social-media and messaging-application promotion that targeted Concorde, as described herein, employed the same machinery.[15]

90. On August 18, 2025, the *Financial Times*, an international news syndicate with a special emphasis on business and economic news, published the article "'I almost fell off my chair': Investors lose billions on meme stocks as 'pump and dump' scams multiply" describing seven Nasdaq-listed foreign stocks, including Concorde, whose share prices dropped more than

---

14 Edwin Dorsey, *Problems in Chinatown: A Deep Dive Into Criminal Stock Scams*, THE BEAR CAVE (July 17, 2025), https://thebearcave.substack.com/p/problems-in-chinatown [https://perma.cc/W79G-HLDM].

15 Edwin Dorsey, *Problems in Chinatown (Part 2)*, THE BEAR CAVE (Aug. 7, 2025), https://thebearcave.substack.com/p/problems-in-chinatown-part-2 [https://perma.cc/G7FM-VMY7]; *see also* StopNasdaqChinaFraud.com, https://www.stopnasdaqchinafraud.com/ [https://perma.cc/G47B-6LT3] (last visited Aug. 14, 2026).

80% over a few trading sessions in recent weeks amounting to a $3.7 billion decline from their cumulative market value.[16]

91. On September 10, 2025, DOJ indicted Ostin's Co-CEO and a financial advisor for orchestrating the social media-based pump and dump of Ostin's stock during the class period.[17] The indictment was unsealed and announced on September 12, 2025. Here, the parallels and timeline of the Concorde pump and dump identified by *TradeInformer* support a strong inference that Defendants acted in the same manner; purposefully/recklessly engaging in or conspiring to engage in a coordinated social media promotion campaign aimed at defrauding investors.

92. On January 29, 2026, Bloomberg published the article "Wall Street's Stamp of Legitimacy Fuels Suspected Pump-and-Dump Schemes" describing the significant spike in investor scams involving small companies based in Asia taken public by U.S.-based underwriters specializing in foreign issuer stocks.[18] The article specifically notes R.F. Lafferty, the same underwriter for Concorde, was one of the notable underwriters who took public 14 firms that later became the subject of pump-and-dump campaigns.

93. Concorde's own subsequent annual report further confirmed that the Company did not possess the financial strength that its Class Period promotion implied. In its annual report on

---

[16] George Steer, *I almost fell off my chair: Investors lose billions on meme stocks as 'pump and dump' scams multiply*, FINANCIAL TIMES (Aug. 18, 2025) https://www.ft.com/content/38c9815b-8ccc-40d5-bcbf-cfdb8b73ffa6?syn-25a6b1a6=1 [https://archive.ph/swm6r].

[17] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme (Sep. 12, 2025) (on file with author).

[18] Weihua Li, Nicola White, Mathieu Benhamou and Armand Emamdjomeh, *Wall Street's Stamp of Legitimacy Fuels Suspected Pump-and-Dump Schemes*, BLOOMBERG (Jan. 29, 2026), https://news.bloomberglaw.com/capital-markets/wall-streets-stamp-of-legitimacy-fuels-suspected-pump-and-dumps

Form 20-F for the fiscal year ended December 31, 2025, Concorde reported net losses of $83,623,097 for fiscal year 2024 and $15,202,384 for fiscal year 2025, in contrast to the net profit of $994,194 it had reported for fiscal year 2023 in the financial statements used in the offering. The Company's reported results thus reflected substantial and continuing losses rather than the growth and profitability that Defendants and the coordinated promotional campaign represented to the market during the Class Period.[19]

## IV. REGULATORY ACTIONS

94. Recognizing this recurring "pump-and-dump" pattern in offshore IPOs, regulators took action to stop them.

95. On September 3, 2025, Nasdaq issued a press release detailing proposed changes to its listing standards in response to "emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments."[20] Specifically, "[t]he revised standards include:

- A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.
- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.
- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China."

The article goes on to explain that "Nasdaq will continue to actively refer cases to the Securities and Exchange Commission ([']SEC[']) and the Financial Industry Regulatory Authority ([']FINRA[']) on potentially manipulative trading activities, while strengthening our cooperation

19 Concorde International Group Ltd., Annual Report (Form 20-F) (May 12, 2026) (for the fiscal year ended Dec. 31, 2025).

20 Press Release, Nasdaq, NASDAQ Proposes Changes to its Listing Standards (Sep. 3, 2025) (on file with author).

with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets." As a whole, the proposed rule changes by Nasdaq demonstrate how well known and pervasive foreign IPOs like Concorde were over the class period. Therefore, Defendants purposefully engaged in, conspired to engage in a pump-and-dump of Concorde's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

96. On September 5, 2025, the SEC issued a press release announcing "Formation of Cross-Border Task Force to Combat Fraud."[21] The release specifically identifies "auditors and underwriters" as "gatekeepers" who enable "'pump-and-dump' and 'ramp-and-dump' schemes" perpetrated by "foreign based companies" including "China" as targets of the new task force. Paul S. Atkins, Chairman of the SEC was quoted in the September 5th release stating:

> we will not tolerate bad actors – whether *companies, intermediaries, gatekeepers*, or exploitative traders – *that attempt to use international borders to frustrate and avoid U.S. investor protections.* This new task force will consolidate SEC investigative efforts and allow the SEC to *use every available tool to combat transnational fraud*. [Emphasis added].

Overall, the SEC press release reinforces just how omnipresent foreign-based IPO frauds like Concorde were throughout the Class Period. Again, this demonstrates that Defendants purposefully engaged in, conspired to engage in a pump-and-dump of Concorde's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

97. As set forth above, FINRA issued an investor alert warning the public of the broker imposter scams on December 9, 2025[22] stating:

---

21 Press Release, Security and Exchange Commission, SEC Announces Formation of Cross-Border Task Force to Combat Fraud (Sep. 5, 2025) (on file with author).

22 FINRA, *Investor Alert: Social Media 'Investment Group' Imposter Scams Continue to Rise*, FINRA.ORG: FOR INVESTORS: INVESTOR INSIGHTS (Dec. 9, 2025) https://www.finra.org/investors/insights/investment-group-imposter-scams [https://perma.cc/WJ67-YHCZ].

> FINRA has seen a significant spike in investor complaints resulting from recommendations made by fraudulent "investment groups" promoted through social media channels. In July 2025, the FBI issued a Public Service Announcement regarding investment group scams noting at least a 300% increase in victim complaints referencing ramp-and-dump stock fraud as compared to 2024. These scams target investors through online engagement, often by promoting an investment group or club.
>
> Complaints received by FINRA and posted on social media describe bad actors, posing as registered investment professionals, who initially advertise "stock investment groups" on Instagram, Facebook and other social media channels and then turn to encrypted group chats on messaging applications such as WhatsApp to communicate with interested investors and pitch investments. Investors are sometimes first contacted via text message or, in some cases, have even found themselves added to encrypted group chats directly without any prior contact. FINRA has also observed an increase in reports of scammers messaging and communicating with investors in one-on-one encrypted chats in addition to group chats.
>
> FINRA continues to receive complaints alleging millions of dollars in total losses due to investment group scams, and has recently observed an increase in complaints from victims located outside the U.S. And if history is a guide, the impact of these scams could be much greater than is being reported.

98. On December 18, 2025, the SEC officially approved Nasdaq's proposed rule changes.[23]

99. On May 14, 2026, the SEC approved a further Nasdaq rule change requiring companies principally operating in China, including Hong Kong and Macau, to raise at least $25

[23] Self-Regulatory Organizations, The Nasdaq Stock Market LLC, Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 1, to Modify Certain Initial Listing Requirements, SEC Release No. 34-104450 (Dec. 18, 2025).

million in gross proceeds in a firm-commitment public offering in order to list on Nasdaq.[24] In adopting the rule, Nasdaq and the SEC explained that the smaller offering sizes, lower public-float percentages, and limited investor base of such issuers make their securities more susceptible to manipulation, including insider trading and pump-and-dump schemes, and that larger offerings produce a broader shareholder base and greater liquidity that reduce opportunities for manipulation. Concorde's $5.0 million initial public offering and public float of only approximately 1,437,500 shares were characteristic of precisely the small-offering, low-float profile that Nasdaq and the SEC concluded rendered issuers susceptible to the manipulation alleged herein.

100. The regulatory findings supporting these rule changes confirm how concentrated, and how foreseeable, the manipulation of low-float foreign issuers had become. In approving the new listing standards, the SEC noted that, from August 2022 to April 2025, approximately 70% of Nasdaq's enforcement case referrals to the SEC or FINRA relating to market manipulation involved Chinese companies, even though those companies accounted for less than 10% of all Nasdaq listings during that period.[25] The SEC further noted that, since September 2025, it had suspended trading in the securities of 14 companies, many with ties to mainland China or Hong Kong, due to suspicious trading patterns. These findings confirm that the pump-and-dump manipulation of thinly traded foreign issuers such as Concorde was a known, pervasive, and foreseeable risk throughout the Class Period, not an isolated or unforeseeable event.

---

[24] The Nasdaq Stock Market LLC, Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Provide Nasdaq with Limited Discretion to Deny Initial Listing to Certain Companies, Release No. 34-104464, File No. SR-NASDAQ-2025-104, (Dec. 19, 2025) https://www.sec.gov/files/rules/sro/nasdaq/2025/34-104464.pdf.

[25] The Nasdaq Stock Market LLC, *supra* note 24.

101. The SEC entered these trading suspensions pursuant to Section 12(k) of the Exchange Act, and its suspension orders describe the same scheme alleged herein. In its orders, the SEC explained that it was suspending trading because of potential manipulation in each company's securities effectuated through recommendations made to investors by unknown persons via social media to purchase, hold, or sell the securities, and, in a number of instances, to send screenshots documenting their transactions, which appeared to be designed to artificially inflate the price and trading volume of the securities. The suspended companies shared Concorde's profile as recently public, Asia-based, offshore-incorporated issuers, and included issuers within the same cohort of manipulated foreign issuers as Concorde, among them Smart Digital Group Limited (NASDAQ: SDM), a Cayman Islands company headquartered in Singapore, and QMMM Holding Limited (NASDAQ: QMMM), each of which the SEC suspended on September 26, 2025. The SEC's suspension of these issuers, for the very manner of social-media-driven manipulation alleged here, confirms both the reality of the scheme and the foreseeability of the risk that Concorde presented.[26]

102. As previously stated, on September 12, 2025, the DOJ unsealed an indictment in the Eastern District of Virginia charging executives of Ostin with securities and wire fraud as well as conspiracy to commit securities fraud and wire fraud, for orchestrating the Ostin pump-and-dump scheme identical to Concorde.[27]

103. The indictment alleges that the Defendants, along with their co-conspirators, engaged in a fraudulent scheme to artificially inflate the price and trading volume of Ostin stock

---

[26] Order of Suspension of Trading, In re Smart Digital Group Ltd., Exchange Act Release No. 104112 (Sep. 26, 2025); Order of Suspension of Trading, In re QMMM Holding Ltd., Exchange Act Release No. 104113 (Sep. 26, 2025).

[27] Off. of Pub. Affs., U.S. Dep't of Just., *supra* note 17.

through social media and messaging service applications, including promotions that impersonated advisors and financial professionals. The government details how the Defendants inflated the market capitalization of Ostin from $22 million to more than $1 billion. As the stock price rose, the Defendants opened brokerage accounts that were used to sell millions of shares that were obtained through non-bona fide securities offerings and resulted in members of the conspiracy fraudulently obtaining more than $110 million in proceeds from the sale of the stock. These offerings were structured to give the appearance of legitimate financing but were, in fact, used to funnel shares into nominee accounts later used for dumping.

104. On December 4, 2025, Ostin's auditor, TPS Thayer, LLC, was sanctioned by the PCAOB pursuant to a settled disciplinary order finding that TPS Thayer knew or should have known of, and failed reasonably to supervise, violations arising out of its 2020, 2021, and 2022 audits of Ostin.[28] As alleged in the Auditor Defendant Allegations below, Concorde's auditor, Kreit and Chiu, exhibited the same categories of audit-quality deficiency that the PCAOB has identified in gatekeeper audits of comparable issuers, and functioned as a key gatekeeper whose unqualified opinions enabled Concorde to access the U.S. capital markets. As the SEC explained, "gatekeepers, particularly auditors and underwriters, […] help these companies access the U.S. capital markets."[29] Therefore, without these fraudulent audit opinions, companies like Concorde could not have registered their securities for sale and Defendants executed their fraudulent scheme.

105. In summary, the updates to Nasdaq's rules, SEC task force, FINRA investor alert, FBI public service announcement, DOJ indictment of Ostin executives, PCAOB sanctioning of

---

[28] ORDER INSTITUTING DISCIPLINARY PROCEEDINGS, MAKING FINDINGS, AND IMPOSING SANCTIONS, PCAOB RELEASE NO. 105-2025-037 (Dec. 4, 2025), https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/decisions/documents/105-2025-037-tps.pdf?sfvrsn=41d4ed02_2 [https://perma.cc/Q78L-LNB2].

[29] SEC, *supra* note 21.

Ostin's auditor, the DOJ's criminal prosecution and $214 million forfeiture in the China Liberal scheme, and the DOJ's June 30, 2026 forfeiture actions in this District concerning the CTRL Group and Dreamland schemes, demonstrate just how pervasive foreign IPO fraud was throughout the class period. Despite these obvious risks, Defendants proceeded with the Concorde IPO and continued to promote investment in the Company. Therefore, Defendants purposefully engaged in, conspired to engage in a pump-and-dump of Concorde's stock, and/or recklessly disregarded a substantial likelihood it would be used to perpetrate one.

106. The pattern has continued to generate enforcement activity in this District. On June 30, 2026, the United States Attorney for the Southern District of New York filed two verified civil forfeiture complaints seeking forfeiture of more than $19.5 million in cash and securities traceable to coordinated pump-and-dump schemes in the securities of two Nasdaq-listed foreign issuers structured like Concorde: CTRL Group Limited, a British Virgin Islands company operating in Hong Kong that had conducted a $4.00-per-share initial public offering and listed on the Nasdaq Capital Market under the symbol "MCTR," and Dreamland Limited, a Cayman Islands company operating in Hong Kong that had conducted a $4.00-per-share initial public offering and listed on the Nasdaq Capital Market under the symbol "TDIC." In each action the Government alleged that the issuer's shares were promoted through coordinated social-media campaigns and private messaging-application groups on platforms including WhatsApp, Discord, X, and Reddit; that the promotions drove the share price up in a manner unsupported by any corporate news; and that pre-positioned insiders and affiliates sold into the artificial demand before the price collapsed. The Government pleaded that the proceeds were forfeitable as the proceeds of securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5, wire fraud, and money laundering—the same securities-fraud theory alleged here. The Dreamland complaint further

alleged that the scheme employed the compromised login credentials of a legitimate third-party financial adviser in an attempt to purchase more than $22 million of the promoted stock through other investors' accounts—the same impersonation of a legitimate financial professional through which Concorde was promoted to Plaintiff, as alleged above. Both actions were investigated by the FBI, were brought with the assistance of FINRA and the SEC's Cross-Border Task Force, and were filed in this District, where Concorde's securities were offered and sold and where this action is pending.[30]

107. Together, the facts alleged by Plaintiff and other class members, along with news releases like those of *The Bear Cave*, *WSJ*, *Financial Times*, *Bloomberg* and *TradeInformer*, as well as regulatory actions taken by the Nasdaq, SEC, DOJ, and PCAOB prove that throughout the Class Period, Concorde's stock price was artificially inflated through coordinated social media campaigns which disseminated materially false and misleading information about the Company. Through these campaigns, impersonators using stolen identities of legitimate financial advisors lured victims through Facebook/Instagram/Meta ads into private investor chat groups on platforms like WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise buying pressure for Concorde stock.

108. The statements made by impersonators had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing Concorde shares at inflated prices. By peddling fabricated prospects of

---

[30] *United States v. $30,619.27 in United States Currency, et al.*, No. 1:26-cv-05543 (S.D.N.Y. filed June 30, 2026) (CTRL Group Limited); *United States v. $8,388,824.85 in United States Currency, et al.*, No. 1:26-cv-05545 (S.D.N.Y. filed June 30, 2026) (Dreamland Limited); Press Release, U.S. Att'y's Office for the S.D.N.Y., U.S. Attorney Announces Recovery of $19.5 Million for Victims of China-Based Pump-and-Dump Schemes (No. 26-195) (June 30, 2026). The Dreamland complaint additionally alleged securities fraud in violation of 18 U.S.C. §1348.

imminent corporate success, the scheme misled investors about Concorde's value and created artificial demand for Concorde stock. Again, Concorde's IPO and low float were purposefully designed by Defendants to enable this fraudulent scheme to be effectuated.

109. In connection with their investigation, Lead Counsel submitted a Freedom of Information Act ("FOIA") request to the SEC seeking investigative materials created or obtained in connection with the SEC's Cross-Border Task Force concerning R.F. Lafferty & Co., Inc. for the period 2024 through 2026. By letter dated July 17, 2026, the SEC declined to produce responsive records, withholding them under 5 U.S.C. §552(b)(7)(A), the exemption that applies only to records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities. Lead Counsel submitted a separate FOIA request seeking investigative materials created or obtained in connection with the SEC's Cross-Border Task Force concerning Concorde's auditor, Kreit and Chiu CPA LLP, for the same 2024 through 2026 period. By letter dated June 25, 2026, the SEC likewise withheld responsive records under Exemption 7(A) on the same law enforcement grounds. The SEC's invocation of Exemption 7(A) as to both R.F. Lafferty and Kreit and Chiu reflects that the agency maintained law enforcement records concerning each as of mid-2026.

## V. POST CLASS PERIOD EVENTS – THE FRAUDULENT PROMOTION OF CONCORDE'S SECURITIES IS ONGOING

110. On March 18, 2026, Concorde completed a merger with YOOV Group Holding Limited ("YOOV"), pursuant to an Agreement and Plan of Merger dated February 3, 2026, and a waiver agreement dated March 18, 2026, by and between Concorde and YOOV. Upon the completion of the transaction, YOOV became a wholly owned subsidiary of Concorde, and Concorde issued 200,000,000 newly issued Class A Ordinary Shares to the shareholders of YOOV. That issuance was more than one hundred times the size of Concorde's entire public float, which

had been established less than a year earlier through an initial public offering of only 1,250,000 Class A Ordinary Shares, together with a subsequent over-allotment of 187,500 Class A Ordinary Shares.

111. According to Concorde's own public filings, YOOV is a holding company incorporated in the British Virgin Islands with no material operations of its own. YOOV is headquartered in Hong Kong, maintains sales and operations offices in Australia, Hong Kong, Malaysia, and Taiwan, and describes itself as a provider of Artificial Intelligence-as-a-Service solutions, deriving the vast majority of its revenues from operations in Hong Kong. Concorde, by contrast, had represented itself to investors at the time of its offering as a Singapore-based integrated security services provider that combined physical manpower with security technology. The merger thus grafted an unrelated Hong Kong artificial-intelligence business onto a Singapore physical-security company and did so through the issuance of 200,000,000 new shares to YOOV's shareholders.

112. In connection with the merger, Concorde changed the ticker symbol under which its Class A Ordinary Shares traded on the Nasdaq Capital Market from "CIGL" to "YOOV", effective April 13, 2026. Concorde's shares had traded under the symbol "CIGL" since its initial public offering on April 22, 2025.

113. On July 20, 2026, Concorde announced that it would change its Nasdaq trading symbol from "YOOV" back to "CIGL", and effective July 21, 2026, Concorde commenced trading under the symbol "CIGL" on the Nasdaq Capital Market. Concorde's Class A Ordinary Shares therefore traded under the "YOOV" symbol for only approximately three months, from April 13, 2026 through July 21, 2026, before Concorde restored the "CIGL" symbol under which those shares had traded since its initial public offering.

114. The fraudulent promotion of Concorde's securities has not ceased. It has continued after the close of the Class Period, and after the collapse of Concorde's share price, through the same coordinated social-media and messaging-application campaign alleged herein, including under the ticker symbol "YOOV," which Concorde adopted in connection with its acquisition of YOOV Group Holding Limited. Accounts on the social-media platform X (formerly Twitter) have continued publicly to tout Concorde's stock under the "YOOV" ticker and to direct investors to join private WhatsApp groups that promise daily stock "recommendations" and real-time alerts, which is the very mechanism through which the pump-and-dump scheme alleged herein was carried out. The images below are true and correct copies of two such posts:






115. The accounts pictured above were not isolated. Publicly indexed posts reflect that @Stock_Screener2 reused the same WhatsApp link, wa.me/16464065692, across solicitations for other tickers, and that @EvanBrookss reused the same WhatsApp link, wa.me/14327552046, across solicitations for other tickers. That repetition is consistent with the operation of recurring stock-tip funnels that direct investors from public social-media posts into private messaging-application groups.[31]

116. The promotion also continued in other languages and markets under the YOOV ticker. On May 14, 2026, the X account @wasit_finance, styled in Arabic as a future-investment

---

[31] *See* Stock Screener (@Stock_Screener2), X, (July 12, 2026, at 2:32 PM ET), https://x.com/Stock_Screener2/status/2076374062105083955 [https://perma.cc/PKJ2-R3VE]; Evan Brooks (@EvanBrookss), X, (July 1, 2026, at 4:49 PM ET), https://x.com/EvanBrookss/status/2072422342668738568 [https://perma.cc/V5XM-Y37U]; Evan Brooks (@EvanBrookss), X, (July 6, 2026, at 11:37 AM ET), https://x.com/EvanBrookss/status/2074155782959157519 [https://perma.cc/PS9X-4E7G].

account, published a sequence of at least three posts concerning YOOV: one invited users to follow YOOV at $1.28 and to join through WhatsApp or Telegram; a second claimed a further 10% gain; and a third claimed a 40% gain in YOOV in less than one hour and again directed users to WhatsApp and Telegram.[32]

117. A further publicly indexed X profile, using the name Lesley Beard and the handle @LokendraMalik5, solicited investors for daily stock picks delivered through WhatsApp at wa.me/14642441215, and listed CIGL among the tickers promoted. This post postdates the July 2025 collapse and, like the posts described above, reflects the continued use of CIGL in a WhatsApp recruitment funnel.[33]

118. The promotion of Concorde's securities also continued on public message boards. In late 2025, an account using the name SqueezeLive posted an identical message titled CIGL letss gooo across numerous stock-focused communities on the Reddit platform, including r/SqueezePlayLive, r/Stocks_Picks, r/DeepFuckingValue, r/10xPennyStocks, r/TheRaceTo10Million, and r/StockBreakouts.[34]

---

[32] *See* Future Investment (@wasit_finance), X, (May 14, 2026, at 9:35 AM ET), https://x.com/wasit_finance/status/2054918498934026345 [https://perma.cc/U47G-698J]; Future Investment (@wasit_finance), X, (May 14, 2026, at 10:03 AM ET) https://x.com/wasit_finance/status/2054925637404475863 [https://perma.cc/6GA2-PRE7]; Future Investment (@wasit_finance), X, (May 14, 2026, at 10:21 AM ET), https://x.com/wasit_finance/status/2054930044837941707 [https://perma.cc/UQA2-YSNF].

[33] *See* Lesley Beard, *Lesley Beard @LokendraMalik5*, X: LOKENDRAMALIK5, https://x.com/LokendraMalik5 (last visited Aug. 14, 2026).

[34] *See* SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT: R/SQUEEZEPLAYLIVE, https://www.reddit.com/r/SqueezePlayLive/comments/1nvn6ev/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/6QFT-H4GR] (last visited Aug. 14, 2026); SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT: R/STOCKS_PICKS https://www.reddit.com/r/Stocks_Picks/comments/1nvs3wc/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/D8UX-HRQG] (last visited Aug. 14, 2026); SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT:

119. The coordinated promotion of Concorde's securities has continued into August 2026, again under the restored "CIGL" ticker and again directing retail investors from public social-media posts into private group chats. On and around August 11, 2026, numerous accounts on the social-media platform X posted repetitive messages touting "$CIGL" with captions such as "Here we go" and "Target price for Tomorrow," each paired with a link to an off-platform "discord" or blog destination purporting to offer trading guidance—the same public-post-to-private-chat funnel alleged throughout this Complaint. A separate account, styled as a "Discord VIP" stock-alert service, publicly listed "$CIGL" among its purported winning "squeeze" picks for August 11, 2026, and solicited investors to join its private Discord channel for "real-time intraday alerts." The images below are true and correct copies of two such posts:[35]

---

R/DEEPFUCKINGVALUE https://www.reddit.com/r/DeepFuckingValue/comments/1nvskyp/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/S5XT-26PW] (last visited Aug. 14, 2026); SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT: R/10XPENNYSTOCKS https://www.reddit.com/r/10xPennyStocks/comments/1nvsgk9/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/S43F-T9MT] (last visited Aug 14, 2026); SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT: R/THERACETO10MILLION https://www.reddit.com/r/TheRaceTo10Million/comments/1nvsljx/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/7QL9-Q986] (last visited Aug. 14, 2026); SqueezeLive, *CIGL letss gooo I guess you guys all ignored my last post this time*, REDDIT: r/StockBreakouts https://www.reddit.com/r/StockBreakouts/comments/1nvs96h/cigl_letss_gooo_i_guess_you_guys_all_ignored_my/ [https://perma.cc/EYJ4-GCEX] (last visited Aug. 14, 2026).

[35] Screenshots captured from the social-media platform X (formerly Twitter) on August 12, 2026.

**Joyta** @Joyta264244 · 17h
$CIGL Here we go👀 discord-profit.blogspot.com
1 · 1 · 58

**Ko Varen** @ko_varen17187 · 18h
$CIGL Target price for Tomorrow discord-trading.blogspot.com
34

**Ko Varen** @ko_varen17187 · 18h
$CIGL Target price for Tomorrow👀 discord-trading.blogspot.com
35

**StockCryptoHub** @OJunlun4549 · 19h
$CIGL Target price for Tomorrow.. discord.gg/XkaWh7Kwfr
40

**Top Trader Henry** @lychn347143 · 21h
$CIGL Here we go.. discord-profit.blogspot.com
42

**Raymond Janet** @ChengYou6848 · Aug 11
$CIGL Here we go👀 discord-profit.blogspot.com
35

**CryptoStockEdge** @minkeuel56498 · Aug 11
$CIGL Target price for Tomorrow👀 discord-trading.blogspot.com
64

**CryptoStockEdge** @minkeuel56498 · Aug 11
$CIGL Target price for Tomorrow👀 discord-trading.blogspot.com
49

**Tom Skey | AlphaSignal** @tomskeyz · Aug 11
Slow market today, but VIP members still caught the right squeezes.

🏆 $PLAG ran from $1.15 to $6.81 for +492.17%
🥈 $WXM ran from $9.10 to $13.96 for +53.41%
🥉 $CIGL ran from $0.61 to $0.86 for +40.98%
🔥 $AIHS also pushed from $3.14 to $4.10 for +30.57%

We had over 10 trade opportunities across $WXM, $WYHG, $PLAG, and $AIHS, giving members multiple chances to catch gains throughout the session.

Slow day, but the LIVE SCANNER, watchlist, and live alerts still found the perfect squeeze.



120. These solicitations post-date the collapse of Concorde's share price and the regulatory and enforcement actions described above and demonstrate that the coordinated manipulation of Concorde's securities remains ongoing and that the risk to investors that Defendants failed to disclose has continued to materialize.

**UNDISCLOSED ADVERSE FACTS**

121. The market for Concorde's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Concorde's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Concorde's securities relying upon the integrity of the market price of the Company's securities and market information relating to Concorde and have been damaged thereby.

122. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Concorde's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false, or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Concorde's business, operations, and prospects as alleged herein.

123. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Concorde's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive

assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

124. The risk disclosures in the Registration Statement also failed to comply with the heightened disclosure requirements of SEC Regulation S-K. Item 105 of Regulation S-K, 17 C.F.R. §229.105(a), required the Registration Statement to describe the material factors that made an investment in Concorde speculative or risky, and to do so in terms specific to Concorde and the securities being offered rather than through generic or boilerplate disclosures that could apply to any company. Item 3 of Form F-1 required Concorde to furnish the information called for by Item 105 of Regulation S-K.

125. The Registration Statement did not satisfy that requirement. It warned only, in generic and boilerplate terms, that Concorde's Class A ordinary shares might experience volatility and that, as a company with a relatively small public float, Concorde might experience greater price volatility, price run-ups, lower trading volume, and less liquidity than larger companies. Those disclosures framed the risk of extreme volatility and manipulation as a hypothetical possibility applicable to any small company, when in fact, as alleged herein, the risk was already concrete and present at the time of the offering. Concorde's deliberately small public float and concentrated insider control had been purposefully structured to enable the very manipulation that followed, and low-float foreign issuers brought to market in the same manner, including issuers underwritten by R.F. Lafferty, were already being targeted by coordinated pump-and-dump schemes and, in a number of cases, halted from trading. A risk disclosure that describes an already-

existing and concrete risk as a mere hypothetical possibility is itself materially false and misleading.

126. Item 303 of Regulation S-K, 17 C.F.R. §229.303, separately required the Registration Statement to disclose known trends, events, and uncertainties that were reasonably likely to have a material effect on Concorde or the market for its securities, and applies to the operating and financial review and prospects of foreign private issuers such as Concorde. Under Item 303, disclosure of a known uncertainty is required unless the issuer affirmatively determines that a material adverse effect is not reasonably likely to occur.

127. Items 105 and 303 required Concorde to disclose, and the Registration Statement failed to disclose, among other things: (a) that Concorde's deliberately small public float and concentrated insider control created an elevated and specific risk that Concorde's securities would be manipulated through a coordinated pump-and-dump scheme; (b) that R.F. Lafferty and other participants in the offering had underwritten or served as gatekeepers for numerous similar low-float foreign offerings that had already become the subject of pump-and-dump campaigns, substantially increasing the likelihood that Concorde's securities would be manipulated; (c) the known risk that trading in Concorde's securities would be restricted or halted as a result of manipulative trading; and (d) the known and worsening trend, apparent by the time of the offering, of coordinated social-media pump-and-dump schemes targeting U.S.-listed foreign issuers, which had already produced extreme volatility, collapses, trading halts, and regulatory action. The Registration Statement's failure to disclose these known and specific risks, and its framing of the manipulation risk as a generic hypothetical, rendered its risk disclosures materially false, misleading, and non-compliant with Regulation S-K.

## ADDITIONAL UNDERWRITER ALLEGATIONS

128. Defendant R.F. Lafferty was an underwriter and sole book-running manager for the offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. R.F. Lafferty also participated in conducting and promoting the offering. R.F. Lafferty further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company; an undertaking known as a "due diligence" investigation. During the course of its "due diligence," R.F. Lafferty had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

129. R.F. Lafferty's relationship with Concorde was lengthy and exclusive, not a brief closing-day encounter. Under the Underwriting Agreement, R.F. Lafferty's engagement began on January 10, 2024, and continued through the closing of the offering on April 23, 2025, a period of 469 days, and the agreement further provided R.F. Lafferty a 12-month tail covering investors it introduced and a six-month right of first refusal on future financings. Robert Hackel, R.F. Lafferty's then Chief Operating Officer, signed the Underwriting Agreement on behalf of R.F. Lafferty and was designated as the recipient of every formal notice under the agreement and the related representative-warrant provisions, and R.F. Lafferty alone committed to purchase all 1,250,000 firm shares and all 187,500 option shares in the offering. A sole underwriter engaged for more than 15 months, acting through its Chief Operating Officer, had extended access to Concorde's capitalization, officers, affiliates, and the development of its dual-class share structure, and was not a stranger to the Company or its insiders.[36]

---

[36] Underwriting Agreement between Concorde International Group Ltd. and R.F. Lafferty & Co., Inc. ("Underwriting Agreement"), §§1.5, 2.24 (Apr. 21, 2025).

130. In addition to having access to internal corporate documents, R.F. Lafferty and/or its agents had access to the Company's management, directors, and lawyers to determine: (i) the strategy to best accomplish the offering; (ii) the terms of the offering, including the price at which Concorde's securities would be sold; (iii) the language to be used in the offering documents; (iv) what disclosures about Concorde would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between R.F. Lafferty's representatives and the Company's management, directors, and lawyers, at a minimum, R.F. Lafferty should have known of Concorde's undisclosed problems and plans and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

131. As Concorde's underwriter, R.F. Lafferty caused the Offering Documents to be filed with the SEC and declared effective in connection with the offering so that they, and the corporate and individual defendants, could offer to sell, and did sell, Concorde's shares to Plaintiff and the members of the potential class pursuant (or traceable) to the Offering Documents.

132. R.F. Lafferty's participation in the solicitation of the Offering was motivated by its financial interest. On April 21, 2025, the Company entered into an Underwriting Agreement with R.F. Lafferty which granted R.F. Lafferty a 45-day option to purchase up to 187,500 Class A ordinary shares at the public offering price less the underwriting discounts. On May 2, 2025, R.F. Lafferty fully exercised the Over-Allotment Option to purchase an additional 187,500 Class A ordinary shares at the public offering price.

133. Rather tellingly, R.F. Lafferty was identified as one of the underwriters responsible for taking 14 public firms public that later became the subject of pump-and-dump campaigns.[37]

[37] Weihua Li, Nicola White, Mathieu Benhamou and Armand Emamdjomeh, *supra* note 18.

For example, R.F Lafferty appears on Raytech (RAY) IPO underwriting alongside both Revere and Dominari, other underwriters also affiliated with affected Nasdaq foreign issuers that plunged in value following pump-and-dump schemes, the shares of which are now approximately -95.8%. Similarly, R.F. Lafferty was co-underwriter with Revere for another foreign issuer that tanked, CCSC Technology International Holdings Limited (Nasdaq symbol "CCTG") which is now approximately -99.7% devalued.

134. R.F. Lafferty's conduct in the Concorde offering did not occur in isolation. Approximately three months before Robert Hackel signed the Concorde Underwriting Agreement, he signed, on behalf of R.F. Lafferty, the January 21, 2025 underwriting agreement for the initial public offering of CTRL Group Limited, another low-float foreign issuer that listed on the Nasdaq Capital Market under the symbol "MCTR." R.F. Lafferty served as the representative of the underwriters for the MCTR offering and was allocated 80% of the underwriting, comprising 1,600,000 of the 2,000,000 firm shares and 240,000 of the 300,000 option shares. Like the Concorde offering, the MCTR offering was a $4.00-per-share, firm-commitment offering with a fully exercised over-allotment option.[38]

135. In a verified civil forfeiture complaint filed on June 30, 2026, the United States Department of Justice alleged that coordinated brokerage accounts tied to China and Hong Kong began accumulating MCTR shares on the January 22, 2025 IPO date and that, in early June 2025, those actors promoted MCTR through hundreds of repetitive social-media posts and messaging-application invitations, driving the price from a prior close of approximately $4.90 to an intraday high of $33.69 with no corresponding company news, before selling approximately 1,065,313

[38] Underwriting Agreement between CTRL Group Ltd. and R.F. Lafferty & Co., Inc. and Revere Securities LLC (Jan. 21, 2025); and related CTRL Group Ltd., Current Report (Form 6-K) (Jan 22, 2025).

shares for approximately $11.97 million and approximately $6.33 million in net profit, after which MCTR collapsed. The MCTR scheme that the Department of Justice has alleged bore the same structural and promotional hallmarks as the scheme alleged herein, arose out of an offering that Robert Hackel signed for R.F. Lafferty three months before he signed the Concorde offering, and, according to those allegations, reached its promotion-and-dump phase in early June 2025, approximately five weeks before Concorde's July 10, 2025 collapse and during R.F. Lafferty's ongoing post-offering relationship with Concorde. That near-contemporaneous and materially similar scheme, tied to the same signatory and the same underwriter, supports the inference that R.F. Lafferty was on notice of the precise manner in which low-float foreign initial public offerings of the type it underwrote were being manipulated.[39]

136. The specifics of the CTRL Group scheme, as the Department of Justice has alleged them, closely track the scheme alleged here. According to the forfeiture complaint, CTRL Group traded in a narrow range on low volume from its January 2025 listing until, in late May and early June 2025, coordinated social-media accounts on X, Reddit, and other platforms posted hundreds of identical messages touting CTRL Group and directing investors to Discord and WhatsApp groups purporting to offer investment advice; CTRL Group then surged from a prior close of approximately $4.90 to an intraday high of $33.69 on June 3, 2025, on trading volume more than 70,000% above the prior day and with no corresponding company news, before collapsing once the promotion ceased. The Government further alleged that ten U.S. brokerage accounts, opened by individuals located in China and Hong Kong and, in eight instances, accessed from shared

[39] Verified Complaint for Forfeiture, *United States v. $30,619.27 in United States Currency Formerly On Deposit in Interactive Brokers LLC Account Number U13270608 Held in the Name of Ling Zhang*, No. 26-cv-5543 (S.D.N.Y. June 30, 2026); *See also United States v. $30,619.27 in United States Currency, et al.*, No. 1:26-cv-05543 (S.D.N.Y. filed June 30, 2026).

internet-protocol or device (MAC) addresses indicating common control, sold approximately 1,065,313 CTRL Group shares for approximately $11,966,324.44 in proceeds and approximately $6,331,533.90 in net profit during the promotion, with the proceeds thereafter wired abroad. CTRL Group subsequently changed its name to TJGC Group Limited and its trading symbol from "MCTR" to "TJGC," just as Concorde subsequently changed its own symbol from "CIGL" to "YOOV" and back. The CTRL Group scheme is a near-contemporaneous and materially identical scheme which arose out of an offering that Robert Hackel signed for R.F. Lafferty approximately three months before he signed the Concorde offering, placing R.F. Lafferty on notice of precisely the manner in which the low-float foreign initial public offerings it underwrote were being manipulated.[40]

137. R.F. Lafferty's access to information about Concorde was secured by contract rather than resting on informal channels alone. Under the Underwriting Agreement, Concorde agreed, for a period of years following the offering, to provide or make available to R.F. Lafferty its reports and other documents filed with the SEC, its shareholder communications, press releases, and news items, and, upon R.F. Lafferty's reasonable request, transfer-agent and Depository Trust Company transfer sheets reflecting activity in Concorde's shares, including daily and monthly consolidated sheets, and exchange-published reports concerning the trading and price of Concorde's shares. Concorde further agreed to retain a financial-public-relations firm reasonably acceptable to R.F. Lafferty, generally could not issue a press release without R.F. Lafferty's prior written consent during the period surrounding the closing, and agreed that the individual lockup agreements could be released or waived in R.F. Lafferty's sole discretion. These contractual rights

[40] Verified Complaint for Forfeiture, *supra* note 39 ¶¶5-71.

gave R.F. Lafferty direct channels through which to monitor the capitalization, transfer, publicity, and trading of Concorde's shares.

138. R.F. Lafferty had also been placed on direct regulatory notice of the precise pattern of misconduct that Concorde's offering presented. On March 11, 2013, R.F. Lafferty consented to a censure and a $50,000 fine in a FINRA disciplinary proceeding arising from its failure to implement its anti-money-laundering program. FINRA found that two customers deposited millions of shares of penny-stock issuers with questionable operating histories into their accounts and liquidated approximately $7.3 million of those securities, and that, while the customers were liquidating the shares, suspicious internet promotional campaigns touted the same securities, yet R.F. Lafferty failed to detect, investigate, or report that activity despite the red flags. This proceeding placed R.F. Lafferty on notice, more than a decade before the Concorde offering, that low-priced securities deposited and liquidated amid suspicious internet promotional campaigns are used as vehicles for manipulation, the very pattern that Concorde, a low-float foreign issuer promoted through coordinated social-media and messaging-application campaigns and subject to an abrupt collapse, later presented.

139. The 2013 disciplinary proceeding also placed R.F. Lafferty's owner, Defendant Hackel, on personal notice of that pattern. The settlement of that proceeding required R.F. Lafferty's president to certify in writing, within 30 business days, that the firm had implemented revised anti-money-laundering procedures addressing the deficiencies FINRA had identified. A contemporaneous 2013 audited broker-dealer report filed with the SEC identifies Henry Hackel as R.F. Lafferty's president. Henry Hackel was therefore the officer designated to make the remedial certification concerning the very promotion-and-liquidation pattern, the deposit and liquidation of low-priced securities, amid suspicious internet promotional campaigns, that Concorde later

presented. Hackel's position as the president responsible for that certification supports the inference that R.F. Lafferty's controlling owner had direct, personal notice of that pattern of manipulation more than a decade before the Concorde offering.[41]

140. R.F. Lafferty had also been the subject of a further FINRA disciplinary settlement bearing on the reliability of its recordkeeping and its dependence on clearing-firm data. FINRA found that, from July 2014 through July 2017, 56,033 of R.F. Lafferty's order memoranda lacked accurate information identifying whether the underlying trades were solicited or unsolicited, that R.F. Lafferty relied on clearing-firm records and treated trades with blank solicitation fields as unsolicited, and that the firm did not correct all or even most of the deficient records and that no principal took adequate supervisory steps. R.F. Lafferty accepted a censure and a $55,000 fine without admitting or denying the findings, and that proceeding did not result in a finding of fraud or manipulation. That history further placed R.F. Lafferty on notice of the limits of its own recordkeeping and of its reliance on records maintained by others, bearing on the adequacy of the investigation it was required to conduct for the Concorde offering.[42]

141. The Offering Documents also reflected an unexplained inconsistency in the treatment of insider-affiliated shares. The Underwriting Agreement represented that a schedule to the agreement listed all of the Company's officers and directors, all holders of 2% or more of its shares, and all holders of securities exercisable for or convertible into the Company's ordinary shares, each of whom was to execute a 180-day lockup. Schedule 3 to the Underwriting Agreement listed only six individuals. It omitted Weilekai Investments Pte Ltd, which held 2,000,000 Class

---

[41] R.F. Lafferty & Co., Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2009020281601 (Mar. 11, 2013); R.F. Lafferty & Co., Inc., Annual Audited Report (Form X-17A-5) (Mar. 5, 2014).

[42] R.F. Lafferty & Co., Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2016047634501 (Nov. 12, 2020).

B ordinary shares, or approximately 9.57% of the Company's outstanding shares, and which is owned in equal parts by Defendant Chua and his spouse, Ping Ping Lim, with Chua holding sole voting and dispositive power over its shares. Weilekai fell squarely within the representation's unambiguous requirement to list every holder of 2% or more of the Company's shares, yet Weilekai did not appear on Schedule 3. That schedule listed the Individual Defendants and certain other insiders, but it did not list Ping Ping Lim, Defendant Chua's spouse, or Sharifah Noriati Binte Said Omar, who had held Concorde shares in a representative capacity for Chua, even though each held Class B ordinary shares convertible into Class A ordinary shares. The omission of these two insider-affiliated holders of convertible securities from the lockup schedule was facially inconsistent with the Underwriting Agreement's own representation, and neither the offering documents nor the Underwriting Agreement explained it. The schedule, designated Schedule 3 to the Underwriting Agreement, was warranted under Section 2.24 of that agreement to be a complete and accurate list of every holder of securities exercisable for or convertible into the Company's ordinary shares, and Section 4.8 required each listed holder to deliver an executed lockup agreement by the date of the Underwriting Agreement. Concorde's annual report filed on May 15, 2025, disclosed that Ping Ping Lim held 377,775 Class B ordinary shares and that Sharifah Noriati Binte Said Omar held 185,185 Class B ordinary shares, or 562,960 Class B ordinary shares in the aggregate, each convertible on a one-for-one basis into Class A ordinary shares, yet neither holder appeared on Schedule 3.

142. The significance of that omission is confirmed by the events that followed. Concorde's annual report filed in 2026 discloses that 562,960 Class B ordinary shares converted into 562,960 Class A ordinary shares on June 16, 2025, 24 days before the July 10, 2025 collapse. That figure exactly equals the sum of Ping Ping Lim's 377,775 Class B shares and Sharifah

Noriati's 185,185 Class B shares that had been omitted from Schedule 3, and it represented an increase of approximately 39.16% in the 1,437,500 Class A ordinary shares that Concorde had described as freely tradable following the offering and the full exercise of the over-allotment option. Concorde's later ownership table expressly identifies Ping Ping Lim as the holder of 377,775 Class A ordinary shares, and the identity of the holder of the remaining 185,185 converted shares is supported by the exact arithmetic correspondence to Sharifah Noriati's omitted block. The two convertible holders being omitted from the lockup schedule and the shares that converted into freely tradable form twenty-four days before the collapse supports the inference that the omission was not immaterial and that a reasonable investigation by R.F. Lafferty would have identified these insider-affiliated convertible holders and the lockup and conversion status of their shares.[43]

143. The omission from Schedule 3 was also broader than the two June 16 conversion blocks addressed above. In addition to Weilekai Investments Pte Ltd, Ping Ping Lim, and Sharifah Noriati, Schedule 3 omitted at least two further insider-affiliated holders of convertible securities: Jia Wei Chua, Defendant Chua's son, and Meang Fai Pang, described as a close associate of the Company, each of whom held 14,815 Class B ordinary shares convertible one-for-one into Class A ordinary shares. Section 2.24 of the Underwriting Agreement warranted that Schedule 3 was a complete and accurate list of every holder of securities convertible into the Company's ordinary shares, and Section 4.8 required each such holder to execute a 180-day lockup; yet Schedule 3 named only six individuals and omitted these holders. Concorde's 2026 annual report discloses that 14,814 Class B ordinary shares converted into Class A ordinary shares on September 5, 2025.

[43] Concorde International Group Ltd., Annual Report (Form 20-F) (May 15, 2025); Concorde International Group Ltd., Annual Report (Form 20-F) (May 12, 2026); Underwriting Agreement §§2.24, 4.8 (Apr. 21, 2025).

That figure is within one share of each omitted 14,815-share block. The one-share difference prevents attribution of the September conversion to either holder on the present public record, but the correspondence confirms the materiality of obtaining the complete shareholder register, all conversion notices, and all lockup agreements or waivers for every omitted convertible holder.[44]

144. The same contractual architecture placed R.F. Lafferty in a position to observe the promotion of Concorde's shares as it occurred. For 40 days following the closing, Concorde could not issue any press release or other public communication, other than ordinary-course releases, without R.F. Lafferty's prior written consent. Within that 40-day window, on May 16, 2025, Concorde issued a press release touting its financial results and business prospects, describing 2024 as "transformative" and representing that the offering had validated its business model. Thereafter, on June 27, 2025, 13 days before the collapse, Concorde filed an investor presentation for use in meetings with investors, shareholders, and analysts that emphasized purported revenue growth, an expanding pipeline, and contract wins. Whether R.F. Lafferty gave written consent to the May 16 release, or received or reviewed the June 27 presentation, is information within R.F. Lafferty's and Concorde's possession that is not presently reflected in the public record; the contractual consent-and-reporting architecture, however, placed R.F. Lafferty in a position to monitor, and to influence, Concorde's public communications during the very period in which Concorde's shares were being promoted.[45]

---

[44] Underwriting Agreement §§2.24, 4.8 & Schedule 3 (Apr. 21, 2025); Concorde International Group Ltd., Final Prospectus (Form 424B4) (Apr. 21, 2025) (lockup and beneficial-ownership disclosures); Concorde International Group Ltd., Annual Report (Form 20-F) (May 12, 2026).

[45] Underwriting Agreement (Apr. 21, 2025); Press Release, SEC, Concorde International Group Ltd., Concorde International Group Reports Full-Year 2024 Financial Results and Provides Business Update (May 16, 2025) (on file with the author); Concorde International Group Ltd., Current Report (Form 6-K) (June 27, 2025); and Concorde International Group Ltd., Investor Presentation (June 27, 2025).

145. As the sole underwriter of the offering, R.F. Lafferty occupied the position of a gatekeeper to the U.S. public securities markets. It is understood in the underwriting industry that the underwriter participates in preparing the disclosure in, and conducts the marketing of, the registration statement and prospectus, and assists the issuer in providing investors an offering document that discloses all material information relevant to the offering.[46]

146. To discharge that role, an underwriter must conduct a reasonable investigation and independently verify the material facts stated in the offering documents, rather than relying on the issuer's representations. A reasonable investigation requires the underwriter to assume a posture adverse to the issuer during the diligence process and to test the issuer's disclosures critically, in effect serving as a devil's advocate, so that the offering documents are accurate and complete and omit no material fact necessary to make the statements therein not misleading.

147. Congress and the SEC have long recognized that underwriters occupy a unique position that enables them to discover and to compel the disclosure of essential facts about an offering, and that subjecting underwriters to liability under Section 11 of the Securities Act is intended to provide the incentive for their careful investigation of the offering.[47] Because the underwriter exercises ultimate control over the contents and dissemination of the offering documents, it must either ensure full and accurate disclosure or decline to underwrite the offering.

148. R.F. Lafferty failed to conduct a reasonable investigation in connection with the Concorde offering. Had R.F. Lafferty performed an adequate investigation, it would have discovered, and would have been required either to disclose or to decline to underwrite in light of, the trend of coordinated pump-and-dump manipulation targeting low-priced, low-float, foreign

[46] Goldman Sachs, Report of the Business Standards Committee 13 (Jan. 2011).

[47] The Regulation of Securities Offerings, Securities Act Release No. 33-7606A, 63 Fed. Reg. 67174 (Dec. 4, 1998).

issuers that shared the same structural features as Concorde, together with the specific and elevated risk that Concorde's deliberately small public float and concentrated insider control created. As alleged above, R.F. Lafferty had itself underwritten other such offerings that had already become the subject of pump-and-dump campaigns, and it was therefore on notice of precisely the risk that a reasonable investigation would have confirmed.

## ADDITIONAL AUDITOR DEFENDANT ALLEGATIONS

149. The unqualified audit opinion of Kreit and Chiu covering the two-year period ended December 31, 2023, was incorporated into the IPO, registration statements, prospectuses, and other "offerings" of securities the Company filed during the Class Period. In its opinion, Kreit and Chiu certified that, "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022" and that the audits were conducted "in conformity with International Financial Reporting Standards (IFRS)" and "in accordance with the standards of the PCAOB" which "require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud."[48] It went on to affirm the procedures they performed stating:

> Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

[48] Concorde International Group Ltd., *supra* note 1.

150. This unqualified audit report incorporated into the IPO and other SEC filings was false and misleading because Concorde's consolidated financial statements were not prepared in accordance with IFRS or Public Company Accounting Oversight Board ("PCAOB") requirements.

151. In issuing unqualified audit opinions on Concorde's financial statements, despite these IFRS and PCAOB violations, Kreit and Chiu failed to comply with the professional standards dictated by the PCAOB. These standards required Kreit and Chiu to exercise due professional care in the performance of the audit (PCAOB Auditing Standards ("AS") §1015); to plan and perform the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement, whether caused by error or fraud (PCAOB AS §1101 and AS §2810); to obtain sufficient appropriate audit evidence to provide a reasonable basis for their opinion (PCAOB AS §1105); to design and perform audit procedures responsive to the assessed risks of material misstatement, including fraud risks in areas such as revenue recognition (PCAOB AS §2301 and AS §2401); and, because their audit report was incorporated into Concorde's registration statement and prospectus, to perform procedures with respect to subsequent events through the effective date of the registration statement (PCAOB AS §2801 and AS §4101).[49]

152. In auditing and reviewing the financial statements incorporated into Concorde's Registration Statement and Prospectus, Kreit and Chiu failed to perform the procedures that its opinion represented it had performed and that PCAOB standards required. Among other things, Kreit and Chiu failed to: (i) obtain sufficient appropriate audit evidence to support Concorde's reported revenue, including the reported 113% year-over-year revenue increase and the reported

[49] GENERAL RESPONSIBILITIES OF THE AUDITOR IN CONDUCTING AN AUDIT AND AMENDMENT TO PCAOB STANDARDS, PCAOB RELEASE NO. 2024-004 (May 13, 2024), https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit [https://perma.cc/S4PV-DDED].

swing from a net loss of $803,980 for the year ended December 31, 2022 to a net profit of $994,194 for the year ended December 31, 2023, and to evaluate whether that reported growth and profitability were genuine and sustainable; (ii) test the fair value assigned to the Class B Ordinary Shares issued as share-based compensation to Concorde's Board, executive officers, their affiliates, and existing shareholders, which the Company reported at $83,155,336, and to evaluate the related-party nature and business purpose of that issuance; (iii) evaluate whether the Company's presentation of a non-GAAP "profit before tax" was misleading in light of the Company's actual reported results; (iv) investigate the Company's related-party transactions, including compensation arrangements involving Defendant Chua and his spouse; and (v) assess whether Concorde had sufficient accounting personnel and internal controls over financial reporting to prepare IFRS-compliant financial statements suitable for a U.S.-listed public company.

153. As a result of these failures, Kreit and Chiu did not identify or disclose the revenue-recognition, related-party, share-based-compensation, and internal-control problems described herein, and its audit opinion was materially false and misleading because the financial statements it certified were themselves materially misleading in the respects alleged herein. These representations were especially material because Concorde was a newly public foreign issuer, based in Singapore and incorporated in the British Virgin Islands, with no meaningful public operating history in the United States, such that investors were heavily dependent on Kreit and Chiu's independent certification of the Company's financial statements.

154. Kreit and Chiu's own prior work confirms that it was aware of Concorde's financial fragility and had particular reason to scrutinize the Company's reported pre-IPO turnaround. Kreit and Chiu has served as Concorde's auditor since 2023, and in connection with Concorde's

financial statements for the fiscal year ended December 31, 2022, Kreit and Chiu expressly concluded that there was substantial doubt about Concorde's ability to continue as a going concern, based on the Company's operating losses and accumulated deficit. Concorde reported a net loss of $803,980 and an accumulated deficit of $783,037 for fiscal year 2022. One reporting period later, in the financial statements Kreit and Chiu certified for the Concorde IPO, that going-concern doubt had vanished: Concorde reported a 113% increase in revenue, from $5,006,345 for fiscal year 2022 to $10,655,993 for fiscal year 2023, and a swing from a net loss of $803,980 for fiscal year 2022 to a net profit of $994,194 for fiscal year 2023. An auditor that had itself concluded, one year earlier, that there was substantial doubt about the issuer's ability to survive was required to apply heightened professional skepticism to so dramatic and IPO-timed a reversal, and to obtain sufficient appropriate audit evidence that the reported revenue growth, the reported return to profitability, and the removal of the going-concern qualification were genuine and sustainable rather than the product of accounting timed to the offering. Kreit and Chiu failed to do so.

155. Kreit and Chiu was also required, under PCAOB Auditing Standard 2710, to read the other information in the registration statement and prospectus in which its audit report appeared and to consider whether that other information was materially inconsistent with the audited financial statements. Concorde's offering materials repeatedly represented that the Company had "experienced significant revenue growth" and touted the strength and resilience of its business, and, for the most recent interim period, presented a non-GAAP "profit before tax" that excluded an $83,155,336 non-cash share-based compensation charge and thereby obscured the Company's reported loss for the period, even though Kreit and Chiu had itself concluded, in connection with the fiscal year 2022 financial statements, that there was substantial doubt about the Company's ability to continue as a going concern. Kreit and Chiu was required to read that other information

and to consider and resolve its inconsistency with the financial statements and with the Company's true financial condition before permitting its report to be used in the offering, and its failure to do so allowed the offering materials to present investors with a materially incomplete and inconsistent picture of Concorde's financial condition.

156. In conducting its audits, Kreit and Chiu had access to the files and key employees of the Company at all relevant times. As Concorde's auditor, Kreit and Chiu had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review Concorde's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as Concorde's internal controls and structures. Accordingly, Kreit and Chiu was aware of significant deficiencies and material weaknesses at the Company. Thus, had Kreit and Chiu complied with PCAOB standards, it would have determined that there was no reasonable basis for its unqualified audit report because, among other things, Kreit and Chiu was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports, its conformity with IFRS and the Company's reported financial metrics.

157. The Concorde audits were led by an identified engagement partner. Kreit and Chiu's Public Company Accounting Oversight Board Form AP filings identify Ankur Sharma, PCAOB partner identification number 0665100005, of the firm's New York office, as the engagement partner for both of the Concorde audit reports, the report dated June 26, 2024, covering the fiscal year ended December 31, 2023, and the report dated May 15, 2025, covering the fiscal year ended December 31, 2024. The same engagement partner therefore led both consecutive Concorde audit cycles, and by the time of the second audit the engagement team had already acquired experience with Concorde's accounting, its material weaknesses, and the SEC's review

of its registration statement, so that the audit deficiencies alleged herein cannot be attributed to first-time unfamiliarity with the client.[50]

158. The audited financial statements that Kreit and Chiu certified for the fiscal year ended December 31, 2024, also contained a facial error reflecting inadequate final review. In the notes to those financial statements, the subsequent-events note states that the Company evaluated subsequent events after December 31, 2024 through May 15, 2024, a cutoff date more than seven months before the balance-sheet date to which it purportedly applied, while the same note describes events occurring in April and May 2025. The stated review period was therefore facially impossible, and the error appeared in the audited financial-statement notes that Kreit and Chiu was required to review. The presence of this error in the audited notes, following the PCAOB's identification of audit-quality deficiencies in the firm's work, supports the inference that Kreit and Chiu failed to perform an adequate final review of the financial statements it certified.[51]

159. Kreit and Chiu's failures in auditing Concorde were consistent with a documented pattern of audit-quality deficiencies at the firm. Kreit and Chiu is a small New York-based accounting firm that, at the time of its most recent public PCAOB inspection, served as the principal auditor for 21 issuer audit clients with only five engagement partners responsible for that issuer audit work. In the PCAOB's first-ever inspection of Kreit and Chiu, the results of which the PCAOB set forth in Release No. 104-2024-020, which was dated December 11, 2023 and publicly released on January 23, 2024, the PCAOB reviewed two of the firm's issuer audits and

[50] Ankur Sharma (Partner ID: 0665100005), Kreit and Chiu CPA, LLP, PCAOB Form AP for Concorde International Group Ltd. (June 26, 2024); and Ankur Sharma (Partner ID: 0665100005), Kreit and Chiu CPA, LLP, PCAOB Form AP for Concorde International Group Ltd. (May 15, 2025).

[51] Concorde International Group Ltd., Annual Report (Form 20-F), Note 28 (Subsequent Events) (May 15, 2025).

identified Part I.A deficiencies in both of them, a deficiency rate of 100%. A Part I.A deficiency means that, in the PCAOB's assessment, the firm had not obtained sufficient appropriate audit evidence to support its audit opinion at the time it issued its audit report.

160. The specific deficiencies the PCAOB identified concern the very audit procedures that stand between a fraudulent issuer and the investing public. In one of the two audits reviewed, Kreit and Chiu had itself identified revenue as a fraud risk, yet the firm failed to perform sufficient procedures to test the revenue population, limiting its testing to comparing the prior year's revenues to the current year's amounts, in violation of PCAOB Auditing Standards AS 1105 and AS 2301. In that same audit, Kreit and Chiu had identified journal entries as a fraud risk and had identified the characteristics of potentially fraudulent entries, but then failed to determine whether any journal entries actually met those characteristics, instead limiting its testing to haphazardly selected entries, in violation of PCAOB AS 2401. In the other audit reviewed, Kreit and Chiu failed to evaluate the severity of identified control deficiencies to determine whether they constituted a material weakness, in violation of PCAOB AS 2201, and failed to evaluate the reasonableness of significant assumptions underlying the issuer's impairment analysis, in violation of PCAOB AS 1105 and AS 2501. The PCAOB further found that Kreit and Chiu failed to comply with the PCAOB's requirements governing communications with audit committees and the content of the auditor's report, including AS 1301 and AS 3101.

161. These were not isolated or merely technical lapses. They reflect precisely the audit-quality failures on which a pump-and-dump scheme depends: an auditor that identifies fraud risks in revenue and journal entries but does not perform the testing necessary to detect fraud, and that does not evaluate whether identified control deficiencies rise to the level of a material weakness. Kreit and Chiu brought that same deficient approach to its audit of Concorde. Its resulting clean,

unqualified audit opinion supplied the appearance of legitimacy that Concorde needed to register and sell its securities to the public and that the perpetrators of the scheme exploited to lend credibility to Concorde's shares. Without Kreit and Chiu's unqualified opinion, Concorde could not have completed its initial public offering or maintained its Nasdaq listing, and the scheme alleged herein could not have been carried out.

162. Kreit and Chiu's most senior management had personal notice of the firm's audit-quality deficiencies before the firm issued its Concorde opinions. The firm's managing partner, Steven Kreit, personally signed a written response to the PCAOB, dated October 26, 2023, in which the firm represented that it had evaluated each of the matters the inspection team had described and was taking the steps necessary to comply with the applicable professional standards. That response preceded the firm's first Concorde audit report, dated June 26, 2024, by approximately eight months. Steven Kreit thereafter personally certified, as managing partner, each of the firm's Form AP filings for the Concorde engagements, executing those certifications on August 29, 2024 and May 23, 2025, in each case representing that he had reviewed the filing and that it contained no untrue statement of a material fact. Although those Form AP certifications concerned the accuracy of the engagement disclosures rather than the Company's financial statements, they establish that the firm's managing partner was personally connected to both Concorde audit cycles and had, before the first Concorde opinion issued, personally represented to the firm's regulator that the firm was remediating the very categories of audit-quality deficiency that its Concorde audits then exhibited.[52]

[52] Kreit and Chiu CPA, LLP, Response to PCAOB Inspection Report, PCAOB Release No. 104-2024-020 Appendix A (Oct. 26, 2023); PCAOB, Inspection Report of Kreit and Chiu CPA LLP, Release No. 104-2024-020 (Dec. 11, 2023); Kreit and Chiu CPA, LLP, PCAOB Form AP Filings for Concorde (*supra* note 50).

163. Kreit and Chiu's audit of Concorde reflected a business model built around the very category of issuer that regulators have identified as presenting a heightened risk of manipulation. Kreit and Chiu is a small accounting firm, founded in 2021, whose public-company practice is concentrated in audits of small foreign private issuers from China, Hong Kong, Singapore, and other Asian jurisdictions seeking to access the U.S. public markets through initial public offerings, and it markets itself as one of the top ten IPO auditors in the United States. As alleged above, the SEC's Cross-Border Task Force, FINRA, and Nasdaq have each identified small foreign-issuer IPOs of exactly this type as vehicles for pump-and-dump and ramp-and-dump schemes, and have specifically identified auditors as the gatekeepers whose failures enable those schemes. A firm concentrating its practice in this category of high-risk issuer had every reason to scrutinize Concorde with heightened care, and its failure to do so, culminating in a clean and unqualified audit opinion, supplied the appearance of legitimacy on which the scheme alleged herein depended.

164. Concorde's own disclosures confirm the internal-control failures that Kreit and Chiu was required to, but did not, address. In its annual report on Form 20-F, Concorde disclosed that, in connection with the audits of its consolidated financial statements as of December 31, 2025, 2024, and 2023, Concorde and its independent registered public accounting firms identified material weaknesses in the Company's internal control over financial reporting. Those material weaknesses included a lack of proper training of the Company's accounting staff to ensure consistent application of IFRS and compliance with related financial-reporting guidelines, and the ineffective design of review controls over both routine accounting processes and the accounting treatment of complex transactions. Kreit and Chiu audited the 2023 and 2024 financial statements in connection with which these material weaknesses were identified, and those financial statements

were incorporated into the offering and into the Company's first annual report. The weaknesses concerned the same subject matter, the application of IFRS, the accounting for complex transactions such as the Company's share-based compensation, and the design and operation of review controls, in which the PCAOB had found Kreit and Chiu's audit work deficient, further confirming that Kreit and Chiu knew or was reckless in not knowing of the control failures underlying the financial statements it certified.

165. Concorde's most recent annual report further confirms that Kreit and Chiu had actual knowledge of these internal-control failures. In the portion of that annual report disclosing Concorde's change of auditors, Concorde disclosed that Kreit and Chiu had discussed with the Company's audit committee, in connection with the audits for the years ended December 31, 2023 and 2024, material weaknesses in the Company's internal control over financial reporting, including a lack of proper segregation of duties over the execution and approval of journal entries and financial processes, a lack of proper training of the accounting staff to ensure consistent application of IFRS, and the ineffective design of review controls over both routine accounting processes and the accounting treatment of complex transactions. The journal-entry weakness that Kreit and Chiu identified and discussed concerns the same subject matter, journal entries, in which the PCAOB separately found that Kreit and Chiu had failed to perform adequate fraud testing, as alleged above. That Kreit and Chiu identified and discussed these material weaknesses with the audit committee, yet nonetheless issued unqualified audit opinions on the same financial statements and permitted those opinions to be incorporated into Concorde's offering, confirms that Kreit and Chiu knew, or was reckless in not knowing, that the financial statements it certified were the product of deficient internal controls.

166. The pattern of auditor changes that followed Concorde's collapse is consistent with the concealment alleged herein. In the same annual report, Concorde disclosed that it dismissed Kreit and Chiu and, on August 1, 2025, engaged AssentSure PAC as its independent registered public accounting firm, and that it thereafter dismissed AssentSure PAC and, in March 2026, engaged Guangdong Prouden CPAs GP, a firm headquartered in mainland China, as its independent registered public accounting firm. Concorde thus changed its independent auditor twice within approximately seven months, ultimately replacing its U.S.-based auditor with a firm located in a jurisdiction in which, as Concorde's own disclosures acknowledge, the PCAOB had historically been unable to conduct inspections. That rapid turnover of auditors, culminating in the engagement of a mainland China firm in the same month that Concorde closed its merger with YOOV, mirrors the auditor-related hallmarks that regulators have identified in the foreign issuer pump-and-dump schemes described above.

167. Kreit and Chiu's conduct in connection with Concorde was not its only engagement for a foreign issuer that later collapsed. Kreit and Chiu also served as the independent registered public accounting firm for CTRL Group Limited, the issuer that traded on the Nasdaq Capital Market under the symbol "MCTR" and whose offering is described in the underwriter allegations below. The firm's Form AP filings identify Ahmed Mohidin, rather than Ankur Sharma, as the engagement partner for the MCTR audits, and Steven Kreit again personally certified the firm's MCTR Form AP filings as managing partner. Joanne Chiu, whom Kreit and Chiu identifies as its Chief Operating Officer, the Chair of its Board, and the leader of its Asia practice, personally and publicly promoted Kreit and Chiu's participation in the MCTR offering, publishing a February 27, 2025 message congratulating "our client CTRL Group Limited" on its Nasdaq listing and tagging the firm. Kreit and Chiu issued a further audit report for MCTR after MCTR's June 2025 collapse

and after Concorde's July 2025 collapse, and a firm profile, updated November 14, 2025, continued to market the firm as a "Top 7 U.S. IPO Auditor" and to list both Concorde and MCTR among its representative clients even after both securities had collapsed.[53]

168. As alleged in the underwriter allegations *below*, the United States Department of Justice, in a verified civil forfeiture complaint filed on June 30, 2026, alleged that MCTR was the vehicle of a coordinated social-media pump-and-dump scheme, in which connected accounts accumulated MCTR shares beginning on its IPO date and, in early June 2025, drove its price from approximately $4.90 to an intraday high of $33.69 with no corresponding company news before selling into the promotion, after which MCTR collapsed. That Kreit and Chiu audited, and its senior cross-border leader publicly promoted, a near-contemporaneous foreign issuer that the Department of Justice has alleged was being manipulated in the same manner and during the same period as Concorde, and that Kreit and Chiu continued to identify both issuers as representative clients after both had collapsed, supports the inference that Kreit and Chiu had notice of, and consciously disregarded, the pattern of manipulation to which the foreign issuers it audited were being subjected.[54]

169. Kreit and Chiu's engagement partner for Concorde, Ankur Sharma, was also listed as the engagement partner for its audits of Thunder Energies Corporation, Franklin Wireless Corp., Lytus Technologies Holdings PTV. Ltd., Qualis Innovations Inc., Fuse Group Holding Inc., and

---

[53] Ahmed Mohidin (Partner ID: 0665100009), Kreit and Chiu CPA, LLP, PCAOB Form AP for CTRL Group Ltd. (Aug. 14, 2025); Ahmed Mohidin (Partner ID: 0665100009), Kreit and Chiu CPA, LLP, PCAOB Form AP for CTRL Group Ltd. (Sep. 6, 2025); Joanne C. Chiu, LINKEDIN: JOANNE C. CHIU'S POST https://www.linkedin.com/posts/joanne-c-chiu-cpa_ipo-nasdaq-auditor-activity-7300698453494382592-wKul [https://perma.cc/8CBW-8AGK] (last visited Aug. 12, 2026); Kreit and Chiu CPA, LLP, Kreit & Chiu Firm Brochure - English, https://pkcllp.com/wp-content/uploads/2026/07/KC-Company-Profile-US_English-UPDATED-7.5.26.pdf (updated Apr. 5, 2026).

[54] Verified Complaint for Forfeiture, *supra* note 39.

Liaoning Shuiyun Qinghe Rice Industry Co., Ltd. Each of these companies subsequently experienced substantial shareholder losses, delisting, or allegations of wrongdoing. Thunder Energies' quoted share price fell to effectively zero before the company liquidated its assets and voluntarily delisted and "went dark." Lytus lost more than 99.99% of its value, underwent reverse stock splits totaling 1-for-150,000, and was delisted from Nasdaq for failing to maintain the minimum bid price. Franklin Wireless declined approximately 90% from its 2020 high and paid $2.4 million to settle a securities class action alleging that it concealed overheating and fire risks in its wireless devices; its chief executive also agreed to pay the company $1 million to settle separate litigation concerning alleged short-swing profits. Fuse Group and Liaoning Shuiyun each lost more than 99% of their reported peak market value, while Qualis—now known as Family Office of America—declined approximately 80% from its recent high.

**LOSS CAUSATION**

170. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

171. During the Class Period, the prices at which Plaintiff and the Class purchased Concorde's securities were artificially inflated as a direct and proximate result of the scheme alleged herein. That artificial inflation was the product of, among other things, Concorde's deliberately structured low-float initial public offering, which placed only approximately 1,437,500 Class A ordinary shares into public hands while concentrating supervoting control in Chua and his affiliates; the coordinated promotion of Concorde stock through social-media advertisements and messaging-application groups by persons impersonating legitimate financial professionals; the use of offshore and nominee accounts to generate artificial trading activity and to facilitate the coordinated dumping of Concorde shares; and the gatekeeping failures of R.F.

Lafferty, Kreit and Chiu, and Cogency that permitted the scheme to be executed through a U.S.-listed issuer. Defendants' materially false and misleading statements and omissions concealed that Concorde's share price was the product of this manipulation rather than the Company's business fundamentals, and thereby maintained the artificial inflation throughout the Class Period.

172. The risk concealed by Defendants' misrepresentations and omissions, namely, that Concorde's share price was the product of a coordinated pump-and-dump scheme rather than legitimate market forces, materialized and was revealed to the market beginning on July 10, 2025. On that day, Concorde's share price collapsed by approximately 79.9%, closing at $5.66, after having reached a closing price of $28.18 and an intraday high of $31.06 on July 9, 2025. That same day, *TradeInformer* reported that pump-and-dump scammers were targeting Concorde and that brokers had begun restricting their clients' access to Concorde shares. On July 17, 2025, *The Bear Cave* published "Problems in Chinatown," which identified Concorde as the vehicle of a fraudulent stock promotion and placed it within a cohort of U.S.-listed foreign issuers that collapsed in the same window under identical social-media and messaging-application pump-and-dump campaigns, including Top KingWin Ltd. (NASDAQ: WAI), which fell approximately 90% on July 7, 2025; Park Ha Biological Technology Co., Ltd. (NASDAQ: PHH), which fell approximately 93% on July 8, 2025; Everbright Digital Holding Ltd. (NASDAQ: EDHL), which fell approximately 80% on July 14, 2025; Picocela Inc. (NASDAQ: PCLA), which fell approximately 76% on July 15, 2025; and Ostin Technology Group Co., Ltd. (NASDAQ: OST), which fell approximately 93% on June 26, 2025. Following these revelations, Concorde's share price continued to decline and has since traded below $1.00 for a sustained period.

173. The materially false and misleading statements and omissions concerning Concorde's financial condition also contributed to and maintained the artificial inflation of

Concorde's share price, and concealed a category of risk that likewise materialized to the detriment of Plaintiff and the Class. The unqualified audit opinions of Kreit and Chiu, the audited financial statements they certified, and Concorde's related disclosures presented Concorde to the market as an audited, newly public operating company with genuine and growing earnings, while concealing that Concorde's own auditor had recently expressed substantial doubt about the Company's ability to continue as a going concern, that Concorde suffered from material weaknesses in its internal control over financial reporting so significant that they had produced a restatement of approximately $83.1 million, and that Concorde's reported pre-IPO return to profitability had not been shown to be genuine or sustainable. That concealment deprived the market of the information a reasonable investor would have used to assess whether Concorde's actual business could support any price approaching its Class Period levels, or arrest a decline once the coordinated promotion ceased. The concealed condition, namely, that Concorde had no demonstrated earnings power or financial foundation capable of supporting such a price, was among the risks that materialized when the artificial inflation was removed: rather than settling at a price supported by legitimate operations, Concorde's shares fell to, and have since remained below, $1.00 per share.

174. The truth concerning Concorde's financial condition that Defendants' misstatements and omissions had concealed was further revealed to the market through a series of events and partial disclosures following the July 10, 2025 collapse. Concorde's shares continued to decline and traded below $1.00 for a sustained period; on July 1, 2026, Nasdaq notified Concorde that it no longer satisfied the minimum bid price requirement for continued listing; Concorde dismissed Kreit and Chiu and, within approximately seven months, changed its independent registered public accounting firm twice, ultimately engaging a firm headquartered in a jurisdiction in which, as Concorde's own disclosures acknowledge, the PCAOB had historically

been unable to conduct inspections; and Concorde's subsequent public filings confirmed the going-concern doubt, the material weaknesses in internal control over financial reporting, and the true effect of the approximately $83.1 million share-based-compensation charge that its offering financial statements had obscured. Each of these events was a foreseeable consequence of, and was directly traceable to, the materialization of the very financial risks that Defendants' misrepresentations and omissions concealed, and each contributed to the economic loss suffered by Plaintiff and the Class. To the extent the decline in the price of Concorde securities reflected both the revelation of the manipulation alleged above and the materialization of the concealed financial condition alleged here, both were among the risks that Defendants' wrongful conduct concealed, and Plaintiff need not disaggregate them at the pleading stage.

175. The decline in the price of Concorde securities described above was the direct, foreseeable, and proximate result of the materialization of the manipulative acts and practices comprising the scheme alleged herein, and of the revelation to the market that Concorde's Class Period price had been artificially inflated by that scheme. The losses suffered by Plaintiff and the Class were not the result of general market or industry conditions, macroeconomic factors, or other events unrelated to Defendants' fraud, but were instead caused by the disclosure and materialization of the very risks that Defendants' misrepresentations and omissions had concealed. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered economic loss and were damaged thereby.

## SCIENTER ALLEGATIONS

176. As alleged herein, Defendants acted with scienter since Defendants: (1) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (2) knew that such statements or documents would be issued

or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Concorde, their control over, and/or receipt and/or modification of Concorde's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Concorde, participated in the fraudulent scheme alleged herein.

177. The scheme alleged herein involved Concorde's core corporate activity, namely, the structure of its initial public offering, the issuance of its Class A and Class B ordinary shares, and the reporting of its share structure and financial results. The Individual Defendants, as the officers and directors who structured the IPO, approved the issuance of the Company's supervoting Class B ordinary shares to themselves and their affiliates, and controlled the contents of the Company's registration statement, prospectus, and press releases, necessarily had detailed knowledge of the Company's capital structure, its tiny public float, and its financial condition. Under the core operations doctrine, that knowledge supports a strong inference that the Individual Defendants knew or recklessly disregarded the matters alleged herein.

178. The recipients of Concorde's pre-IPO share issuances were not arm's-length investors. On March 18, 2024, approximately one year before the IPO, Concorde issued 20,788,886 Class B ordinary shares, each carrying one hundred votes, to Defendant Chua, his spouse Ping Ping Lim, his son Jia Wei Chua, Defendants Yap and Ong, and other insiders and affiliates, for total consideration of $208. Concorde later recognized $83,155,336 in share-based compensation based on the fair value of those same shares. The placement of the Company's

supervoting shares with a closed, hand-selected group of insiders and affiliates for nominal consideration, together with the deliberately tiny public float that resulted, supports a strong inference that the Individual Defendants structured Concorde's capital to concentrate control and to enable the manipulation of Concorde's stock, and acted with scienter.

179. During the Class Period, Concorde's share price rose from the $4.00 initial public offering price to an intraday high of $31.06 on July 9, 2025, giving the Company a purported market capitalization of approximately $693.5 million, even though Concorde announced no business development, earnings result, contract award, or other legitimate corporate event that could justify the increase, and its actual operations generated only approximately $10.7 million in annual revenue. The absence of any legitimate basis for so dramatic a price increase, together with the deliberately thin float and concentrated insider control that made such an increase possible, supports the inference that Defendants knew Concorde's share price was being artificially manipulated.

180. Defendants had motive to inflate Concorde's share price. First, Concorde was financially fragile: its own auditor, Kreit and Chiu, had recently concluded that there was substantial doubt about the Company's ability to continue as a going concern. Second, the deliberately tiny public float and the concentration of supervoting control in Chua and his affiliates positioned Concorde's insiders and affiliates to profit from an artificially inflated share price. Third, as alleged herein, and on information and belief, insiders and affiliates used offshore or nominee accounts to facilitate the coordinated dumping of Concorde shares as the price was inflated. The inflation of Concorde's share price thus served the direct financial interest of the very insiders who structured the offering.

181. Defendants had opportunity to commit the fraud alleged herein because, as officers and directors of Concorde, the Individual Defendants controlled the Company's initial public offering, its registration statement, prospectus, and press releases, and its share issuances; they structured the Company's dual-class share capital and approved the issuance of the supervoting Class B shares; they had access to material non-public information concerning the Company's financial condition and capital structure; and they retained approximately 97.57% of the Company's voting power following the offering. The combination of motive and opportunity, together with the other facts alleged herein, establishes a strong inference of scienter.

182. Concorde's own participation in, and knowledge of, the scheme is further supported by the Company's treatment of two insider-affiliated holders of convertible securities in the Offering Documents. In the Underwriting Agreement, Concorde itself represented and warranted, in Section 2.24, that Schedule 3 was a complete and accurate list of every holder of securities convertible into the Company's ordinary shares, each of whom was required by Section 4.8 to execute a 180-day lockup. As alleged above, Concorde omitted from its own Schedule 3 two insider-affiliated holders of Class B ordinary shares convertible into Class A ordinary shares: Ping Ping Lim, Defendant Chua's spouse, who held 377,775 Class B ordinary shares, and Sharifah Noriati Binte Said Omar, who held 185,185 Class B ordinary shares in a representative capacity for Chua. Concorde's own annual reports disclosed each of these holdings, so the omission was contrary to facts within the Company's own books and records. The omission was neither immaterial nor random: the 562,960 Class B ordinary shares held by these two omitted insiders are the same 562,960 shares that converted, on June 16, 2025, into Class A ordinary shares of the class Concorde had described as freely tradable, 24 days before the July 10, 2025 collapse, increasing the shares Concorde had described as freely tradable by approximately 39%. Because

the warranty and the schedule were Concorde's own, and because the omitted holders were Defendant Chua's spouse and a holder who held for Chua, the false warranty and the omission are attributable to the Company and its controlling insiders, and support a strong inference that Concorde participated in structuring the offering so that insider-affiliated convertible shares would be kept off the lockup schedule and thereby positioned to be freed for sale into the market during the very period in which Concorde's shares were being artificially inflated. That conduct reflects the Defendants' knowing participation in the scheme alleged herein, and not merely a failure of investigation by its underwriter.

183. The timing of the insider-affiliated conversion and Concorde's own promotional communication was exceptionally close. As Concorde later disclosed, 562,960 Class B ordinary shares converted into Class A ordinary shares on June 16, 2025. The very next day, June 17, 2025, Concorde publicly announced approximately SG$11,621,370 (approximately US$9,040,472) in purported new contracts said to have been obtained from January through May 2025, and presented the announcement as evidence of business momentum; Concorde did not furnish that release to the SEC on Form 6-K until August 6, 2025, 50 days after its public date and 27 days after the July 10, 2025 collapse. Trading in Concorde's shares was negligible on the day of the conversion, approximately 592 shares traded on June 16 and 2,163 shares on June 17, but climbed to approximately 122,515 shares by June 23 and 878,055 shares by June 27 as the price rose. From June 16 through July 10, 2025, approximately 12,036,245 shares traded, more than eight times the 1,437,500-share IPO and over-allotment float, and more than six times the 2,000,460 Class A ordinary shares that would have existed after the disclosed June 16 conversion. On July 10, 2025 alone, approximately 6,275,117 shares traded as the price fell from an intraday high of $31.055 on July 9 to an intraday low of $2.12 on July 10. The close sequence of the insider-affiliated

conversion, the Company's own promotional announcement, and the ensuing extraordinary turnover supports a strong inference that the conversion, the public promotion, and the trading were highly coordinated.[55]

184. The concentration of voting control that the Individual Defendants engineered also left Concorde without the independent oversight that ordinarily checks insider conduct at a public company. Because Defendant Chua holds a majority of the voting power of Concorde's outstanding shares through the supervoting Class B ordinary shares described above, Concorde is a "controlled company" within the meaning of the Nasdaq corporate governance rules. As Concorde has acknowledged in its SEC filings, it has availed itself of the exemptions available to controlled companies from the Nasdaq requirements that a listed company maintain a board composed of a majority of independent directors, a nominating and corporate governance committee composed entirely of independent directors, and a compensation committee composed entirely of independent directors. The absence of these independent checks left the same insiders who structured the offering and controlled the Company's disclosures free to do so without independent board or committee oversight, further supporting the inference that they acted with scienter.

185. Defendant Chua's involvement was not limited to his titles; he was personally involved at each operational stage of the conduct alleged herein. As the Company's Chief Executive Officer and Chairman, Chua signed and certified Concorde's registration statement, its

---

[55] Press Release, Concorde International Group Ltd., Concorde International Group Secures Multi-Year Contracts (Form 6-K Ex. 99.1) (dated June 17, 2025; furnished on Form 6-K Aug. 6, 2025); Nasdaq, *Concorde International Group Ltd Class A Ordinary Shares (CIGL) Historical Quotes*, NASDAQ: MARKET ACTIVITY: CIGL: HISTORICAL QUOTES https://www.nasdaq.com/market-activity/stocks/cigl/historical (last visited Aug. 14, 2026) [https://perma.cc/8JSJ-X29P] (daily open, high, low, close, and volume).

prospectus, and the Company's SEC filings; he controlled the contents of the Company's press releases and was personally quoted in them, including the May 16, 2025 and June 17, 2025 press releases that touted the Company's prospects; and he directed and received the bulk of the pre-IPO insider share issuance, receiving 17,900,000 of the 20,788,886 supervoting Class B ordinary shares issued on March 18, 2024, and holding 18,000,000 Class B ordinary shares thereafter, with additional Class B shares issued to his spouse, Ping Ping Lim, his son, Jia Wei Chua, and Weilekai Investments Pte Ltd, an entity Chua half-owns and over whose shares he holds sole voting and dispositive power. Through those shares, Chua retained approximately 97.57% of Concorde's voting power following the offering. These facts show more than title-based access; they show Chua's personal involvement in the structuring of the offering, the insider share issuances, the concentration of voting control, and the public statements at the center of the fraud alleged herein, and support a strong inference that Chua acted with scienter or, at a minimum, with reckless disregard for the truth.

186. Concorde's own post-Class Period SEC filings provide irreconcilable accounts of the number of shares outstanding as of June 30, 2025. In unaudited interim financial statements furnished to the SEC on September 29, 2025, Concorde reported 1,622,685 Class A ordinary shares and 20,311,112 Class B ordinary shares outstanding as of June 30, 2025, and stated that 181,500 Class B ordinary shares had converted into Class A ordinary shares on June 11, 2025. Concorde's later annual report, however, disclosed a different conversion history: that 562,960 Class B ordinary shares converted into Class A ordinary shares on June 16, 2025, and that a further 14,814 Class B ordinary shares converted on September 5, 2025. These accounts cannot all be true. The reported Class A figure of 1,622,685 equals the 1,437,500 IPO and over-allotment shares plus exactly 185,185—the pre-IPO block attributed to Sharifah Noriati. The reported Class B

figure of 20,311,112 equals the pre-conversion balance of 20,888,886 less both the 562,960-share June 16 conversion and the 14,814-share September 5 conversion, even though the September 5 conversion occurred more than two months after the June 30, 2025 balance-sheet date to which the figure purportedly applied. The September 2025 table totals only 21,933,797 shares, understating the post-offering total of 22,326,386 shares by 392,589—a figure that equals Ping Ping Lim's 377,775-share block plus the 14,814-share September conversion. Had the balances been reported consistently with Concorde's later annual report, the June 30, 2025 figures would have been 2,000,460 Class A ordinary shares and 20,325,926 Class B ordinary shares, together totaling 22,326,386.[56]

187. These internally inconsistent disclosures, which appear to count Sharifah Noriati's 185,185-share conversion on the Class A side, to omit Ping Ping Lim's 377,775 shares from both classes, and to count a post-period conversion on the Class B side, further demonstrate that Concorde's public share reporting and its disclosure controls could not reliably account for the very insider-affiliated shares whose lockup and conversion status were material to the market, and support the inference that the omission of those holders from the lockup schedule was neither immaterial nor random.

188. Defendant Ong, as Concorde's Chief Financial Officer and principal financial officer, was responsible for the accuracy of the Company's financial reporting and signed and certified the Company's SEC filings, including the financial statements incorporated into the Registration Statement and Prospectus, and herself received Class B ordinary shares in the March 18, 2024 insider issuance. By virtue of her position and her responsibility for the Company's

[56] Concorde International Group Ltd., Unaudited Interim Condensed Consolidated Financial Statements as of June 30, 2025 (Form 6-K Ex. 99.1) (Sep. 29, 2025), Note 15 (Equity); Concorde International Group Ltd., Annual Report (Form 20-F) (May 12, 2026).

financial reporting, Ong knew or recklessly disregarded that the Company's reported financial results and its disclosures concerning its financial condition, its internal controls over financial reporting, and its capital structure were materially false and misleading.

189. The inference of scienter is further supported by Defendants' continued promotion of Concorde in the face of mounting and public warnings that Concorde was the vehicle of a pump-and-dump scheme. As alleged herein, the *Wall Street Journal*, *TradeInformer*, and *The Bear Cave* publicly identified Concorde as a fraud, brokers such as DEGIRO restricted trading in Concorde as a suspected fraud, and the SEC Cross-Border Task Force, FINRA, and Nasdaq each warned of exactly the category of foreign manipulation that Concorde exhibited. The Department of Justice had indicted the executives of Ostin Technology Group for an identical scheme, and the PCAOB had sanctioned Ostin's auditor for knowing violations of auditing standards. Defendants nonetheless proceeded with and continued to promote the Concorde offering and made no effort to warn investors, demonstrating at a minimum reckless disregard for the truth.

190. The extent of the fraud alleged herein is enormous in magnitude, going to the very legitimacy of Concorde's public offering and its use as a vehicle for market manipulation. A scheme of this scope and character, in which the Company's initial public offering was structured with a deliberately tiny float to enable a pump-and-dump, and in which Concorde's share price ran from the $4.00 offering price to an intraday high of $31.06 and then collapsed below $1.00, could not have been overlooked by Defendants absent intent or recklessness, particularly by the officers and directors who structured the offering and by the gatekeepers who brought Concorde to market and vouched for its disclosures. The magnitude and character of the fraud, which bring the legitimacy of Concorde's offering into question, themselves support a strong inference of scienter.

191. The inference of scienter is further bolstered by Concorde's own acknowledgment of its internal-control deficiencies. In its offering materials, Concorde disclosed that it lacked effective internal controls over financial reporting and warned that this deficiency "may affect [its] ability to accurately report [its] financial results or prevent fraud. . . ." The Individual Defendants, who controlled the Company's financial reporting and certified its SEC filings, knew or recklessly disregarded that Concorde's internal controls over financial reporting were not effective, a deficiency so fundamental, and so directly connected to the accuracy of the financial statements and disclosures at issue, that it further supports a strong inference of scienter.

192. The inference of scienter is further supported by the departures of Individual Defendants in the months following the collapse of Concorde's share price. As Concorde disclosed in its annual report, Defendant Ong resigned as the Company's Chief Financial Officer effective November 5, 2025, and Defendant Yap resigned from the Company's Board of Directors effective November 9, 2025, in each case within approximately four months of the July 2025 collapse and the public reports identifying Concorde as the vehicle of a pump-and-dump scheme. The resignations of the Company's principal financial officer and of a director in close proximity to the collapse and to the emergence of the fraud, considered together with the other facts alleged herein, further support a strong inference of scienter.

193. Defendant Kreit and Chiu acted with scienter, or at a minimum with reckless disregard, in issuing clean, unqualified audit opinions on the financial statements incorporated into the offering, for the reasons set forth in the auditor allegations above. Kreit and Chiu's audits concerned Concorde's core financial reporting, it had continuous access to the Company's books, records, and personnel, and it was compensated for its work. Kreit and Chiu had itself concluded, one year before the IPO, that there was substantial doubt about Concorde's ability to continue as

a going concern, and its own PCAOB inspection record reflected deficiencies in testing identified fraud risks in revenue and journal entries. Together with the red flags identified above, these facts support a strong inference that Kreit and Chiu associated its clean opinions with Concorde's financial statements with at least reckless disregard for their accuracy.

194. The inference of Kreit and Chiu's scienter is further supported by the specific facts set forth in the auditor allegations above. The same engagement partner, Ankur Sharma, led both consecutive Concorde audits, so that the accumulated red flags could not be attributed to unfamiliarity with the client. The firm's managing partner, Steven Kreit, had personally represented to the PCAOB, approximately eight months before the first Concorde opinion, that the firm was remediating the categories of audit-quality deficiency that its Concorde audits then exhibited, and he personally certified the firm's Form AP filings for both Concorde audit cycles. Kreit and Chiu holds itself out as possessing expertise in public-company audits, initial public offerings, reverse mergers, and internal-control compliance under Section 404 of the Sarbanes-Oxley Act, making its failure to detect basic audit-risk and internal-control problems at Concorde less plausibly the product of mere inadvertence. Kreit and Chiu was economically dependent on its issuer-audit practice, deriving approximately 98% of its total fees from audit services billed to issuer-audit clients, and it billed Concorde audit fees of approximately $312,772, $183,750, and $312,000 for the 2022, 2023, and 2024 fiscal years, or approximately $808,522 in the aggregate. The audited 2024 financial statements contained a facially impossible subsequent-events review period, reflecting inadequate final review. And Kreit and Chiu audited and publicly promoted a near-contemporaneous foreign issuer, MCTR, that the Department of Justice has alleged was manipulated in the same manner and during the same period as Concorde. Considered together, these facts support a strong inference that Kreit and Chiu acted with conscious disregard of the

risk that the financial statements it certified were materially misleading and that the Concorde offering was being used as a vehicle for manipulation. The accumulation of personal notice, engagement continuity, professed expertise, economic dependence, a concrete review failure, and the near-contemporaneous comparator renders the inference of Kreit and Chiu's conscious disregard at least as compelling as any competing innocent explanation.[57]

195. Defendant R.F. Lafferty likewise acted with scienter, or at a minimum with reckless disregard, for the reasons set forth in the underwriter allegations above, including its identification as an underwriter of numerous other offerings that later became the subject of pump-and-dump campaigns, which put R.F. Lafferty on notice of the heightened risk that Concorde's low-float foreign IPO presented.

196. The inference of scienter as to R.F. Lafferty is further supported by the totality of the facts set forth in the underwriter allegations above. R.F. Lafferty was engaged as Concorde's sole underwriter for 469 days, acted through its Chief Operating Officer, Robert Hackel, and committed to purchase the entire offering. It accepted an Underwriting Agreement warranting that the lockup schedule listed every holder of securities convertible into ordinary shares, yet that schedule omitted two insider-affiliated Class B holders, Ping Ping Lim and Sharifah Noriati, whose omitted blocks of 377,775 and 185,185 shares exactly matched the 562,960 Class B shares that converted into freely tradable Class A shares twenty-four days before the collapse. The Underwriting Agreement gave R.F. Lafferty contractual rights to monitor Concorde's capitalization, transfers, publicity, and trading. R.F. Lafferty's controlling owner had been personally designated to certify the firm's remediation of the very promotion-and-liquidation red

---

[57] Concorde International Group Ltd., Annual Report (Form 20-F) (May 15, 2025) (audit fees for fiscal years 2022-2024); Kreit & Chiu CPA LLP, Annual Report (PCAOB Form 2), Reporting Year 2024, Item 3.2(a)(1) (June 25, 2024) (fee concentration).

flags that Concorde later presented. And, according to the Department of Justice, a materially similar low-float foreign scheme arising out of an offering that Robert Hackel signed for R.F. Lafferty was in its promotion-and-dump phase approximately five weeks before Concorde collapsed. Considered together, these facts support a strong inference that R.F. Lafferty acted with conscious disregard of the risk that the Concorde offering was being used as a vehicle for manipulation. The specificity of the matching omissions and conversion, the contractual monitoring rights, the owner-level notice, and the near-contemporaneous and materially similar MCTR scheme together render the inference of R.F. Lafferty's conscious disregard at least as compelling as any competing innocent explanation. The knowledge and conduct of R.F. Lafferty alleged herein were those of the firm acting through its president and controlling owner, Defendant Henry Hackel, and its Chief Operating Officer, Robert Hackel, who directed and executed R.F. Lafferty's participation in the Concorde offering.

197. Each of the Underwriter and Auditor Defendants was compensated, directly or indirectly, in connection with the Concorde IPO, and each was thereby motivated to lend its imprimatur to the offering without performing the due diligence and audit procedures necessary to ensure the accuracy and legitimacy of Concorde's disclosures, operations, and financial statements. As alleged herein, R.F. Lafferty and Kreit and Chiu had each previously participated in offerings of similar foreign issuers whose securities later experienced extreme volatility and collapse consistent with market manipulation, such that each was on notice of, or recklessly disregarded, the heightened risk that Concorde's low-float foreign IPO presented. The Individual Defendants, in turn, as the lead executives who retained these gatekeepers, knew or should have known that R.F. Lafferty and Kreit and Chiu had such track records, further supporting the inference of scienter.

198. Defendant Cogency, acting through its Senior Vice President Defendant Colleen A. De Vries, executed the signature of Concorde's duly authorized representative in the United States on each of the six publicly filed versions of Concorde's Form F-1 registration statement, comprising the original registration statement filed August 27, 2024, and Amendment Nos. 1 through 5 filed between September 18, 2024, and January 7, 2025. Section 6(a) of the Securities Act required Concorde, as a foreign private issuer, to obtain that signature from its duly authorized United States representative in order to register and sell its securities in the United States, and Section 11(a)(1) of the Securities Act subjects every person who signs a registration statement to liability for the material misstatements and omissions it contains. Cogency's signature was thus not a single ministerial act, but a repeated course of conduct, undertaken six times over more than four months, that was necessary to the registration and sale of Concorde's securities.

199. Cogency and De Vries had performed the same duly-authorized-representative function for other foreign issuers, including China Liberal Education Holdings Limited and Ostin Technology Group Co., Ltd., whose securities the Department of Justice later charged were the subject of pump-and-dump schemes. The Department of Justice announced charges concerning China Liberal Education on March 21, 2025, 10 days before Concorde's registration statement was declared effective on March 31, 2025, and announced charges concerning Ostin Technology on September 10, 2025. Notwithstanding those developments, Cogency continued to serve as Concorde's duly authorized United States representative after the July 10, 2025 collapse of Concorde's stock: on October 30, 2025, 112 days after the collapse and 50 days after the Ostin charges, Cogency, again acting through De Vries, signed a Form S-8 registration statement for Concorde that registered 4,632,648 Class A ordinary shares under Concorde's 2025 equity incentive plan, an amount equal to approximately 203.7% of the 2,274,356 Class A shares then

reported outstanding. Cogency's status as a repeat provider of the duly-authorized-representative signature to foreign issuers of this kind demonstrates it was aware of the fraudulent scheme or recklessly disregarded it.

200. The inference of scienter is further and independently supported by the extensive comment-letter correspondence between the Staff of the SEC's Division of Corporation Finance and Concorde during the registration of the offering. Between April 16, 2024 and January 6, 2025, the Staff issued no fewer than seven comment letters concerning Concorde's draft and filed registration statements, and Concorde, through Defendant Chua, submitted a written response to each. That correspondence placed the Individual Defendants on direct and repeated notice of the specific deficiencies in Concorde's disclosures and financial reporting that are alleged herein, in the months before the offering closed and the Class Period began.

201. Most significantly, the comment process establishes that Concorde's insiders understood that the supervoting shares they had issued to themselves and their affiliates carried a fair value of tens of millions of dollars, and not the nominal $208 at which Concorde had originally recorded them. In a comment letter dated November 19, 2024, the Staff observed that Concorde had "issued 20,788,886 Class B Ordinary Shares to members of the Board, executive officers or their affiliates and existing shareholders, for total consideration of $208," and directed Concorde to explain how it had accounted for the issuance and "determined the fair value" of those shares. Only in response to that comment did Concorde, on November 26, 2024, revise its interim financial statements to recognize $83,155,336 of share-based compensation for those shares, based on the $4.00 expected offering price. When the Staff further directed, on December 10, 2024, that the correction be presented as a formal restatement under IAS 8 and that the affected financial-statement columns be relabeled "restated," Concorde did so and, at the Staff's insistence, disclosed

the material weaknesses that had "contributed to the restatement." That Concorde recognized an $83 million expense, and disclosed the associated material weaknesses, only after being compelled to do so by the Staff supports a strong inference that the Individual Defendants knew, or recklessly disregarded, that the insider share issuance and the Company's financial reporting had been materially misstated.

202. The comment process also placed Defendants on notice that Concorde's description of its financial condition and market position was misleading. As early as April 16, 2024, the Staff noted that Concorde's "financial statements reflect net losses," that its "auditor has expressed doubt about [its] ability to continue as a going concern," and directed Concorde to address, "if true, that to date [it had] not achieved profitability." The Staff separately directed Concorde to "clarify the basis for [its] belief" that it was one of the "leading integrated security services providers in Singapore," and to revise the passages, including in the prospectus summary and business sections, that described Concorde as "the leader" in the markets it served. Notwithstanding this notice, Concorde and the Individual Defendants continued to describe the Company as the "leading" integrated security services provider in the Offering Documents and in the Class Period press releases quoted above.

203. The Staff likewise repeatedly questioned the reliability of the revenue figures on which Concorde's growth narrative depended. In both its April 16, 2024, and July 10, 2024 letters, the Staff observed that Concorde's disclosure that its I-Guarding Services revenue, which Concorde represented to be approximately 99% of its total revenue, was recognized "at a point in time" was inconsistent with Concorde's own financial-statement table showing that a majority of that revenue was recognized "over time," and inconsistent with Concorde's disclosure that the substantial majority of its revenue was generated by annual recurring contracts, and directed

Concorde to reconcile these disclosures. The Staff also required Concorde to add the controlled-company disclosures and a controlled-company risk factor that Concorde had omitted from its initial submission. These facts confirm that the disclosures concerning Concorde's revenue, profitability, market position, and control structure that are alleged herein to be materially false and misleading were the subject of specific and repeated Staff scrutiny, of which the Individual Defendants were aware.

204. Scienter is also supported by the fact that the SEC invoked FOIA's Exemption 7(A), which reflects that the SEC maintained law enforcement records concerning both R.F. Lafferty and Kreit and Chiu as of mid-2026.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

205. The market for Concorde's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Concorde's securities traded at artificially inflated prices during the Class Period. On July 9, 2025, the Company's share price reached a Class Period high of $31.06 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Concorde's securities and market information relating to the Company, and have been damaged thereby.

206. During the Class Period, the artificial inflation of Concorde's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Concorde's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Concorde and its business,

operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

207. At all relevant times, the market for Concorde's securities was an efficient market for the following reasons, among others:

a. Concorde shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. as a regulated issuer, Concorde filed periodic public reports with the SEC and/or the NASDAQ;

c. Concorde regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Concorde and its securities were the subject of publicly available IPO coverage, financial-news reports, market-movement updates, and investment commentary disseminated through financial-news, investment-information, and brokerage platforms, including Renaissance Capital, Seeking Alpha, IPO Scoop, Investing.com, Dow Jones, The Fly, Benzinga, Proactive Investors, GuruFocus, TipRanks, StockTitan, Quiver Quantitative, and Tiger Brokers. These materials were publicly accessible to investors and disseminated into the marketplace.

208. As a result of the foregoing, the market for Concorde's securities promptly digested current information regarding Concorde from all publicly available sources and reflected such

information in Concorde's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Concorde's securities at artificially inflated prices and a presumption of reliance applies.

209. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

210. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Concorde who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

211. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Concorde securities between April 21, 2025, and July 14, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

212. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Concorde's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Concorde shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Concorde or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

213. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

214. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

215. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Concorde; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

216. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

217. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

218. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Concorde's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

219. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Concorde's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

220. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Concorde's financial well-being and prospects, as specified herein.

221. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Concorde's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Concorde and its business operations and future prospects in light

of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

222. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

223. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Concorde's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

224. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Concorde's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Concorde's securities during the Class Period at artificially high prices and were damaged thereby.

225. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Concorde was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Concorde securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

226. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

227. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Scheme Liability)**
**Against All Defendants**

228. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Claim does not depend on, and is not limited to, any false or misleading statement, and is asserted based on the manipulative and deceptive acts, practices, and course of business alleged herein.

229. During the Class Period, Defendants Concorde, Chua, Ong, Yap, Brisson, R.F. Lafferty, Kreit and Chiu, and Cogency (collectively, for purposes of this Claim, the "Scheme Defendants"), directly or indirectly, in connection with the purchase or sale of Concorde securities, by the use of the means or instrumentalities of interstate commerce, the mails and wires, or the facilities of a national securities exchange, knowingly or with reckless disregard: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon Plaintiff and the Class.

230. The scheme was not carried out through false statements alone. It was executed through a coordinated course of manipulative and deceptive conduct designed to bring Concorde public through an initial public offering structured with a deliberately low public float; to generate the false appearance of legitimate supply and demand for Concorde shares through coordinated social media promotion; to artificially inflate the price and trading volume of Concorde securities; and to enable the coordinated dumping of those shares into an artificially inflated market at the expense of Plaintiff and the Class.

231. Concorde and the Individual Defendants participated in and executed the scheme by conducting the April 21, 2025 initial public offering, which was structured with a low public float that was purposefully designed to enable the pump-and-dump of Concorde's shares; by issuing, authorizing, and disseminating press releases and other communications that touted the Company and its prospects without a legitimate basis in the Company's actual operations or financial condition; and by concealing the true nature, mechanics, and purpose of the offering and the coordinated promotion of Concorde shares, so that the shares would remain available for sale into the market during the execution of the scheme.

232. R.F. Lafferty participated in and executed the scheme by serving as the sole book-running manager and underwriter for the offering; by causing the offering documents to be filed with the SEC and declared effective so that Concorde shares could be sold into the public market; by conducting and promoting the offering while purporting to have performed an adequate and reasonable due diligence investigation; and by exercising its over-allotment option, all of which lent the appearance of legitimacy necessary to place and sell Concorde shares, consistent with R.F. Lafferty's identified pattern of underwriting numerous offerings that later became the subject of pump-and-dump campaigns.

233. Kreit and Chiu participated in and executed the scheme by issuing unqualified audit opinions on the financial statements incorporated into the offering, and by permitting the incorporation of those opinions into the Registration Statement, Prospectus, and other Class Period filings, which created the appearance of legitimacy necessary to register and sell Concorde shares and to sustain trading in Concorde securities while the scheme was carried out, when Kreit and Chiu knew or recklessly disregarded that the financial statements were not prepared in conformity

with IFRS or the standards of the PCAOB and that the offering was a vehicle for the scheme alleged herein.

234. Cogency participated in and executed the scheme by serving as the Company's agent for service of process for the offering and by facilitating the issuance of Concorde securities by way of the Registration Statement and Prospectus, thereby enabling the fraudulent offering to proceed and Concorde shares to be placed into the market during the execution of the scheme.

235. Each of the Scheme Defendants engaged in the conduct alleged in this Claim knowingly or with reckless disregard for the truth, and for the purpose and with the effect of artificially inflating the price and trading volume of Concorde shares and concealing the true nature, mechanics, and purpose of the scheme from Plaintiff and the Class.

236. As a direct and proximate result of the manipulative and deceptive conduct alleged in this Claim, the price and trading volume of Concorde shares were artificially inflated during the Class Period, and the artificial inflation was removed when the scheme could no longer be sustained, causing the losses suffered by Plaintiff and the Class.

237. Plaintiff and the Class were ignorant of the scheme and the manipulative and deceptive acts and practices alleged herein. Plaintiff and the Class purchased Concorde shares in reliance on the integrity of the market price of those shares. Had Plaintiff and the Class known of the scheme, they would not have purchased Concorde shares, or would not have done so at the artificially inflated prices they paid.

238. By virtue of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

239. As a direct and proximate result of the Scheme Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases and sales of Concorde shares during the Class Period.

**THIRD CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants and Defendant Hackel**

240. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

241. Individual Defendants acted as controlling persons of Concorde within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

242. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

243. As set forth above, Concorde and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

244. Defendant Hackel acted as a controlling person of R.F. Lafferty within the meaning of Section 20(a) of the Exchange Act. By virtue of his position as President and his ownership of 75% or more of R.F. Lafferty, and his authority to direct the management and policies of the firm, Hackel had the power to influence and control, and did influence and control, directly or indirectly, the conduct of R.F. Lafferty, including its participation as underwriter for the Concorde offering and the acts and omissions alleged herein. As set forth above, R.F. Lafferty violated Section 10(b) and Rule 10b-5 as alleged in the First and Second Claims. By virtue of his position as a controlling person, Hackel is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Hackel's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**FOURTH CLAIM**
**Violation of Section 11 of the Securities Act**
**Against All Defendants**

245. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except that, for purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Claim is based solely on strict liability and negligence under Section 11 of the Securities Act.

246. This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This Claim does not sound in fraud and does not allege, and does not depend upon any allegation of, fraudulent intent or scienter, which are not elements of a claim under Section 11 of the Securities Act.

247. The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein, as alleged above.

248. Defendant Concorde, as the issuer of the securities sold in the offering, is strictly liable to Plaintiff and the Class for the material misstatements and omissions in the Registration Statement, regardless of fault. The remaining Defendants named in this Claim are liable under Section 11 unless they prove that, after a reasonable investigation, they had reasonable grounds to believe, and did believe, that the statements in the Registration Statement were true and not misleading.

249. The Individual Defendants signed, or authorized the signing of, the Registration Statement and were directors or senior officers of Concorde at the time of the offering. The Individual Defendants participated in the preparation, review, approval, and issuance of the Registration Statement and caused Concorde securities to be offered and sold to the investing public pursuant thereto. Each of the Individual Defendants had a duty to conduct a reasonable and diligent investigation of the truthfulness and completeness of the statements contained in the Registration Statement, and to ensure that it did not omit material facts required to be stated therein or necessary to make the statements therein not misleading.

250. Defendant R.F. Lafferty served as the sole firm-commitment underwriter and representative underwriter for the offering and qualifies as an underwriter within the meaning of Section 2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11). R.F. Lafferty participated in the solicitation, offering, distribution, and sale of Concorde securities to the investing public pursuant to the Registration Statement. As underwriter, R.F. Lafferty had a duty to conduct a reasonable and diligent investigation of the truthfulness and completeness of the Registration Statement,

including the offering-specific risks created by Concorde's deliberately small public float and concentrated insider control and by R.F. Lafferty's own underwriting, allocation, and distribution of the Concorde shares. Had R.F. Lafferty conducted such an investigation, it would have discovered the material misstatements and omissions alleged herein.

251. Defendant Kreit and Chiu was the independent registered public accounting firm that audited and certified the financial statements included in the Registration Statement and consented to the inclusion of its audit report therein. Kreit and Chiu is liable under Section 11 as an expert for the portions of the Registration Statement purporting to be made upon its authority as an expert, namely the audited financial statements it certified. Kreit and Chiu had a duty to conduct a reasonable investigation and to possess reasonable grounds to believe that the financial statements it certified were true and did not omit material facts, and it failed to do so.

252. Defendant Cogency served as Concorde's authorized United States representative and agent for service of process in connection with the Registration Statement, was identified in the Registration Statement, and participated in the United States registration process that allowed Concorde, a foreign private issuer, to access the U.S. public markets through the offering. To the extent Cogency signed, authorized, consented to, or otherwise caused the filing and effectiveness of the Registration Statement in its capacity as Concorde's authorized United States representative, Cogency is liable under Section 11 of the Securities Act.

253. None of the Defendants named herein, other than Concorde as issuer, made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material facts, and were not misleading. Had these Defendants conducted a reasonable investigation and exercised

reasonable care, they would have known of the material misstatements and omissions alleged herein.

254. The material misstatements and omissions alleged in this Claim concerned existing facts and then-existing conditions and risks at the time of the offering, including the structure of the offering, the size of the public float, the concentration of insider voting control, and the Company's financial condition and internal controls over financial reporting. They were not forward-looking statements, and the omitted facts were not identified as forward-looking in the Registration Statement. Accordingly, no statutory safe harbor or bespeaks-caution doctrine applies to the claims asserted in this Claim.

255. By reason of the conduct alleged herein, each Defendant violated, or controlled a person who violated, Section 11 of the Securities Act.

256. Plaintiff acquired Concorde securities pursuant or traceable to the Registration Statement.

257. Plaintiff and the Class have sustained damages. The value of Concorde securities declined substantially subsequent to and as a result of Defendants' violations, and Concorde's share price has traded below $1.00 for over 30 days.

258. Loss causation is not an element of Plaintiff's and the Class's claims under Section 11 of the Securities Act. To the extent any Defendant contends that all or any portion of the decline in the value of Concorde securities resulted from factors other than the material misstatements and omissions in the Registration Statement, that contention is an affirmative defense of negative causation under Section 11(e) of the Securities Act, 15 U.S.C. §77k(e), on which the Defendant bears the burden of proof. In any event, and without assuming any burden that the law places on Defendants, the decline in the value of Concorde securities resulted from the materialization of the

conditions and risks that the Registration Statement misstated or omitted, including Concorde's deliberately small public float, the concentration of insider voting control, and the Company's financial condition, going-concern doubt, and material weaknesses in internal control over financial reporting, and not from any unrelated market, industry, or macroeconomic factor.

259. At the time of their purchases of Concorde securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Claim is based to the time this action was commenced. Less than three years have elapsed between the time the securities upon which this Claim is brought were offered to the public and the time this action was commenced.

**FIFTH CLAIM**
**Violation of Section 15 of the Securities Act**
**<u>Against the Individual Defendants and Defendant Hackel</u>**

260. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except that, for purposes of this Claim, Plaintiff excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

261. This Claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants and Defendant Hackel.

262. The Individual Defendants were controlling persons of Concorde within the meaning of Section 15 of the Securities Act. By virtue of their positions as directors or senior officers of Concorde, and their ownership and contractual rights, participation in, and awareness of the Company's operations and the contents of the Registration Statement and Prospectus, the Individual Defendants each had the power to influence and control, and did influence and control,

directly or indirectly, the decision-making of the Company, including the content and dissemination of the Registration Statement and Prospectus.

263. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the violation of Section 11 of the Securities Act alleged herein, and exercised the same. The Individual Defendants were culpable participants in the violation of Section 11 of the Securities Act alleged in the Fourth Claim above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be completed.

264. By reason of the conduct alleged herein, and by virtue of their positions as controlling persons of Concorde, the Individual Defendants are jointly and severally liable with and to the same extent as Concorde for its violation of Section 11 of the Securities Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Concorde securities.

265. Defendant Hackel was a controlling person of R.F. Lafferty within the meaning of Section 15 of the Securities Act. By virtue of his position as President and his ownership of 75% or more of R.F. Lafferty, and his authority to direct the management and policies of the firm, Hackel had the power to influence and control, and did influence and control, R.F. Lafferty, including its conduct as an underwriter in connection with the Registration Statement and the Concorde offering. As set forth above, R.F. Lafferty violated Section 11 of the Securities Act as alleged in the Fourth Claim. By virtue of his position as a controlling person, Hackel is jointly and severally liable with and to the same extent as R.F. Lafferty for its violation of Section 11 of

the Securities Act. As a direct and proximate result of Hackel's wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Concorde securities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: August 14, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *John T. Jasnoch*
John T. Jasnoch (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Sean T. Masson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave, 24th Floor

New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
smasson@scott-scott.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ John T. Jasnoch*
John T. Jasnoch